# EXHIBIT 1

Code Name: "NYPE 93"
Recommended by:
The Baltic and International Maritime Council (BIMCO)
The Federation of National Associations of
Ship Brokers and Agents (FONASBA)

# TIME CHARTER

### New York Produce Exchange Form
### Issued by the Association of Ship Brokers and Agents (U.S.A.), Inc.

November 6th, 1913 - Amended October 20th, 1921; August 6th, 1931; October 3rd, 1946;
Revised June 12th, 1981; September 14th 1993.

| | |
|---|---|
| **THIS CHARTER PARTY**, made and concluded in *Singapore*...............…………...………………………………. | 1 |
| this ………………………………….30ᵗʰ day of *June, 2017*…………………………………………………19 | 2 |
| Between *Amis Integrity S.A. MMG Tower, 23rd Floor, Ave. Paseo Del Mar, Costa Del Este, Panama City, Panama as* | 3 |
| *Head* **Owners** *and Wisdom Marine Lines S.A., 711, No. 237, Sec.2, Fu-Hsing S. Road, Taipei 106, Taiwan Republic of* | 4 |
| *China as Manager* | 5 |
| of the Vessel described below, and *24Vision Chartering Solutions DMCC, One JLT-05-93, One JLT, Plot No.:* | 6 |
| *DMCC-EZ1-1AB, Jumeirah Lake Towers, Dubai, United Arab Emirates* | 7 |
| **as Charterers.** | 8 |

**Description of Vessel**   9

| | |
|---|---|
| Name *MV "AMIS INTEGRITY"* ………………….. ~~Flag ……… ………..Built~~ ….......................................... ~~(year).~~ | 10 |
| ~~Port and number of Registry~~ ................................................................................................................ | 11 |
| ~~Classed................................................................in..........................................................................~~ | 12 |
| ~~Deadweight ……………………long\*/metric\* tons (cargo and bunkers, including freshwater and~~ | 13 |
| ~~stores not exceeding ………………… long\*/metric\* tons) on a salt water draft of.................................~~ | 14 |
| ~~on summer freeboard.~~ | 15 |
| ~~Capacity ……….....................cubic feet grain.................................................cubic feet bale space.~~ | 16 |
| ~~Tonnage …...........................................GT/GRT.~~ | 17 |
| ~~Speed about .......................................knots, fully laden, in good weather conditions up to and including maximum~~ | 18 |
| ~~Force ............................on the Beaufort wind scale, on a consumption of about .............................long\*/metric\*~~ | 19 |
| ~~tons of……………………………………………….~~ | 20 |

*\* Delete as appropriate.*   21
~~*For further description See Clause 46.*~~ *see Appendix "A" (if applicable)*   22

**1.    Duration**   23

The Owners agree to let and the Charterers agree to hire the Vessel from the time of delivery for a period   24
~~of~~ *about 6 to about 8 months' period, about meaning 15 days more or less in Charterer's option, always trading via safe*   25
*port(s), safe berth(s) and safe anchorage(s), always within International Navigation Limits, in/out geographical rotation,*   26
*always afloat, not always afloat but safely aground allowed - refer to NAABSA Clause. Charterers' option for an*   27
*additional about 6 to about 8 months period, about meaning 15 days more or less in Charterers' option and hire for this*   28
*period to be US$ 11,600.00 (Eleven Thousand Six Hundred United States dollars) daily including over time.*

*Optional declaration:*
*Option to be declared latest by 14ᵗʰ January 2018. (Charterers need to tender first redelivery notice / 35 days' redelivery*
*notice if Charterers' intend to redeliver the Vessel before 14ᵗʰ January 2018). New hire / period to commence on first*
*minute / first day of the 7th month and 15 days. If Charterers have already sent any redelivery notices in line with the*
*agreed prevailing Charter Party terms, then optional period will become void.*

**2.    Delivery**   29

The Vessel shall be placed at the disposal of the Charterers ~~at~~ *on dropping last outward sea pilot ex yard Imabari at*   30

*any time day or night, Sundays and Holidays included, but excluding Red Sea, Aden-PMO range, at any time day or* 31
*night, Sundays and Holidays included.* ……………………………………………………………………….… 32
..................................................................................*The Vessel on arrival first load port* ~~The Vessel on her delivery~~ 33
shall be ready to receive cargo with clean-swept holds and tight, staunch, strong and in every way fitted 34
for ordinary cargo service, having water ballast and with sufficient power to operate all cargo-handling gear 35
simultaneously. 36

The Owners shall give the Charterers not less than *15,10,7,5*............ days' *approximate*. notice of expected date of 37
delivery *and 3, 2 and 1 day(s)' definite notice of date and time and place for delivery*. 38

## 3.    On-Off Hire Survey 39
40

*Prior to delivery and redelivery, the parties shall, unless otherwise agreed, jointly appoint one (1) surveyor, who shall*
*conduct joint on-hire/off-hire surveys, for the purpose of ascertaining quantity of bunkers on board and the condition*
*of the Vessel. A report shall be prepared on each occasion and signed by the surveyor and on-hire survey shall be on*
*Owners' time and off-hire survey on Charterers' time. Both parties hereto shall equally share the cost and expense*
*for the said inspection.*

~~Prior to delivery and redelivery, the parties shall, unless otherwise agreed, each appoint surveyors, for their~~
~~respective accounts, who shall not later than at first loading port/last discharging port respectively, conduct~~ 41
~~joint on-hire/off-hire surveys, for the purpose of ascertaining quantity of bunkers on board and the condition~~ 42
~~of the Vessel. A single report shall be prepared on each occasion and signed by each surveyor, without~~ 43
~~prejudice to his right to file a separate report setting forth items upon which the surveyors cannot agree.~~ 44
~~If either party fails to have a representative attend the survey and sign the joint survey report, such party~~ 45
~~shall nevertheless be bound for all purpose by the findings in any report prepared by the other party.~~ 46
~~On-hire survey shall be on Charterers' time and off-hire survey on Owners' time.~~ 47

## 4.    Dangerous Cargo/Cargo Exclusions 48

(a) The Vessel shall be employed in carrying lawful merchandise excluding any goods of a dangerous, 49
injurious, flammable or corrosive nature. unless carried in accordance with the requirements or 50
recommendations of the competent authorities of the country of the Vessel's registry and of ports of 51
shipment and discharge and of any intermediate countries or ports through whose waters the Vessel must 52
pass. Without prejudice to the generality of the foregoing, in addition the following are specifically 53
excluded: livestock of any description, arms, ammunition, explosives, nuclear and radioactive materials, 54
*see Clause 49.* ……………………………………………………………………………………………. 55
……………………………………………………………………………………………………………. 56
……………………………………………………………………………………………………………. 57
……………………………………………………………………………………………………………. 58
……………………………………………………………………………………………………………. 59
……………………………………………………………………………………………………………. 60
……………………………………………………………………………………………………………. 61
……………………………………………………………………………………………………………. 62
……………………………………………………………………………………………………………. 63
……………………………………………………………………………………………………………. 64

~~(b) If IMO-classified cargo is agreed to be carried, the amount of such cargo shall be limited to~~ 65
~~.................................... tons and the Charterers shall provide the Master with any evidence he may~~ 66
~~reasonably require to show that the cargo is packaged, labelled, loaded and stowed in accordance with IMO~~ 67
~~regulations, failing which the Master is entitled to refuse such cargo or, if already loaded, to unload it at~~ 68
~~the Charterers' risk and expense.~~ 69

## 5.    Trading Limits 70

The Vessel shall be employed in such lawful trades between safe ports and safe places, 71
within *see Clause 50.* …………………………………………………………………………………… 72

…………………………………………………………………………………………………………………excluding     73
……………………………………………………………………………………………………………………………     74
…………………………………………………………………………………………………………………………………     75
……………………………………………………………………………………………………..……as the Charterers shall direct.     76

## 6.     Owners to Provide     77

The Owners shall provide and pay for the insurance of the Vessel, except as otherwise provided, and for     78
all provisions, cabin, deck, engine-room and other necessary stores, including boiler water; shall pay for     79
wages, consular shipping and discharging fees of the crew and charges for port services pertaining to the     80
crew shall maintain the Vessel's class and keep her in a thoroughly efficient state in hull, machinery and equipment     81
for and during the service and have a full complement of officers and crew.     82

## 7.     Charterers to Provide     83

The Charterers, while the Vessel is on hire, shall provide and pay for all the bunkers except as otherwise     84
agreed; shall pay for port charges (including compulsory watchmen and cargo watchmen and compulsory     85
garbage disposal), all communication expenses pertaining to the Charterers' business at cost, pilotages,     86
towages, agencies, commissions, consular charges (except those pertaining to individual crew members     87
of flag of the Vessel), and all other usual expenses except those stated in Clause 6, but when the Vessel     88
puts into a port for causes for which the Vessel is responsible (other than by stress of weather), then all     89
such charges incurred shall be paid by the Owners. Fumigations ordered because of illness of the crew     90
shall be for Owners' account. Fumigations ordered because of cargo carried or ports visited while     91
the Vessel is employed under this Charter Party shall be for the Charterers' account. All other fumigations     92
the Charterers' account after the Vessel has been on Charter for continuous shall be for period of six months     93
or more.     94

The Charterers shall provide and pay for necessary dunnage and also any extra fittings requisite for a     95
special trade or unusual cargo, but the Owners shall allow them the use of any dunnage already aboard     96
the Vessel. Prior to redelivery the Charterers shall remove their dunnage and fittings at their cost, and in     97
their time. *Local agent(s) appointed and employed by Charterers is responsible to retrieve information from the Vessel     98
and to report/file all necessary information to the local/port authority. In no case, will Owners/Vessel be held liable
for the failure of insufficient reporting / filing unless Master has failed to furnish the specific information requested
by agent(s).*

## 8.     Performance of Voyages     99

(a) The Master shall perform the voyages with due despatch, and shall render all customary assistance     100
with the Vessel's crew.  The Master shall be conversant with the English language and (although     101
appointed by the Owners) shall be under the orders and directions of the Charterers as regards     102
employment and agency; and the Charterers shall perform all cargo handling, including but not limited to     103
loading, stowing, trimming, lashing, securing, dunnaging, unlashing, discharging, and tallying, at their risk     104
and expense, under the supervision of the Master.     105

(b) If the Charterers shall have responsible cause to be dissatisfied with the conduct of the Master or     106
officers, the Owners shall, on receiving particulars of the complaint, investigate the same, and, if     107
necessary, make a change in the appointments.     108

## 9.     Bunkers     109
*Suggest bunkers on delivery quantities as is (sufficient to reach major near bunkering hub (Yeosu).
Prices both ends to be as per the price of voucher for actual purchase.*

*Owners' option to stem additional bunkers during final leg under this Charter Party provided no interference with
Charterers' operations. Charterer's option to supply RMF 25 in South Africa where RME not available. Charterers to
bunker the Vessel with fuel ISO 8217:2010 standards only. But Charterers are allowed to stem ISO 8217:2005
standards where ISO 8217: 2010 standards is not available or not available at competitive prices.*

*If and when the value of estimated bunkers on redelivery exceeds the value of the hire due up to the Charter Party minimum period, Charterers have the right to deduct that excess from the hire payment(s). Same not to be considered as a notice of redelivery.*

(a) The Charterers on delivery, and the Owners on redelivery, shall take over and pay for all fuel and diesel oil remaining on board the Vessel as hereunder. The Vessel shall be delivered with:
…………………………………….long\*/metric\* tons of fuel oil at the price of ………………..per ton;………….
………………………………..tons of diesel oil at the price of …………………… per ton. The Vessel shall be redelivered with: …………………………... tons of fuel oil at the price of …….…………………….. per ton; ................………...... tons of diesel oil at the price of ……........................ per ton.

\* *Same tons apply throughout this Clause.*

(b) The Charterers shall supply bunkers of a quantity suitable for burning in the Vessel's engines and auxiliaries and which conform to the specification(s) as set out in *Clause 46.* Appendix A

The Owners reserve their right to make a claim against the Charterers for any damage to the main engines or the auxiliaries caused by the use of unsuitable fuels or fuels not complying with the agreed specification(s). Additionally, if bunker fuels supplied do not conform with the mutually agreed specification(s) or otherwise prove unsuitable for burning in the Vessel's engines or auxiliaries, the Owners shall not be held responsible for any reduction in the Vessel's speed performance and/or increased bunker consumption, nor for any time lost and any other consequences.

## 10.    Rate of Hire/Redelivery Areas and Notices

The Charterers shall pay for the use and hire of the said Vessel at the rate of *US$ 10,600.00 (Ten thousand Six Hundred United States Dollars) daily including over time.*

*Charterers' option for an additional about 6 to about 8 months period, about meaning 15 days more or less in Charterer's option, and hire for this period to be US$ 11,600.00 (Eleven Thousand Six Hundred United States Dollars) daily including over time.*

*Optional declaration:*
*Option to be declared latest by 14th January 2018. (Charterers need to tender first redelivery notice / 35 days' redelivery notice if Charterers' intend to redeliver the Vessel before 14th January 2018). New hire/period to commence on first minute/first day of the 7th month and 15 days.*

*If Charterers have already sent any redelivery notices in line with the agreed prevailing Charter Party terms, then optional period will become void,*
U.S. currency, daily, or $……...............................……….... U.S. currency per ton on the Vessel's total deadweight carrying capacity, including bunkers and stores, on ...............................................summer freeboard, per 30 days, commencing on and from the day of her delivery, as aforesaid, at and at and after the same rate for any part of a *day* month; hire shall continue until the hour of the day of her redelivery in like good order and condition, ordinary wear and tear excepted, to the Owners (unless Vessel lost) at *on dropping last outward sea pilot or passing one safe port Skaw - Passero range including United Kingdom / EIRE (excluding Baltic Sea / Black Sea / East of Cape Passero), or in Charterers' option passing Muscat outbound / Japan range (including full India, Pakistan, Sri Lanka, Bangladesh, Indonesia, full Malaysia, full Philippines excluding Red Sea / Aden Gulf / Somalia Area); in case Vessel trading to Persian Gulf then redelivery to be passing Muscat outbound, Boston / Buenos Aires range (including U.S. Gulf, Caribbean, North Coast South America) port in Charterer's option, at any time day or night, Sundays and Holidays included,* unless otherwise mutually agreed.

The Charterers shall give the Owners not less than *30 / 25 / 20 / 15 / 10 / 7* days' *approximate* notice of the Vessel's expected date and probable port of redelivery *and 3 / 2 / 1 day(s)' definite notice of redelivery.*

For the purpose of hire calculations, the times of delivery, redelivery or termination of Charter shall be adjusted to GMT.

*Local time to apply for delivery time and hire calculations to be in G.M.T.*

11.   **Hire Payment**                                                                                                    139

*First hire payment to be made within 3 banking days after Vessel's delivery; first hire to consist of 30 days plus bunkers value, second hire payment of 15 days to be paid 15 days after Vessel's delivery, thereafter payable every 15 days in advance.*

*Clarification: First hire payment will consist of an additional 15 days hire plus bunker value, to be considered as a safety Owners' comfort. Charterers will be allowed to deduct bunkers from the last sufficient hire payment(s) same towards end of the first maximum period or when intending to redeliver the Vessel. The additional 15 days hire will still remain once Charterers declare the optional year.*

(a)   *Payment*                                                                                                          140

Payment of Hire shall be made *to the Owners' nominated bank in United States Currency as per Clause 63* so as to    141
be received by the Owners or their designated payee in
……………………………………………………, viz…………………………………………………………………    142
………………………………………………………………………………………………………………………………    143
………………………………………………………………………………………………………………………………    144
……………………………………………………………………………………………………………………………in    145
…………………………………………………………currency, or in United States Currency, in funds available to the    146
Owners ~~on the due date~~, 15 days in advance, and for the last *15 days* ~~month~~ or part of same the approximate    147
amount of hire, and should same not cover the actual time, hire shall be paid for the balance day by day    148
as it becomes due, if so required by the Owners. Failing the punctual and regular payment of the hire,    149
or on any fundamental breach whatsoever of this Charter Party, the Owners shall be at liberty to    150
withdraw the Vessel from the service of the Charterers without prejudice to any claims they (the Owners)    151
may otherwise have on the Charterers.    152

At any time after the expiry of the grace period provided in Sub-Clause 11 (b) hereunder and while the    153
hire is outstanding, the Owners shall, without prejudice to the liberty to withdraw, be entitled to withhold    154
the performance of any and all of their obligations hereunder and shall have no responsibility whatsoever    155
for any consequences, thereof, in respect of which the Charterers hereby indemnify the Owners, and hire    156
shall continue to accrue and any extra expenses resulting from such withholding shall be for the    157
Charterers' account.    158

(b)   *Grace Period*                                                                                                     159

Where there is failure to make punctual and regular payment of hire due to oversight, negligence, errors    160
or omissions on the part of the Charterers or their bankers, the Charterers shall be given by the Owners    161
……*3 (three)*............ clear banking days (as recognized at the agreed place of payment) written notice to rectify the    162
failure, and when so rectified within those …….. *3 (three)*…… days following the Owners' notice, the payment shall    163
stand as regular and punctual.    164

Failure by the Charterers to pay the hire within …… *3 (three)* …… days of their receiving the Owners' notice as    165
provided herein, shall entitle the Owners to withdraw as set forth in Sub-Clause 11 (a) above.    166

(c)   *Last Hire Payment*                                                                                                167

Should the Vessel be on her voyage towards port of redelivery at the time the last and/or the penultimate    168
payment of hire is/are due, said payment(s) is/are to be made for such length of time as the Owners and    169
the Charterers may agree upon as being the estimated time necessary to complete the voyage, and taking    170
into account bunkers actually on board, to be taken over by the Owners and estimated disbursements for    171
the Owners' account before redelivery. Should same not cover the actual time, hire is to be paid for    172
the balance, day by day, as it becomes due. When the Vessel has been redelivered, any difference is to be    173
refunded by the Owners or paid by the Charterers, as the case may be.    174

(d)   *Cash Advances*                                                                                 175

Cash for the Vessel's ordinary disbursements**,** at any port may be advanced by the Charterers, as required     176
by the Owners, subject to 2.5 percent commission *in total* and such advances shall be deducted from the hire.     177
The Charterers, however, shall in no way be responsible for the application of such advances.         178

## 12.    Berths                                                                                     179

The Vessel shall be loaded and discharged in any safe dock or at any safe berth or safe place that     180
Charterers or their Agents may direct, provided the Vessel can safely enter, lie and depart always afloat     181
at any time of tide. *See also Clause 50.*                                                           182

## 13.    Spaces Available                                                                           183

(a)  The whole reach of the Vessel's holds, decks, and other cargo spaces (not more than she can     184
reasonably and safely stow and carry), also accommodations for supercargo, if carried, shall be at the     185
Charterers' disposal, reserving only proper and sufficient space for the Vessel's officers, crew, tackle,     186
apparel, furniture, provisions, stores and fuel.                                                     187

(b)    In the event of deck cargo being carried, the Owners are to be and are hereby indemnified by the     188
Charterers for any loss and/or damage and/or liability of whatsoever nature caused to the Vessel as a
result of the carriage of deck cargo and which would not have arisen had deck cargo not been loaded. *See*
*Clause 52*

## 14.    Supercargo and Meals                                                                       191

The Charterers are entitled to appoint a supercargo, who shall, accompany the Vessel at the Charterers'     192
risk and see that voyages are performed with due despatch. He is to be furnished with free     193
accommodation and same fare as provided for the Master's table, the Charterers paying at the rate of     194
*US$ 15.00*…………………………... per day.   The Owners shall victual pilots and customs officers, and also, when     195
authorized by the Charterers or their Agents, shall victual tally clerks, stevedore's foreman, etc.,     196
Charterers paying ~~at the rate of~~ ……….. *as per Clause 53*……….........… ~~per meal~~ for all such victualling.     197

## 15.    Sailing Orders and Logs                                                                    198

The Charterers shall furnish the Master from time to time with all requisite instructions and sailing     199
directions, in writing, in the English language, and the Master shall keep full and correct deck and engine     200
logs of the voyage or voyages, which are to be patent to the Charterers or their Agents, and furnish the     201
Charterers, their Agents or supercargo, when required, with a true copy of such deck and engine logs,     202
showing the course of the Vessel, distance run and the consumption of bunkers. Any log extracts     203
required by the Charterers shall be in the English language.                                         204

## 16.    Delivery/Cancelling                                                                        205

If required by the Charterers, time shall not commence before *12th July 2017 - 00:00 hours local time* and should the     206
Vessel not be ready for delivery on or before *30th July 2017 local time*….. but not later than..... *23:59*...... hours     207

*local time*, the Charterers shall have the option of cancelling this Charter Party.                 208

*Extension of Cancelling*                                                                            209

~~If the Owners warrant that, despite the exercise of due diligence by them, the Vessel will not be ready~~     210
~~for delivery by the cancelling date, and provided the Owners are able to state with reasonable certainty~~     211
~~the date on which the Vessel will be ready, they may, at the earliest seven days before the Vessel is~~
~~expected to sail for the port or place of delivery, require the Charterers to declare whether or not they will~~     213
~~cancel the Charter Party. Should the Charterers elect not to cancel, or should they fail to reply within two~~     214
~~days or by the cancelling date, whichever shall first occur, then the seventh day after the expected date~~     215

~~of readiness for delivery as notified by the Owners shall replace the original cancelling date. Should the~~ 216
~~Vessel be further delayed; the Owners shall be entitled to require further declarations of the Charterers in~~ 217
~~accordance with this Clause.~~ 218

**17.** **Off Hire** 219

In the event of loss of time from deficiency and/or default and/or strike of officers or crew, or deficiency 220
of stores, fire, breakdown of, or damages to hull, machinery or equipment, grounding, detention by the 212
arrest of the Vessel, (unless such arrest is caused by events for which the Charterers, their servants, 222
agents or subcontractors are responsible), or detention by average accidents to the Vessel or cargo unless 223
resulting from inherent vice, quality or defect of the cargo ~~or Charterers' direction~~, dry docking for the purpose of 224
examination or painting bottom, or by any other similar cause preventing the full working of the Vessel, the payment of 225
hire and overtime, if any, shall cease for the time thereby lost. Should the Vessel deviate or put back 226
during a voyage, contrary to the orders or directions of the Charterers, for any reason other than accident 227
to the cargo or where permitted in lines 257 to 258 hereunder, the hire is to be suspended from the time 228
of her deviating or putting back until she is again in the same or equidistant position from the destination 229
and the voyage resumed therefrom *(except for any rescue operation ordered by any Government or similar* 230
*governmental authority of its kind)*. All bunkers used by the Vessel while off hire shall be for the Owners' account. 
In the event of the Vessel being driven into port or to anchorage through stress of weather, 231
trading to shallow harbors or to rivers or ports with bars, any detention of the Vessel and/or expenses 232
resulting from such detention shall be for the Charterers' account. If upon the voyage the speed be reduced by 233
defect in, or breakdown of, any part of her hull, machinery or equipment, the time so lost, and 234
the cost of any extra bunkers consumed in consequence thereof, and all extra proven expenses may be 235
deducted from the hire. 236

**18.** **Sublet** 237

Unless otherwise agreed, the Charterers shall have the liberty to sublet the Vessel for all or any part of 238
the time covered by this Charter Party, but the Charterers remain responsible for the fulfillment of this 239
Charter Party. 240

**19.** **Drydocking** - *See Clause 67* 241

~~The Vessel was last drydocked ..................................................................................................................~~ 242

~~*(a) The Owners shall have the option to place the Vessel in drydock during the currency of this Charter~~ 243
~~at a convenient time and place, to be mutually agreed upon between the Owners and the Charterers, for~~ 244
~~bottom cleaning and painting and/or repair as required by class or dictated by circumstances.~~ 245

~~*(b) Except in case of emergency no drydocking shall take place during the currency of this Charter~~ 246
~~Party.~~ 247

~~* Delete as appropriate~~ 248

**20.** **Total Loss** 249

Should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or 250
being last heard of) shall be returned to the Charterers at once. *The act of God, enemies, fire, restraint of Princes,* 251
*Rulers and People, and all dangers and accidents of the Seas, Rivers, Machinery, Boilers and Steam Navigation, and*
*errors of Navigation throughout this Charter Party, always mutually excepted.*

**21.** **Exceptions** 252

The act of God, enemies, fire, restraint of princes, rulers and people, and all dangers and accidents of the 253
seas, rivers, machinery, boilers, and navigation, and errors of navigation throughout this Charter, always 254
mutually excepted.˷ 255

**22.      Liberties**                                                                                     256

The Vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist Vessels     257
in distress, and to deviate for the purpose of saving life and property.                                  258

**23.      Liens**                                                                                        259

The Owners shall have a lien upon all cargoes and all sub-freights and/or sub-hire for any amount due       260
under this Charter Party, including general average contributions, and the Charterers shall have a lien on   261
the Vessel for all monies paid in advance and not earned, and any overpaid hire or excess deposit to be     262
returned at once.                                                                                         263

The Charterers will not directly or indirectly suffer, nor permit to be continued, any lien or encumbrance,  264
Which might have priority over the title and interest of the Owners in the Vessel. The Charterers           265
undertake that during the period of this Charter Party, they will not procure any supplies or necessaries   266
or services, including any port expenses and bunkers, on the credit of the Owners or in the Owners' time, *unless*  267
*previously mutually agreed with the Owners.*

**24.      Salvage**                                                                                      268

All derelicts and salvage shall be for the Owners' and the Charterers' equal benefit after deducting        269
Owners' and Charterers' expenses and crew's proportion.                                                   270

**25.      General Average**                                                                              271

General average shall be adjusted according to York-Antwerp Rules *1994*, ~~1974, as amended 1990~~, or any   272
subsequent modification thereof, in *London*………………………… and settled in *United States Dollars* ……..……… 273
currency.                                                                                                 274

The Charterers shall procure that all Bills of Lading issued during the currency of the Charter Party will   275
contain a provision to the effect that general average shall be adjusted according to York-Antwerp Rules    276
1974, as amended *1994*, ~~1990~~, or any subsequent modification thereof and will include the "New Jason      277
Clause" as per Clause 31.                                                                                  278

Time Charter hire shall not contribute to general average.                                                 279

**26.      Navigation**                                                                                   280

Nothing herein stated is to be construed as a demise of the Vessel to the Time Charterers. The Owners       281
shall remain responsible for the navigation of the Vessel, acts of pilots and tug boats, insurance, *Extra war risk*  282
*insurance be paid by Charterers immediately upon presentation of vouchers otherwise as Clause 5 of the Charter Party.*
*Charterers to pay extra crew war bonus, crew insurance, if any* crew, and all other matters, same as when trading for
their own account.                                                                                        283

**27.      Cargo Claims**                                                                                 284

Cargo claims as between Owners and the Charterers shall be settled in accordance with the latest amended     285
Inter-Club New York Produce Exchange Agreement ~~of February 1970, as amended May, 1984~~ and or any         286
subsequent modification ~~or replacement thereof~~.                                                       287

**28.      Cargo Gear and Lights**                                                                        288

The Owners shall maintain the cargo handling gear of the Vessel *as fitted/described* ~~which is as follows~~:   289
………………………………………………………………………………………………………………………………                                                       290
………………………………………………………………………………………………………………………………                                                       291

...................................................................................................................................................... 292
providing gear (for all ~~derricks or~~ cranes) capable of lifting capacity as described. The Owners shall also 293
provide on the Vessel for night work lights as on board, but all additional lights over those on board shall 294
be at the Charterers' expense. The Charterers shall have the use of any gear on board the Vessel. If 295
required by the Charterers, the Vessel shall work night and day and all cargo handling gear shall be at the 296
Charterers' disposal during loading and discharging. In the event of disabled cargo handling gear, or 297
insufficient power to operate the same, the Vessel is to be considered to be off hire to the extent that 298
time is actually lost to the Charterers and the Owners to pay stevedore stand-by charges *but limited to maximum* 299
*one shift only* occasioned thereby, unless such disablement or insufficiency of power is caused by the Charterers' 300
Stevedores. If required by the Charterers, *subject to the Owners' consent to hire shore gear and* the Owners shall bear 301
the cost of hiring shore gear, in lieu thereof, in which case the Vessel shall remain on hire. 302

*Vessel is equipped with grabs; Charterers have the right to use free of charge. Owners undertake to carry out usual*
*maintenance of the grabs and their accessories. Owners are not to be responsible for the breakdown of grabs if such*
*breakdown/lack of performance is caused by default of shore labor/stevedores and Vessel to remain on-hire at all times.*

*If such breakdown of grabs is caused by lack of usual maintenance of the grabs and its accessories, then actual time lost*
*as a result of breakdown to be prorate by actual working grabs shall be for Owners' account and the Vessel shall be*
*off-hire and if Vessel's grabs breakdown doesn't delay Vessel's schedules in ports then Vessel shall remain on hire.*

**29.    Crew Overtime** – *See Clause 55* 303
~~In lieu of any overtime payments to officers and crew for work ordered by the Charterers or their agents,~~ 304
~~the Charterers shall pay the Owners, concurrently with the hire~~ .........................................per month 305
~~or pro rata.~~ 306

**30.    Bills of Lading** 307

(a) The Master shall sign the Bills of Lading or waybills for cargo as presented in conformity with mates 308
or tally clerk's receipts. However, the Charterers may sign Bills of Lading or waybill on behalf of the 309
Master, with the Owner's prior written authority, always in conformity with mates or tally clerk's receipts. 310

(b) All Bills of Lading or waybills shall be without prejudice to this Charter Party and the Charterers shall 311
indemnify the Owners against all consequences or liabilities which may arise from any inconsistency 312
between this Charter Party and any Bills of Lading or waybills signed by the Charterers or by the Master 313
at their request. 314

(c) Bills of lading covering deck cargo shall be claused: "Shipped on deck at Charterers', Shippers' and 315
Receivers' risk, expense and responsibility, without liability on the part of the Vessel, or her Owners for 316
any loss, damage, expense or delay howsoever caused." *General Deck Cargo Clause to be incorporated in Bills of* 317
*Lading covering deck cargo (see also Clause 52).*

**31.    Protective Clauses** 318

This Charter Party is subject to the following Clauses all of which are also to be included in all Bills of 319
Lading or waybills issued hereunder: 320

(a)    CLAUSE PARAMOUNT 321
"This Bill of Lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the 322
United States, the Hague Rules, or the Hague-Visby Rules, as applicable, or such other similar national 323
legislation as may mandatorily apply by virtue of origin or destination of the Bills of Lading, which shall 324
be deemed to be incorporated herein and nothing herein contained shall be deemed a surrender by the 325
carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities under said 326
applicable Act. If any term of this Bill of Lading be repugnant to said applicable Act to any extent, such 327
term shall be void to that extent, but no further." 328

and 329

(b)    BOTH-TO-BLAME COLLISION CLAUSE                                        330

"If the ship comes into collision with another ship as a result of the negligence of the other ship and any    331
act, neglect or default of the Master, mariner, pilot or the servants of the carrier in the navigation or in    332
the management of the ship, the Owners of the goods carried hereunder will indemnify the carrier against    333
all loss or liability to the other or non-carrying ship or her Owners insofar as such loss or liability represents    334
loss of, or damage to, or any claim whatsoever of the Owners of said goods, paid or payable by the other    335
or non-carrying ship or her Owners to the Owners of said goods and set off, recouped or recovered by the    336
other or non-carrying ship or her Owners as part of their claim against the carrying ship or carrier.    337

The foregoing provisions shall also apply where the Owners, operators or those in charge of any ships or    338
objects other than, or in addition to, the colliding ships or objects are fault in respect to a collision or    339
contact."    340

and    341

(c)    NEW JASON CLAUSE    342
"In the event of accident, danger, damage or disaster before or after the commencement of the voyage    343
resulting from any cause whatsoever, whether due to negligence or not, for which, or for the    344
consequences of which, the carrier is not responsible, by statute, contract, or otherwise, the goods,    345
shippers, consignees, or Owners of the goods shall contribute with the carrier in general average to the    346
payment of any sacrifices, losses, or expenses of a general average nature that may be made or incurred,    347
and shall pay salvage and special charges incurred in respect of the goods.    348

If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if salving ship    349
or ships belonged to strangers.  Such deposit as the carrier or his Agents any deem sufficient to cover    350
the estimated contribution of the goods and any salvage and special charges thereon shall, if required,    351
be made by the goods, shippers, consignees or Owners of the goods to the carrier before delivery,"    352

and    353

(d)    U.S. TRADE -DRUG CLAUSE    354
"In pursuance of the provisions of the U.S. Anti-Drug Abuse Act 1986 or any re-enactment thereof, the    355
Charterers warrant to exercise the highest degree of care and diligence in preventing unmanifested    356
narcotic drugs and marijuana to be loaded or concealed on board the Vessel.    357

Non-compliance with the provisions of this Clause shall amount the breach of warranty for consequences    358
of which the Charterers shall be liable and shall hold the Owners, the Master and the crew of the Vessel    359
harmless and shall keep them indemnified against all claims whatsoever which may arise and be made    360
against them individually or jointly. Furthermore, all time lost and all expenses incurred, including fines,    361
as a result of the Charterers' breach of the provisions of this Clause shall be for the Charterer's account    362
and the Vessel shall remain on hire.    363

Should the Vessel be arrested as a result of the Charterers' non-compliance with the provisions of this    364
Clause, the Charterers shall at their expense take all reasonable steps to secure that within a reasonable    365
time the Vessel is released and at their expense put up the bails to secure release of the Vessel.    366

The Owners shall remain responsible for all time lost and all expenses incurred, including fines, in the    367
event that unmanifested narcotic drugs and marijuana are found in the possession or effects of the    368
Vessel's personnel."    369

and    370

(e)    WAR CLAUSES – *See Clause 94*    371
"~~(i) No contraband of war shall be shipped. The Vessel shall not be required, without the consent of the~~    372

~~Owners, which shall not be unreasonably withheld, to enter any port or zone which is involved in a state~~ 373
~~of war, warlike operations, or hostilities, civil strife, insurrection or piracy whether there be a declaration~~ 374
~~of war or not, where the Vessel, cargo or crew might reasonably be expected to be subject to capture,~~ 375
~~seizure or arrest, or to a hostile act by a belligerent power (the term "power" meaning any de jure or de~~ 376
~~facto authority or any purported governmental organization maintaining naval, military or air forces).~~ 377

~~(ii) If such consent is given by the Owners, the Charterers will pay the provable additional cost of insuring~~ 378
~~the Vessel against hull war risks in an amount equal to the value under her ordinary hull policy but not~~ 379
~~exceeding a valuation of…………………………….……………………… In addition, the Owners may purchase and the~~ 380
~~Charterers will pay for war risk insurance on ancillary risks such as loss of hire, freight disbursements,~~ 381
~~total loss, blocking and trapping, etc. If such insurance is not obtainable commercially or through a~~ 382
~~government program, the Vessel shall not be required to enter or remain at any such port or zone.~~ 383

~~(iii) In the event of the existence of the conditions described in (i) subsequent to the date of this Charter,~~ 384
~~or while the Vessel is on hire under this Charter, the Charterers shall, in respect of voyages to any such~~ 385
~~port or zone assume the provable additional cost of wages and insurance properly incurred in connection~~ 386
~~with Master, officers and crew as a consequence of such war, warlike operations or hostilities.~~ 387

~~(iv) Any war bonus to officers and crew due to the Vessel's trading or cargo carried shall be for the~~ 388
~~Charterers' account.~~ 389

## 32.   **War Cancellation** 390

In the event of the outbreak of war (whether there be a declaration of war or not) between any two or 391
more of the following countries: *Fed. Republics of Russia / People Republic of China / U.S.A. / E.U. country,*………… 392
.................................................................................................................................................................... 393
.................................................................................................................................................................... 394
.................................................................................................................................................................... 395
either the Owners or the Charterers may cancel this Charter Party. Whereupon, the Charterers shall 396
redeliver the Vessel to the Owners in accordance with Clause 10; if she has cargo on board, after 397
discharge thereof at destination, or, if debarred under this Clause from reaching or entering it, at a near 398
open and safe port as directed by the Owners; or, if she has no cargo on board, at the port at which she 399
then is; or, if at sea, at a near open and safe port as directed by the Owners.  In all cases hire shall 400
continue to be paid in accordance with Clause 11 and except as aforesaid all other provisions of this 401
Charter Party shall apply until redelivery. 402

## 33.   **Ice** 403

The Vessel shall not be required to, enter or remain in any icebound port or area, nor any port or area 404
where lights or lightships have been or are about to be withdrawn by reason of ice, nor where there is 405
risk that in the ordinary course of things the Vessel will not be able on account of ice to safely, enter and 406
remain in the port or area or to get out after having completed loading or discharging. Subject to the 407
Owners' prior approval the Vessel is to follow ice-breakers when reasonably required with regard to her 408
size, construction and ice class. 409

## 34.   **Requisition** 410

Should the Vessel be requisitioned by the government of the Vessel's flag during the period of this Charter 411
Party, the Vessel shall be deemed to be off hire during the period of such requisition, and any hire paid 412
by the said government in respect of such requisition period shall be retained by the Owners. The period 413
during which the Vessel is on requisition to the said government shall count as part of the period provided 414
for in this Charter Party. 415

If the period of requisition exceeds ………………………………………… months, either party shall have the option 416
of cancelling this Charter Party and no consequential claim may be made by either party. 417

**35.** **Stevedore Damage** *– See also Clause 88*                                          418

Notwithstanding anything contained herein to the contrary, the Charterers shall pay for any and all     419
damage to the Vessel caused by stevedores, provided the Master has notified the Charterers and/or their  420
agents in writing as soon as practical but not later than 36 hours after any damage is discovered. Such  421
notice to specify the damage in detail and to invite Charterers to appoint a surveyor to assess the extent  422
of such damage.                                                                        423

(a) In case of any and all damage(s) affecting the Vessel's seaworthiness and/or the safety of the crew   424
and/or affecting the trading capabilities of the Vessel, the Charterers shall immediately arrange for repairs  425
of such damage(s) at their expense and the Vessel is to remain on hire until such repairs are completed   426
and if required passed by the Vessel's classification society.                                    427

(b) Any and all damage(s) not described under point (a) above shall be repaired at the Charterers' option,  428
before or after redelivery concurrently with the Owners' work. In such case, no hire and/or expenses will   429
be paid to the Owners except and insofar as the time and/or the expenses required for the repairs for    430
which the Charterers are responsible, exceed the time and/or expenses necessary to carry out the       431
Owners' work.                                                                         432

**36.** **Cleaning of Holds**                                                               433

The Charterers shall provide and pay extra for sweeping and/or washing and/or cleaning of holds between   434
voyages and/or between cargoes provided such work can be undertaken by the crew and is permitted by     435
local regulations, ~~at the rate of~~ .......................... ~~per hold~~. *All cleaning materials, supplies including fresh water required*  436
*for such cleaning to be for Charterers' account. Interim Hold Cleaning US$ 500.00 per hold actually used.*

In connection with any such operation, the Owners shall not be responsible if the Vessel's holds are not   437
accepted or passed by the port or any other authority. The Charterers shall have the option to re-deliver   438
the Vessel with unclean/unswept holds against a lump sum payment of *US$ 4,500.00 (Four Thousand Five Hundred*  439
*United States Dollars)* in lieu of hold cleaning *including removal, disposal of dunnage, lashing material, debris.*

**37.** **Taxes**                                                                        440

Charterers to pay all local, State, National taxes and/or dues assessed on the Vessel or the Owners     441
resulting from the Charterers' orders herein, whether assessed during or after the currency of this Charter  442
Party including any taxes and/or dues on cargo and/or freights and/or sub-freights and/or hire (excluding  443
taxes levied by the country of the flag of the Vessel or the Owners).                             444

**38.** ~~**Charterers' Colors**~~                                                          445

~~The Charterers shall have the privilege of flying their own house flag and painting the Vessel with their~~   446
~~own markings. The Vessel shall be repainted in the Owners' colors before termination of the Charter~~      447
~~Party. Cost and time of painting, maintaining and repainting those changes effected by the Charterers~~     448
~~shall be for the Charterers' account.~~                                                      449

**39.** ~~**Laid Up Returns**~~                                                             450

~~The Charterers shall have the benefit of any return insurance premium receivable by the Owners from their~~  451
~~underwriters as and when received from underwriters by reason of the Vessel being in port for a minimum~~   452
~~period of 30 days if on full hire for this period or pro rata for the time actually on hire.~~                453

**40.** **Documentation**                                                                454

The Owners shall provide any documentation relating to the Vessel that may be required to permit the     455
Vessel to trade within the agreed trade limits, including, but not limited to certificates of financial       456

responsibility for oil pollution, provided such oil pollution certificates are obtainable from the Owners' P & I club, valid international tonnage certificate, Suez and Panama tonnage certificates, valid certificate of registry and certificates relating to the strength and/or serviceability of the Vessel's gear.

**41.   Stowaways**

(a)   (i) The Charterers warrant to exercise due care and diligence in preventing stowaways in gaining access to the Vessel by means of secreting away in the goods and/or containers shipped by the Charterers.

(ii) If, despite the exercise of due care and diligence by the Charterers, stowaways have gained access to the Vessel by means of secreting away in the goods and/or containers shipped by the Charterers, this shall amount to breach of Charter for the consequences of which the Charterers shall be liable and shall hold the Owners harmless and shall keep them indemnified against all claims whatsoever which may arise and be made against them. Furthermore, all time lost and all expenses whatsoever and howsoever incurred, including fines, shall be for the Charterers' account and the Vessel shall remain on hire.

(iii) Should the Vessel be arrested as a result of the Charterers' breach of Charter according to Sub-Clause (a)(ii) above, the Charterers shall take all reasonable steps to secure that, within a reasonable time, the Vessel is released and at their expense put up bail to secure release of the Vessel.

(b)   (i) If, despite the exercise of due care and diligence by the Owners, stowaways have gained access to the Vessel by means other than secreting away in the goods and/or containers shipped by the Charterers, all time lost and all expenses whatsoever and howsoever incurred, including fines, shall be for the Owners' account and the Vessel shall be off hire.

(ii) Should the Vessel be arrested as a result of stowaways having gained access to the Vessel by means other than secreting away in the goods and/or containers shipped by the Charterers, the Owners shall take all reasonable steps to secure that, within a reasonable time, the Vessel is released and at their expense put up bail to secure release of the Vessel.

**42.   Smuggling**

In the event of smuggling by the Master, Officers and/or crew, the Owners shall bear the cost of any fines, taxes, or imposts levied and the Vessel shall be off hire for any time lost as a result thereof.

**43.   Commissions**

A commission of……*1.00*..... percent is payable by the Vessel and the Owners to ***BRS and 1% to Benefit*** …………
..........................................................................................................................................................................
..........................................................................................................................................................................
..........................................................................................................................................................................
on hire earned and paid under this Charter, and also upon any continuation or extension of this Charter.

**44.   Address Commission**

An address commission of .........*3.75*.........percent is payable to ***Charterers***...........................................................
..........................................................................................................................................................................
..........................................................................................................................................................................
.....................................................................…..………………………….. on hire earned and paid under this Charter.

**45.   Arbitration**

(a)   ~~NEW YORK~~

All disputes arising out of this contract shall be arbitrated at New York in the following manner, and subject to U.S. Law: 499
500

One Arbitrator is to be appointed by each of the parties hereto and a third by the two so chosen. Their decision or that of any two of them shall be final, and for the purpose of enforcing any award, this agreement may be made a rule of the court. The Arbitrators shall be commercial men, conversant with shipping matters. Such Arbitration is to be conducted in accordance with the rules of the Society of Maritime Arbitrators Inc. 501
502
503
504
505

For disputes where the total amount claimed by either party does not exceed US $ .....................** the arbitration shall be conducted in accordance with the Shortened Arbitration Procedure of the Society of Maritime Arbitrators Inc. 506
507
508

(b)    LONDON 509
All disputes arising out of this contract shall be arbitrated at London and, unless the parties agree forthwith on a single Arbitrator, be referred to the final arbitrament of two Arbitrators carrying on business on London who shall be members of the Baltic Mercantile & Shipping Exchange and engaged in Shipping, one to be appointed by each of the parties, with power to such Arbitrators to appoint an Umpire. No award shall be questioned or invalidated on the ground that any of the Arbitrators is not qualified as above, unless objection to his action be taken before the award is made. Any dispute arising hereunder shall be governed by English Law. 510
511
512
513
514
515
516

For disputes where the total amount claimed by either party does not exceed US$............................ ** the arbitration shall be conducted in accordance with the Small Claims Procedure of the London Maritime Arbitrators Association. 517
518
519

*Delete para (a) or (b) as appropriate 520

**The terms of this Charter Party shall be governed by English law. In the event of a dispute between the parties they shall use their best endeavour to find an amicable solution. If the parties are unable to resolve any such dispute or disputes amicably, all such dispute or disputes shall be referred arbitration in London in accordance with the provisions of the Arbitration Act 1996 and prevailing rules of the London Maritime Arbitration Association. The defendant shall appointment his arbitrator within fourteen (14) days of the claimant appointing and notifying the defendant of the appointment of the claimant's arbitrator. If the defendant fails to appoint his arbitrator within the fourteen (14) days period the claimant's arbitrator shall become the sole arbitrator. When each party has appointed its own arbitrator, the two arbitrators shall be at liberty to appoint a third arbitrator only if the two arbitrators are not in agreement upon any one or all of the matters referred to the Tribunal.**

**When the total amount in dispute is less than US$ 50,000.00 such dispute shall be resolved under the LMAA's small claim procedure. If the parties are unable to agree upon the identity of a sole arbitrator, the claimant shall apply to the president for the time being LMAA to appoint a sole arbitrator.**

**Where no figure is supplied in the blank space this provision only shall be void but the other provisions of this clause shall have full force and remain in effect. 521
522

If mutually agreed, Clauses *46*........ to *115*.........., both inclusive, as attached hereto are fully incorporated in this Charter Party. 523
524

*Owners:*                                              *Charterers:*


.........................................                              .........................................

*Guarantor:*

…………………………………………

This Charter Party is a computer-generated copy of the "NYPE 93" form printed by authority of the Association of Ship Brokers & Agents (USA), Inc., using software which is the copyright of Strategic Software Ltd. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the preprinted text of this document which is not clearly visible, the text of the original ASBA approved document shall apply. The Association of Ship Brokers and Agents (USA), Inc. and Strategic Software Ltd. assume no responsibility for any loss or damage caused as a result of any discrepancies between the original approved document and this document.

RIDER CLAUSES TO M/V "AMIS INTEGRITY"
CHARTER PARTY DATED 30TH JUNE 2017
_____

**Clause 46 - Vessel Description & Bunker Spec**
MV 'AMIS INTEGRITY'
BUILT/YEAR:              2017
VESSEL TYPE:            BULK CARRIER
BUILDER:                IMABARI SHIPBUILDING CO
FLAG:                   PANAMANIAN
CLASS:                  ABS
DWT:                    63,469 M/T
DRAFT (SUMMER):         13.418 M

(L.O.A.) / (L.B.P.):    199.98 M / 195.00 M
BREADTH:                32.24 M
GROSS / NET TONNAGE:    35,825 / 21,075

CAPACITY(GRAIN/ BALE):  80,497.70 M3 / 76,176.27 M3
HOLDS / HATCHES:        5/5
HATCH COVER:            FOLDING TYPE (HYDRAULIC DRIVEN) HATCH OPEN
                        1.: L. 18.40M X B. 18.72M
                        2.~5.: L. 23.20M X B. 18.72M

VESSEL IS CO2 FITTED.
VESSEL IS FITTED WITH A60 BULKHEAD.

CARGO GEAR :            CRANE 4 SETS X 30 MT
                        CRANE UNABLE TANDEM AT SAME TIME
                        GRAB X4 (12M3)

SPEED & CONSUMPTION (DAILY):
BALLAST:    ABOUT 14.0 KNOTS ON ABOUT 23.2 MT IFO + ABOUT 0.1 MT MDO
LADEN:      ABOUT 13.3 KNOTS ON ABOUT 24.0 MT IFO + ABOUT 0.1 MT MDO

IN PORT (DAILY):
WORKING:    ABOUT 4.7 MT IFO + ABOUT 0.2 MT MDO
IDLE:       ABOUT 2.3 MT IFO + ABOUT 0.2 MT MDO
(D.O.TO BE USED IN CASE OF LOW LOAD RUNNING (BELOW 30%) OF G/E)

ECO SPEED / CONSUMPTION BASIC BELOW: (REF ONLY/WOG)
BALLAST:    ABOUT 12.0 KNOTS ON ABOUT 15.4 MT IFO + ABOUT 0.1 MT MDO
LADEN:      ABOUT 11.5 KNOTS ON ABOUT 16.7 MT IFO + ABOUT 0.1 MT MDO

BALLAST:    ABOUT 12.5 KNOTS ON ABOUT 17.3 MT IFO + ABOUT 0.1 MT MDO
LADEN:      ABOUT 12.0 KNOTS ON ABOUT 18.5 MT IFO + ABOUT 0.1 MT MDO

ECO/SPEED CONSUMPTION CLAUSE:
OWNERS CONFIRM THAT VESSEL IS CAPABLE OF BEING CONTINUOUSLY OPERATED
ON MINIMUM MAIN ENGINE LOAD SAFELY CLOSE TO THE CUT-IN POINT OF THE
VESSEL'S ENGINE AUXILIARY BLOWERS. OWNERS CONFIRM THEY WILL ALLOW THE
VESSEL TO SAIL AT 50% OF THE MAIN ENGINE LOAD (BUT WITH MAIN ENGINE
ALWAYS OPERATING ABOVE THE CUT-IN POINT OF THE VESSEL'S ENGINE
AUXILIARY BLOWERS).

ALL LOW LOAD OPERATIONS WILL BE PERFORMED UNDER OWNERS/OWNERS
TECHNICAL MANAGERS' SUPERVISION AND ALWAYS IN STRICT CONFORMITY WITH
THE RECOMMENDATIONS FROM VESSEL'S MAIN ENGINE MANUFACTURERS.

RIDER CLAUSES TO M/V "AMIS INTEGRITY"
CHARTER PARTY DATED 30TH JUNE 2017

_____

OWNERS/OWNERS' TECHNICAL MANAGERS WILL PROVIDE PROPER GUIDANCE AND
INSTRUCTIONS TO THE MASTER/SHIP STAFF AND ENSURE STRICT COMPLIANCE WITH
APPLICABLE LOW LOAD OPERATING PROCEDURES AS DEEMED NECESSARY BY
OWNERS/ENGINE MANUFACTURERS.

OWNERS/MASTER TO PROVIDE CHARTERERS WITH ALL ME PARAMETERS AND LOGS
UPON CHARTERERS' REQUEST.

SPEED AND CONSUMPTION BASIS GOOD WEATHER CONDITIONS, NO ADVERSE
CURRENT, NO NEGATIVE INFLUENCE OF SWELL AND NOT EXCEEDING BEUFORT
SCALE FORCE 4 AND DOUGLAS SEA STATE SCALE 3.

VESSEL MAY CONSUME MDO FOR MAIN ENGINE WHEN STEAMING IN SHALLOW,
CONFINED WATERS, MANEUVERING IN/OUT PORT(S), TRANSITING CANALS AND
ALSO HAS LIBERTY TO CONSUME FOR AUXILIARY ENGINE WHEN STARTING,
STOPPING AND WORKING WITH LOW LOAD.

CHARTERERS HAVE FULL USE OF VESSEL'S BUNKER TANK CAPACITY UP TO 80PCT
NO COMMINGLING OF IFO IS ALLOWED FOR THE DURATION OF THIS CHARTER
PARTY.

ALL DETAILS ABOUT AND SOME DATA LIKE DWAT/DRAFT/GRAIN CAPACITY ETC.
WILL BE RECONFIRMED AFTER DELIVERY.

ALL DETAILS "ABOUT"

OWNERS CONFIRM THAT THE VESSEL PARTICULARS AS PROVIDED ARE ACCURATE
AND THAT THE NOMINATED VESSEL COMPLIES WITH THE DESCRIPTION AT THE TIME
OF ENTERING INTO THE CONTRACT AND AT THE TIME OF DELIVERY OF THE VESSEL
AND THE VESSEL REMAINS TO COMPLY WITH THE DESCRIPTION THROUGHOUT THE
DURATION OF THIS CHARTER.

SUB FULL AND COMPLETE TIME CHARTER DESCRIPTION WHICH TO BE
INCORPORATED IN AND FORM PART OF THE CHARTER PARTY, IT IS A CONDITION OF
THIS CHARTER THAT THE VESSEL:

A)   IS A SINGLE DECK SELF-TRIMMING BULK CARRIER WITH ENGINE AND BRIDGE
     AFT; AND

B)   CRANES HAVE A MINIMUM OUTREACH OF 8.7 METERS  ; AND

C)   HOLDS AND HATCHES ARE CLEAR AND UNOBSTRUCTED, WITHOUT
     CENTERLINE BULKHEAD, FREE  OF FRAMES TO THE TANK TOP AND FULLY
     SUITABLE FOR GRAB / MECHANICAL DISCHARGE;  AND

D)   HAS ALL VALID CERTIFICATES AS REQUIRED FOR TRADING WITHIN THE
     AGREED TRADING AREA AND   THE CERTIFICATES WILL REMAIN VALID
     THROUGHOUT THE PERFORMANCE OF THIS CHARTER;  AND

E)   IS ENTERED WITH AND FULLY COVERED BY A P&I CLUB THAT IS A MEMBER OF
     THE INTERNATIONAL GROUP OF P&I CLUBS AND WILL REMAIN SO
     THROUGHOUT THE DURATION OF THIS CHARTER; AND

RIDER CLAUSES TO M/V "AMIS INTEGRITY"
CHARTER PARTY DATED 30TH JUNE 2017
_____

F)   IS CLASSED WITH A CLASSIFICATION SOCIETY THAT IS A MEMBER OF THE INTERNATIONAL ASSOCIATION OF CLASSIFICATION SOCIETIES (IACS) AND SUCH CLASS WILL BE MAINTAINED THROUGHOUT THE DURATION OF THIS CHARTER; AND

G)   IS NOT A DESIGNATED ENTITY AND NEITHER OWNERS, DISPONENT OWNERS, MANAGERS, OPERATORS OR ANY OTHER PARTY CONTROLLING THE VESSEL ARE SUBJECT TO ANY SANCTIONS, PROHIBITIONS, RESTRICTIONS OR DESIGNATION (INCLUDING BUT NOT LIMITED TO US, EU, UN OR ANY OTHER SANCTIONS REGIME) AT THE DATE OF THE FIXTURE AND THROUGHOUT THE DURATION OF THIS CHARTER PARTY; AND

H)   HAS SUFFICIENT DEDICATED STORAGE- AND SERVICE-TANKS AND FULLY SEGREGATED SYSTEMS TO STORE AND HANDLE FOUR DIFFERENT TYPES OF FUEL (HSFO, LSFO, HSMGO AND LSMGO) SIMULTANEOUSLY WITHOUT THE NEED OF INTERMEDIATE CLEANING AND TRANSFER OF FUEL PRIOR TO CHANGING OVER TO A DIFFERENT TYPE OF FUEL; AND
PLEASE REFER TO ATTACHED CAPACITY TABLE AND OTHER TANKS CAPACITY ARE AS FOLLOWS:
　・HEAVY FUEL OIL SETTLING TANK:　　　　ABOUT 16M3
　・HEAVY FUEL OIL SERVICE TANK:　　　　ABOUT 16M3
　・LOW SULPHER FUEL OIL SETTLING TANK:　ABOUT 8M3
　・LOW SULPHER FUEL OIL SERVICE TANK:　ABOUT 8M3
　・NO.1 & 2 DIESEL OIL SERVICE TANK:　　ABOUT 8M3 EACH

BUNKER FO TANKS ARE ABLE TO USE FOR HSFO AND LSFO.

BUNKER DO TANKS AND DO SERV. TANKS ARE ABLE TO USE FOR HSMGO AND LSMGO.

ABOUT PIPE LINE, PLEASE REFER TO ATTACHED PIPING DIAGRAM.

I)   AT THE TIME OF DELIVERY AND AT THE TIME OF ARRIVAL AT THE FIRST LOADING PORT IS FREE OF ASIAN GYPSY MOTH AND ITS LARVAE AND CAN PRESENT CERTIFICATE IF REQUESTED;  AND

J)   IS NOT BLACKLISTED IN AUSTRALIA AND TRADING WITH AHL / ITF / WWF IN GOOD ORDER; AND

(K)  IS RIGHTSHIP APPROVED AND SUCH APPROVAL WILL BE MAINTAINED WITH MINIMUM 3 STARS THROUGHOUT THE DURATION OF THIS CHARTER; AND

L)   HAS A VALID CERTIFICATE OF FINANCIAL RESPONSIBILITY (COFR) ISSUED PURSUANT TO SECTION 1016 (A) OF THE OIL POLLUTION ACT 1990, AND SECTION 108 (A) OF THE COMPREHENSIVE ENVIRONMENTAL RESPONSE, COMPENSATION AND LIABILITY ACT 1980, AS AMENDED, IN ACCORDANCE WITH US COAST GUARD REGULATIONS, 33 CFR PART 138 AND WILL MAINTAIN SUCH CERTIFICATE THROUGHOUT THE DURATION OF THIS CHARTER;  AND  **(CONFIRM, WILL APPLY COFR AFTER DELIVERY ).**

M)   AT THE TIME OF DELIVERY IS CLASS MAINTAINED WITHOUT CONDITION OR RECOMMENDATION AND IS FREE OF AVERAGE DAMAGES AFFECTING THE VESSEL'S CLASS;  AND

RIDER CLAUSES TO M/V "AMIS INTEGRITY"
CHARTER PARTY DATED 30TH JUNE 2017

---

N)   AT THE TIME OF DELIVERY IS FREE FROM MARITIME LIENS, ARRESTS, ENCUMBRANCES AND THE VESSEL AND HER OWNERS AND DISPONENT OWNERS, IF ANY, ARE NOT INVOLVED IN A LEGAL CASE WHICH MAY CAUSE ANY DISRUPTION/DELAY TO THE VESSEL AND/OR RECEIPT/DELIVERY OF CARGO;  AND

O)   IS NOT BANNED BY USCG, PSC OR SIMILAR INSPECTION REGIME;   AND

P)   HAS NOT BEEN DETAINED DURING THE LAST 12 MONTHS PRIOR TO DELIVERY; AND

Q)   THE VESSEL HAS NOT BEEN INVOLVED IN A POLLUTION, GROUNDING, COLLISION OR OTHER CASUALTY DURING THE LAST 12 MONTHS PRIOR TO DELIVERY;  AND

OWNERS CONFIRM THAT:
-   ALL GEAR AND GRABS AS DESCRIBED ARE IN GOOD WORKING CONDITION AND WILL REMAIN SO THROUGHOUT THE DURATION OF THE CHARTER PARTY, ALWAYS AVAILABLE TO THE CHARTERERS, FREE OF CHARGE AND SUITABLE FOR LOADING AND/OR DISCHARGING ANY AND ALL CARGOES ALLOWED SUBJECT TO THE LIMITATION OF CRANE/GRAB UNDER THIS CHARTER PARTY; AND

    CHARTERERS REQUIRE THE FOLLOWING INFORMATION TO BE PROVIDED AS SOON AS POSSIBLE AFTER CONCLUDING MAIN TERMS:

-   OVERVIEW OF VALIDITY DATES OF VESSEL'S CERTIFICATES ; AND ( **WILL ADVISE AFTER DELIVERY** )

-   BUNKER TANK CAPACITY PLAN INCLUDING BREAKDOWN OF CURRENT QUANTITY AND TYPE OF BUNKERS ON BOARD PER TANK AND ESTIMATED QUANTITY AND TYPE OF BUNKERS ON BOARD PER TANK AT TIME OF DELIVERY BUNKER TANK CAPACITY , ( **REVERTING**  )

-   GOOD AND CLEAR COPIES OF THE GA PLAN, CROSS SECTIONS AND DWT SCALE; AND  **(SEE ATTACHMENT,** PASS WORD: 887A185B**)**

-   BALTIC QUESTIONNAIRE // Q88 (REVERTING); AND  ( **REVERTING** )

-   FULL STYLE OF HEAD OWNERS
    **AMIS INTEGRITY S.A.**
    MMG TOWER, 23RD FL.,
    AVE. PASEO DEL MAR, COSTA DEL ESTE,
    PANAMA CITY, PANAMA
    TEL: +886-2-2755-6911
    FAX: +886-2-2755-6865 **)**

-   VESSEL'S FULL ITINERARY AND AGENTS AT LAST DISCHARGE PORT OF THE VESSEL PRIOR TO DELIVERY UNDER THIS CHARTER ; AND (N/A)

-   COPY OF THE VALID P&I CERTIFICATE OF INSURANCE ; AND  ( **WILL PROVIDE AFTER DELIVERY** )

RIDER CLAUSES TO M/V "AMIS INTEGRITY"
CHARTER PARTY DATED 30TH JUNE 2017
_____

- COPY OF THE VALID CLASS CERTIFICATES ; AND **(WILL PROVIDE AFTER DELIVERY )**
- LAST 6 CARGOES / LOAD PORTS / DISCHARGE PORTS / CHARTERERS;  (N/A)

 AND
- CLEAR PHOTOS OF ALL EMPTY CARGO HOLDS UPON COMPLETION OF LAST DISCHARGE PRIOR TO DELIVERY UNDER THIS CHARTER ; AND **( REVERTING )**

- COPIES OF CEMENT HOLD SCHEDULES  **(REVERTING )**

- WATER LINE TO TOP OF HATCH COAMING DISTANCE (EXCLUDING HATCH COVER) WHEN IN HEAVY BALLAST (HOLD 3 FLOODED)  **(PLEASE REFER TO ATTACHED WLTH TABLE )**

HEAD-OWNERS:
AMIS INTEGRITY S.A.
MMG TOWER, 23RD FL.,
AVE. PASEO DEL MAR, COSTA DEL ESTE,
PANAMA CITY, PANAMA
TEL: +886-2-2755-6911
FAX: +886-2-2755-6865 )

MANAGER:
WISDOM MARINE LINES S.A. (AS MANAGERS)
2F., NO.237, SEC.2, FU-HSING S. RD.,
TAIPEI 106, TAIWAN R.O.C.
TEL:+886-2-2755-6911
FAX: +886-2-2755-6865

CHARTERERS FULL STYLE:
24VISION CHARTERING SOLUTIONS DMCC.
ONE JLT-05-93, ONE JLT,
PLOT NO.: DMCC-EZ1-1AB,
JUMEIRAH LAKE TOWERS,
DUBAI, UNITED ARAB EMIRATES
TEL: +971 4 429 5800
EMAIL: JONATHANSCHEERS@24VISION.SOLUTIONS

## Clause 47 - Hold Cleanliness Clause
Vessels holds on arrival at first loading port(s) to be clean, dry, free of rust and/or scale and cargo residues and ready in all respects to load any/all permissible cargoes under the Charter Party to the satisfaction of independent surveyor. If the Vessel is not approved by the surveyor, the Vessel is to be placed off-hire from the time of that failure until the Vessel has passed a subsequent survey. If certain holds are ready, Charterers to have the option to load in those holds and hire shall be paid pro-rata to the holds which passed the inspection.

## Clause 48 - Certificates
Owners guarantee Vessel holding full set of valid certificates through the entire duration of this time Charter period.

## Clause 49 - Cargo Exclusions
It is understood that the Vessel is not to be employed in the carriage of:
Ammonium nitrate, asbestos, ashes, asphalt, bones, borates, borax, calcium carbide, copra and its products, direct reduced iron (DRI), ferro-silicon, fishmeal, hide, hot briquetted iron (HBI), injurious,

RIDER CLAUSES TO M/V "AMIS INTEGRITY"
CHARTER PARTY DATED 30TH JUNE 2017

_____

inflammable or dangerous goods (such as acids, explosives, arms, ammunition or warlike materials, nuclear material or radioactive products or wastes or chemical products), livestock, motor blocks and turnings, motor spirit, naphtha, oilcakes and meals, petroleum or its products (but petroleum coke allowed, see below), pitch in bulk, pond coal, pyrites, raw cotton, round logs, resin, tobacco, tar or any of their products, war material and any cargo(es) requiring CO2 system, general cargo and all cargo listed in International Maritime Dangerous Goods Code (IMDG Code).

Charterers is not allowed to load alumina / silica sand / grain (ex-Australia only, all other grains to be allowed), soda ash and potash cargo for the first voyage. If Charterers do intend any of the beforementioned cargoes on the first leg, then the acceptance of the hold condition is at their own risk with all costs for Charterer's account.

All cargoes are to be loaded/stowed/carried/discharged in strict accordance with IMO and local regulations. Any extra fittings/equipment etc., which are required to observe such regulations are to be undertaken by Charterers at their time and expense.

Deck cargo can be allowed as long as always within the deck strength excluding hatch covers of the Vessel and as per class papers and protective Clauses to apply.

All cargoes belong to B.C. Code Group B (except coal and petcoke) are not allowed and Group A cargo must be provided with a certificate that cargo moisture limit is within transportable moisture limit, which should be duly certified by Owners' P&I Club or his appointed surveyor before loading on board, and all related expenses and time for the survey shall be borne by the Charterers.

First period of 6/8 months:
Regarding dirty cargo, Charterers are to be allowed 5 (five) dirty cargoes per year (i.e. per 12 running months) out of petcoke / salt / sulphur / cement / clinker / scrap but not to be consecutive voyages and last cargo before redelivery.

Nickel ore protective Clause to apply always: if Nickel Ore is agreed.

Nickel ore ex Indonesia is not allowed.
Charterers guarantee that nickel ore is harmless non-dangerous and loaded/carried/stowed/ discharged in accordance with IMO regulations and IMSBC Code. And Charterers/Shipper to provide legally moisture certificate and relevant proper certificate/document to Owners/Master within reasonable time before start to load at loading port, otherwise, the Master may reject the cargo. During the voyage, Owners have option to arrange Owners' surveyor on Charterers' account, on board to ensure safe loading of the cargo. P&I surveyor will not disrupt loading operation unless cargo is unsuitable for loading. If the Master feels that the appearance of the cargo (including visible signs of moisture/water) indicates that it is not suitable for carriage, then the Master to have the option of carrying out "can test". If the result of the "can test" is not satisfactory then the Master has the right to reject the cargo and Shippers/Charterers shall tender suitable replacement for such rejected cargo. Any delays due to such rejection will be for Charterers' time and expense. Surveyor is only assisting Master in the loading operation and Master has all right to stop loading process if the cargo been loaded is questionable under SOLAS/IMSBC code regulation.

**Indian Iron Ore Fines Clause:**
Charterers to provide Shippers' certificates of moisture content, flow moisture point (FMP) and transportable moisture limit (TML) to the Master prior to loading. If Owners and/or Owners' P&I Club elect to appoint a surveyor, then the same is to be an independent and accredited local surveyor (cost to be for Charterers' account) who is to supervise the loading. Owners to keep Charterers well in advance advised about such appointment. Master and attending surveyor to ensure that cargo loaded is in suitable condition for carriage by the Vessel. In the event that Charterers/Shippers are unable to provide the moisture content certificate in time then all-time lost as a consequence to be for

RIDER CLAUSES TO M/V "AMIS INTEGRITY"
CHARTER PARTY DATED 30TH JUNE 2017

_____

Charterers' account. The Master and/or the surveyor have the right to reject the cargo which falls outside the safe transportable moisture content limits as defined by IMSBC code and Charterers are to replace with cargo meeting the IMSBC criteria. Any time lost relating to cargo quality issues, and any related expenses, shall be for Charterers' account. Any cargo rejected by Master and/or surveyor to be jointly tested at a mutually agreed test laboratory and the findings are to be binding for both parties. Any time lost and expenses caused by Master's and/or surveyor's rejection of cargo and conducting survey/testing to be for Charterers' account.

In case bagged cargo is carried, Owners are not responsible for all bags torn/short landed/damaged/ leakage/pilferage except for ones wetted or other damage caused by Vessel's unseaworthiness.

Regarding dirty cargo, Charterers are to be allowed 5 (five) dirty cargoes per year (i.e. per 12 running months) out of petcoke / salt / sulphur / cement / clinker / scrap but not to be consecutive voyages and last cargo before redelivery. Consecutive dirty cargos to be allowed once, Charterers' option to redeliver the Vessel with dirty cargo as last cargo before redelivery against in lieu of hold cleaning of US$ 13,000.00

**Scrap Protective Clause:**
Deleted.

**Cement Protective Clause**:
Deleted.

**Cement Clinker Protective Clause:**
(a)     Charterers are allowed to carry normal non-hazardous cement clinker and undertake to use holds as less as possible, provided Vessel's stability, trim and strength permit.

(b)     Should any additional / special wash down of holds before loadings be recommended / proposed / required by Master, Charterers undertake to arrange the same at their time/expenses.

(c)     After discharge, Charterers to arrange at their expense/time of any additional/special wash-down of holds. Charterers are allowed to use ship crew to perform cleaning by the payment of US$ 5,000.00 lumpsum bonus and to provide all materials required by Master, but always subject to prior consent of Owners/Master/crew and local regulations permitting, and all time used to be for Charterers' account. Owners/Master are not held responsible for assisting cleanliness for loading next cargo and for any consequences whatsoever caused due to such arrangement.

**Petcoke Protective Clause:**
Charterers have the liberty to carry petroleum coke (whether it be full or part cargo), during the entire currency of this Charter-Party on following conditions:

a)     Petcoke mentioned herein is only limited to the type of non-hazardous /non-dangerous type.

b)     If Charterers exercise such option, Charterers undertake to use holds as little as possible, provided Vessel's stability, trim and stress permitting.

c)     Such cargo to be loaded / stowed / trimmed / discharged strictly according to latest IMO and/or any other latest regulations / rules applicable to such cargo.

d)     Should any additional / special wash down of holds before loading the reasonably recommended / proposed / required by Master, Charterers undertake to arrange the same at their expense / time.

RIDER CLAUSES TO M/V "AMIS INTEGRITY"
CHARTER PARTY DATED 30TH JUNE 2017
_____

e)     After discharge, Charterers to arrange at their expense / time any additional / special wash down of holds carrying such cargo by chemicals, as Master reasonably considers necessary.

f)     Deleted.

g)     Any extra expenses resulting therefrom / incurred thereby Charterers and any detention through any of above causes, to be for Charterers' account

h)     It is understood that, if required by Charterers, cleaning of holds to be done by crew against Charterers paying lumpsum of US$ 6,000.00 after carrying petcoke.

**Salt and/or Sulphur Protective Clause:**
When carriage of bulk formed sulphur, Charterers shall confirm, the intended cargo is formed to a specific solid shape (e.g., prills, granules, pellets, pastilles or flakes) and listed in the IMSBC Code Group C. (cargo declaration will state which shape the sulphur will be)

Before loading salt or bulk formed sulphur, Vessel's holds are to be coated with hold block/lime wash and hold block/lime wash to be introduced into the bilge openings to Master's/Shippers' representative's satisfaction in Charterers' time and for Charterers' account. Charterers may request ship crew to carry out hold block/lime wash coating/decoating in which case ship crew to render utmost assistance as per the recommendations from Charterers, but without Owners' responsibility for then result. Charterers to pay lumpsum US$ 500.00 per hold coating withhold block/lime wash and lumpsum US$ 500.00 per hold decoating as well as the cost of hold block/lime wash and extra material required. Alternatively, Charterers may arrange shore labor to carry out it under Master's supervision.

Hold cleaning bonus after decoating will be for Charterers' account as per intermediate hold cleaning Clause.

**Steel Cargo Protective Clauses:**
Where the Vessel is required to load steel cargo (full or part cargo), Owners shall be entitled to carry out pre-loading/pre-discharge survey/tally using a P&I Club approved surveyor, a copy of whose reports are to be given to Charterers, which shall be considered a joint survey, and all pre-loading/pre-discharge survey/tally fees to be equally shared between Owners and Charterers. Bills of Lading to be in strict conformity with Mate's receipt and include all remarks from pre-loading survey report. Charterers are disallowed to use California block stowage for stowing steel cargo. Owners confirm Vessel can load 15 metric tons coils two tier high.

Add:
    -    Scrap

As for Nickel Ore, Charterers inform Owners in advance for Owners to evaluate the realistic circumstance if it is appropriate before Charterers fix the nickel ore business in order to achieve the mutual agreement but in case of agreement , maximum 1 shipment / per Charter Party ( i.e. per about 6 to about 8 months ).

**Cement Protective Clause**:
Charterers undertake to use holds as little as possible, provided Vessel's stability, trim and strength permit. Should any additional / special wash down of holds before loadings be recommended / proposed / required by Master, Charterers undertake to arrange the same at their time/expenses.

After discharge, Charterers to arrange at their expense/time of any additional/special wash down of holds. Charterers are allowed to use ship crew to perform hold cleaning by the payment of US$ 5,000.00 as a lumpsum bonus and to provide all materials required by Master, but always subject to

RIDER CLAUSES TO M/V "AMIS INTEGRITY"
CHARTER PARTY DATED 30TH JUNE 2017

_____

prior consent of Owners/Master/crew while being permitted by local regulations, and all time used to be for Charterers' account. Owners/Master are not responsible for assisting in for loading next cargo and for any consequences whatsoever caused due to such arrangement.

**Clause 50 - Trading Limits / Exclusions**
Vessel always to trade within Institute Warranty Limits, Charterers' option breach of Institute Warranty Limits subject to Owners' underwriters' approval and invoices, always afloat at any time of tide, always via safe port(s)/berth(s) excluding:

Abkhazia, Cuba to be allowed if U.S. boycott is lifted, in any case U.N. approved cargos always to be allowed subject to Vessel's certificates permit, Eritrea, Ethiopia, Georgia but the port of Poti is allowed, Great Lakes, Haiti, Iran, Iraq, Lebanon, Israel, Libya, North Korea, Serbia, Somalia, Syria, Yemen, places subject to U.N. sanctions, areas prohibited by Vessel's war risks underwriters due to war or war-like activities, zone (whether of land or sea) may be, or are likely to be exposed to piracy threat, and places which are excluded by the authority of the Vessel's flag.

BIMCO Infectious or Contagious Diseases Clause for Time Charter Parties to be incorporated in Charter Party.

Algeria and Tunisia – allowed with below protective Clause to apply:
"Charterers to be responsible for any cargo shortage claims, including overlanding and pilferage claims.

Otherwise all other claims to be handled as per terms of the Inter Club Agreement (see Clause 79) including in case of guaranteed to be placed same to be fronted by Owners' P&I Club and with Charterers' P&I Club to give counter guarantee to Owners' P&I Clubs."

Kenya and Tanzania – can be allowed provided Vessel is sailing north bound from south within coastal 12nm and not to breach of HRA, otherwise armed guards to be on board and any additional premium, K&R, LOH insurance and crew war risk bonus to be for Charterers' account; and BIMCO Piracy Clause to apply as agreed in this Charter Party.

Cuba – allowed with protective Clause to apply as follows:
(a)     Owners agree to give Charterers permission to call Cuba during Time Charter period provided that the Vessel departs from Cuba no less than 180 (One hundred and eighty) days before the date of redelivery to Owners and/or before being ordered to call any U.S. ports.

(b)     Any additional premiums and/or calls required by the Vessel's hull underwriters due to the Vessel calling Cuban ports are to be for the Charterers' account.

(c)     Any extra entertainment/extortion/victualling/petty cash requested by officials (immigration, customs, quarantine officers and so on) due to Vessel calling Cuban ports are to be for the Charterers' account.

Trading to CIS pacific coast ports is allowable except during the high-risk periods in 2017 for Asian Gypsy Moth which to be at Charterers' utmost discretion. After each call to CIS pacific coast ports Charterers to ensure that the Vessel is issued with all necessary certificates stating that the Vessel is free from infestation of Asian Gypsy Moth.

Owners to allow Charterers to stem bunkers at CIS Pacific at all times.

Nigeria: but  Charterers inform Owners in advance for Owners to evaluate the realistic circumstance if it is appropriate before Charterers fix business to Nigeria or loading from  Nigeria  in order to achieve the mutual agreement.

RIDER CLAUSES TO M/V "AMIS INTEGRITY"
CHARTER PARTY DATED 30TH JUNE 2017


CHARTER PARTY DATED 30TH JUNE 2017
_____

Liberia, Benin, and Togo:
Total maximum 3 Shipments per year out of Liberia, Benin are allowed, and Charterers are responsible for the arrangement of ship security for Benin. All relevant time/costs for anti-piracy materials arrangement etc. to be for Charterers' account. For calling Benin, BIMCO piracy Clause to apply as agreed and any additional premium and crew bonus to be for Charterers' account, but same always to be in line with market and against copies of original supplier's invoices.

Charterers inform Owners in advance for Owners to evaluate the realistic circumstance if it is appropriate before Charterers fix business to Nigeria or loading from Nigeria in order to achieve the mutual agreement.

Togo always to be allowed with any additional premium and crew bonus to be for Charterers' account.

No direct trade between People's Republic of China and Taiwan unless between agreed open ports.

**Gulf of Aden / Piracy Clause:**
BIMCO Piracy Clause for Time Charter Parties 2009 to apply in full with following amendments:

Notwithstanding the BIMCO Piracy Clause below and the CONWARTIME 2004 Clause, which are both applicable to this Clause, Owners agree to transit Red Sea, Gulf of Aden and Indian Ocean when requested by Charterers on the most direct route subject to the following terms.

Before any transit of the Gulf of Aden and/or Indian Ocean Charterers will engage a security firm that will provide an armed Four (4) man security team to the Vessel for transits through the Gulf of Aden and the HRA area.

The security firm will work out a security plan with the Vessel's command and prepare a brief for the crew for potential piracy incidents and will, taking into account the characteristics of the Vessel, guide the Master and crew in preparing the "hardening" of the Vessel against piracy attacks (e.g. bringing out razor wire and electrical fencing) in accordance with Best Management Practice.

Any material required for "hardening" of the Vessel and any waiting time for embarkation / disembarkation of the security team is to be for Charterers' account. Any "hardening" material onboard the Vessel is Charterers' property and Owners to keep it well stored and accounted for so it may be reused if possible.

Charterers are to appoint and pay the security firm directly, but it is understood that the security of the Vessel remains at all times that of the Owners and Master. Owners are to sign the security firm's un-amended BIMCO Guardcon contract.

Trips from/to India or PG to/from/passing South Africa to be done on the most direct route with any additional costs for transiting the JWC area to be for Charterers' account under terms laid out within this Clause. And armed guards on board at all time.

Charterers are to pay for extra WRI and LOH insurances covering 91st to 180th day.

Charterers are to pay a lumpsum bonus of US$ 5,000.00 per transit.

Owners agree to transit and trade the West Coast of India ~~within the 12 nautical miles zone when requested to do so by Charterers~~ without entering the high-risk area, without employing unarmed or armed guards on the basis of the current circumstance subject to the change of pirate activity, ~~without any extra insurances or crew bonus for Charterers' account.~~ Additional premium covering hull and machinery, extra war risk insurance, kidnap & ransom insurance, loss of hire insurance and crew war

RIDER CLAUSES TO M/V "AMIS INTEGRITY"
CHARTER PARTY DATED 30TH JUNE 2017

---

risk bonus for such transit (if any) to be for Charterer's account, but always against scanned copies of original actual invoice.

Notwithstanding the BIMCO Piracy Clause and the CONWARTIME 2004 Clause , Owners agree that transiting between West Coast India / Arabian Gulf  via the coast of Pakistan and Iran subject to sailing within 12 nautical miles zone without entering the high risk area (e.g.: after passing 65E from West Coast India to Arabian Gulf, please refer to attached map ) does not require armed guards on the basis of the current circumstance subject to the change of pirate activity and the Vessel can be kept provided safe navigation permits, during the whole navigation time within such area. Additional premium covering hull and machinery, extra war risk insurance, kidnap & ransom insurance, loss of hire insurance and crew war risk bonus for such transit (if any) to be for Charterer's account, but always against scanned copies of original actual invoice.

**Pilotage:**
For trading to areas where pilotage is compulsory/ customary, the same to be on Charterers' account. For trading to Orinoco River / Amazon River, the pilotage (including transportation cost) between pilot station and fairway although not compulsory, must be employed and paid by Charterers.

**United States Security Clause:**
If the Vessel calls in the United States, including any United States territory, the following provisions shall apply with respect to any applicable security regulations or measures:

Notwithstanding anything else contained in the Charter Party all costs or expenses arising out of or related to security regulations or measures required by any United States authority including, but not limited to, security guards (in spite of crew without United States visas on board), launch services, tug escorts, port security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the negligence of the Owners, Master or crew. All measures required by the Owners to comply with the ship security plan shall be for the Owners' account.

**Asian Gypsy Moth Clause:**
When Charterers direct the Vessel to the area infested by Asian Gypsy Moth during high risk period which designated by U.S.A./Canadian Authorities, Charterers shall at Charterers' time and expense, undertake to arrange a certificate issued by an appropriate authority of such area / port certifying that the Vessel is free from infestation by Asian Gypsy Moth or its eggs and thereby Owners shall not be held liable for any consequences at the next destined ports. In case the Vessel has traded at high-risk ports during high risk period for Asian Gypsy Moth in far-eastern Russia, Japan, China or South Korea within six months prior redelivery, Charterers shall arrange the inspection to obtain a quarantine proof certificate at their account.

**NAABSA Clause:**
Owners agree to allow the Vessel calling at East Coast South America: Uruguay, Buenaventura, Brazil and Argentina, at places where it is customary for similar size of Vessels to lie aground. In consideration of the above, Charterers hereby indemnify Owners from damages to the Vessel in consequence of her lying aground and pay for such damage's cost incurred and Vessel shall remain on hire during such time. In case the Vessel has fallen aground, Owners have the rights to perform a diving inspection in Charterers' time and cost to establish potential damage.

**BIMCO Sanctions Clause for Time Charter Parties:**
(a)     The Owners shall not be obliged to comply with any orders for the employment of the Vessel in any carriage, trade or on a voyage which, in the reasonable judgement of the Owners, will expose the Vessel, Owners, managers, crew, the Vessel's insurers, or their re-insurers, to any

RIDER CLAUSES TO M/V "AMIS INTEGRITY"
CHARTER PARTY DATED 30TH JUNE 2017

sanction or prohibition imposed by any State, Supranational or International Governmental Organization.

(b)     If the Vessel is already performing an employment to which such sanction or prohibition is subsequently applied, the Owners shall have the right to refuse to proceed with the employment and the Charterers shall be obliged to issue alternative voyage orders within 48 hours of receipt of Owners' notification of their refusal to proceed. If the Charterers do not issue such alternative voyage orders the Owners may discharge any cargo already loaded at any safe port (including the port of loading). The Vessel to remain on hire pending completion of Charterers' alternative voyage orders or delivery of cargo by the Owners and Charterers to remain responsible for all additional costs and expenses incurred in connection with such orders/delivery of cargo. If in compliance with this Sub-Clause (b) anything is done or not done, such shall not be deemed a deviation.

(c)     The Charterers shall indemnify the Owners against any and all claims whatsoever brought by the Owners of the cargo and/or the holders of Bills of Lading and/or sub-Charterers against the Owners by reason of the Owners' compliance with such alternative voyage orders or delivery of the cargo in accordance with Sub- Clause (b).

(d)     The Charterers shall procure that this Clause shall be incorporated into all sub-Charters and Bills of Lading issued pursuant to this Charter Party.

(e)     Without limiting the generality of the foregoing, in the event that cargo interests threaten to arrest or detain, or arrest or detain the Vessel (or any other Vessel or property in the same or associated Ownership, management or control) by reason of the Owners' compliance with any orders for the employment of the Vessel in any carriage, trade or on a voyage under the Charter Party, Bill of Lading or under any contract of carriage , Charterers shall provide on first demand such bail or other security as may be required to prevent such arrest of detention or to secure the release of such Vessel or property and to indemnify and hold Owners harmless in respect of any liability, loss, damage or expense caused by such arrest or detention or threatened arrest or detention whether or not such arrest or detention or threatened arrest or detention may be justified.

## Clause 51 - ISM Clause
BIMCO Standard ISM Clause for Voyage and Time Charter Parties

From the date of coming into force of the International Safety Management (ISM) Code in relation to the Vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both the Vessel and 'the Company' (as defined by the ISM Code) shall comply with the requirements of the ISM Code. Upon request the Owners shall provide a copy of the relevant Document of Compliance (DOC) and Safety Management Certificate (SMC) to the Charterers.

Except as otherwise provided in this Charter Party, loss damage, expense or delay caused by failure on the part of the Owners or "the Company" to comply with the ISM Code shall be for the Owners' account.

## Clause 52 - On-Deck Cargo
Deck cargo is allowed but same always loaded in accordance with Vessel's deck strength and subject to Master's consent and satisfaction.

Carried on deck without liability for loss or damage of whatsoever nature arising during carriage by sea, whether caused by unseaworthiness or negligence or any other cause whatsoever.

RIDER CLAUSES TO M/V "AMIS INTEGRITY"
CHARTER PARTY DATED 30TH JUNE 2017
_____

Charterers are responsible for all matters related to on-deck cargo including but not limiting to lashing/unlashing, secure/unsecure of the on-deck cargo. Bill(s) of Lading covering deck cargo to be marked "Shipped on deck at Charterers'/Shippers'/Receivers' risk, time and expense. Owners, Vessel not responsible for any loss, damage incurred".

For deck cargo to and from ports in U.S.A., Bill of Lading covering deck cargo shall be incorporated: "Carried on deck at Shipper's / Charterers' / Receivers' risk as the perils inherent in such carriage but in all other respects subject to the provisions of United States Carriage of Goods by Sea Act 1936".

## Clause 53 - Cables / Victualling / Entertainment Clause
Charterers will remit to Owners with each hire payment a lump sum equivalent of US$ 1,500.00 (One thousand Five Hundred United States dollars) per month (30 days) pro rata for the whole Time-Charter period. This payment shall be in consideration of all victualling as per Line 195 – 196 and the cost of radio telegrams, telexes, fax and telephone communications made by the Master / Officers to the Charterers or their Agents of servants in direct performance of this Charter Party.

## Clause 54 - Compliance with International Conventions
In the event of the Vessel being prevented from or unable to perform in accordance with the terms of this Charter-Party by reason of:

a)      Action on the part of relevant authorities resulting from noncompliance with any compulsory applicable enacments enforcing all or part of any of the International convention in force.

b)      Labor stoppages in services essential to the operation of the Vessel owing to her flag or Ownership or management or the conditions of employment on board.

Any loss of time in the event a) and/or b) shall result in the Vessel being off-hire and shall be dealt with in accordance with the off-hire Clause.

## Clause 55 - Crew Work
Time Charter hire to include (overtime) expenses for nautical matter such as:
a)      Raising and lowering of derricks in preparation for loading and/or discharging;

b)      Removing and /or replacing of beams in preparation for loading and/or discharging;

c)      Shifting operations, docking and bunkering (provided port & local regulations permit);

d)      Maintaining power while loading and/or discharging and care for winches / cranes of operations;
e)      Opening / closing of hatches for loading / discharging as required.

Crews are not to perform any lashing / unlashing of cargo.

If expressly required by Charterers as dictated by circumstances, crew are to operate Vessel's gears/grabs against a compensation to be directly agreed and settled with Master provided with port and local regulations permit and subject to Owners' prior approval.

Charterers are allowed to use Vessel's cranes/grabs free of any charge during the currency of this Time Charter period.

## Clause 56 - Fumigation / Watchmen
Owners to supply valid fumigation or Sanitary Control / Exemption certificates on delivery of the Vessel and if this does not cover the whole period of time Charter and fumigation/sanitization is necessary, the cost of same and the detention to be for Owners' account.

RIDER CLAUSES TO M/V "AMIS INTEGRITY"
CHARTER PARTY DATED 30TH JUNE 2017
_____

Fumigation ordered because of cargoes carries of ports visited while Vessel is employed under this Charter to be for Charterers' account.

Watchmen, if compulsory / customary (particularly for African ports / South American Ports / Russia ports) to be Charterers' account; otherwise watchmen for cargo for Charterers' account, watchmen for Vessel for Owners' account.

Normal immigration should be on Charterers' account. Immigration for crews embarking from ship including the application of shore passes to be on Owners' account to Master's application.

When Charterers direct the Vessel to ports in U.S.A. and/or Canada and or other ports where applicable, to comply with local oil spill prevention regulations, Owners to be responsible for annual fee. For each call, charges incurred for complying with such regulation (including reporting charge for complying with oil spill contingency plan) to be on Charterers' account.

In transit fumigation to be allowed depending on what kind of fumigation, subject to Master's consent at Charterers' time, risk and cost, provided that Charterers give proper and clear instructions to Master/Crew, and Charterers to be responsible for any consequence for the in-transit fumigation.

### Clause 57 - Black List
Owners guarantee that this Vessel has never called at an Israeli port, and Charterers guarantee that the Vessel will not call at any such port prior to or during the currency of this Charter.

Owners also guarantee that this Vessel is not black-listed by any Arab Countries.

### Clause 58 - Preloading Survey
If required by Owners' P&I Club, when loading steel products, the preloading survey to be arranged by Owners' P&I, the cost will be shared equally between/among Owners, Charterers and sub-Charterers.

### Clause 59 - Fuel Sulphur Content Clause
(a)     Without prejudice to anything else contained in this Charter Party, the Charterers shall supply fuels of such specifications and grades to permit the Vessel, at all times, to comply with the maximum sulphur content requirements of any emission control zone when the Vessel is ordered to trade within that zone.

The Charterers also warrant that any bunker suppliers, bunker craft operators and bunker surveyors used by the Charterers to supply such fuels shall comply with Regulations 14 and 18 of MARPOL Annex VI, including the Guidelines in respect of sampling and the provision of bunker delivery notes.

The Charterers shall indemnify, defend and hold harmless the Owners in respect of any loss, liability, delay, fines, costs or expenses arising or resulting from the Charterers' failure to comply with this Sub-Clause (a).

(b)     Provided always that the Charterers have fulfilled their obligations in respect of the supply of fuels in accordance with Sub-Clause (a), the Owners warrant that:

(i)      The Vessel shall comply with Regulations 14 and 18 of MARPOL Annex VI and with the requirements of any emission control zone; and

(ii)     The Vessel shall be able to consume fuels of the required sulphur content when ordered by the Charterers to trade within any such zone.

RIDER CLAUSES TO M/V "AMIS INTEGRITY"
CHARTER PARTY DATED 30TH JUNE 2017

_____

Subject to having supplied the Vessel with fuels in accordance with Sub-Clause (a), the Charterers shall not otherwise be liable for any loss, delay, fines, costs or expenses arising or resulting from the Vessel's failure to comply with Regulations 14 and 18 of MARPOL Annex VI.

(c)     For the purpose of this Clause, "emission control zone" shall mean zones as stipulated in MARPOL Annex VI and/or zones regulated by regional and/or national authorities such as, but not limited to, the E.U. and the U.S. Environmental Protection Agency.

**Clause 60 - Option to Sell**
Owners to have the option to sell the Vessel and change Vessel's flag/Name/Ownership/Management, provided they give sufficient notice to Charterers and that the new Ownership respects the present Charter Party, subject to Charterers' approval of new Owners which not to be unreasonable withheld.

It is remained understood that no one of the above changes will alter/affect terms and conditions of governing Charter Party, including but not limited to the trading.

**Clause 61 - Bottom Fouling Clause**
In the event of the Charterers ordering the Vessel to port where Vessel's stay is more than 25 consecutive days or to lay-up so as to avoid bottom fouling, Charterers to clean Vessel at their time and expense up to Owners/Master's satisfaction, after such cleaning the speed/consumption warranties will be reinstated, otherwise Owner's representation of Vessel's speed/consumption to be non-operative from the time of sailing from such port(s) until Vessel's next hull cleaning, such fouling affecting speed to be evidenced through a joint diver's inspection. Cost for same to be for Owner's account and time to be for Charterers' account.

**Clause 62 – Panama / Suez Canal Transit**
The Owners guarantee that the Vessel shall be fitted for Panama/Suez Canal transit and in possession of valid necessary certificate and equipment (however, without the Suez Canal Projector light) during the currency of this Charter to comply with current regulations and requirements of both Canals. If required, the Suez Canal Projector light, rent of same to be for Charterers' account.

**Clause 63 - Owners' Bank Full Style**
Beneficiary:              WISDOM MARINE LINES S.A.
Beneficiary Bank:      BANK OF TAIWAN, OFFSHORE BANKING BRANCH
Swift Code:              BKTWTWTP048
Account No.:            069-007-77798-7

**Clause 64 - Owners' Agents**
Charterers agree to have their agents to attend Vessel's ordinary husbanding without any agency fee in conformity with normal shipping practice provided no extra agency fee to be required by each local agent. If required by Owners, Charterers' agents to attend extraordinary matters (like attending repairs, crew change etc.) in which case Owners to refund Agents outlays and pay agency fee agreed between Owners and Charterers' agents.

**Clause 65 - Adding Off-Hire Period**
Should the Vessel be off-hired during the currency of this Charter for any reason whatsoever, Charterers have the option to add such off-hired period to the Charter period. Such option must be declared by Charterers 3 months prior to the redelivery date.

**Clause 66 - Burning MDO**
The Vessel has a liberty to burn diesel oil for main engine when manoeuvring in shallow and/or narrow water, canals, rivers and in and/or out of port. The Vessel also has a liberty to burn diesel oil for auxiliary engine when starting, stopping and working with low load.

RIDER CLAUSES TO M/V "AMIS INTEGRITY"
CHARTER PARTY DATED 30TH JUNE 2017
_____

**Clause 67 - Dry Docking Clause**
The Owners shall have the option to place the Vessel in dry dock after the 2.5-3rd years after delivery from shipyard at a convenient time and place, for bottom cleaning and painting and/or repair as required by Class or dictated by circumstances. Payment of hire shall be suspended upon deviation from Charterers' service until the Vessel is again placed at Charterers disposal at a point not less favourable to Charterers than when hire was suspended. The Charterers do their utmost to accommodate such positioning of the Vessel in Far East in two and a half year (counting from new building delivery) intervals for dry docking. The Owners shall give the Charterers approximate 3 (three) months' notice of dry docking.

**Clause 68 – Letter of Indemnity Clause**
In case original Bill(s) of Lading are not available at discharging port(s), Owners/Master will allow discharge and release the entire cargo against a single Letter of Indemnity (as attached to this Charter) signed by the Charterers only.

If requested by Charterers, Owners/Master will allow discharge and release of the entire cargo at another port than stated on the original Bill of Lading and without presentation of original Bill of Lading against a single Letter of Indemnity (as attached to this Charter) signed by Charterers only.
As per Owners' standard Letter of Indemnity wordings, which will provide later.

**Clause 69 - Bill of Lading Reference**
The Owners accept that Bills of Lading issued under this Charter Party might bear a reference to a Charter Party to which the Owners are not a party. The Charterers hereby undertake to indemnify and hold harmless the Owners for any and all consequences following from the issuance of Bills of Lading by the Owners which bear such reference, but not their contractual obligations under the Bill of Lading as Owners per this Time Charter Party.

**Clause 70 - Deviation / Put Back**
In the event of loss of time either in port or at sea, deviation from the course of the voyage or putting back whilst on the voyage, caused by sickness of or an accident to or misconduct by Master / Officer / Crew, or caused by stowaway, refugee on board the Vessel, or breakdown to Vessel (or drydocking or periodical survey), the hire shall be suspended from the time of inefficiency in port or at sea, deviation or putting back (except for any Government or similar authority ordered rescue operation) until Vessel become again efficient in the same position or regain the line of voyage whichever shorter distance for the port where Vessel is originally destined for and the voyage resumed therefrom, and all direct proven expenses incurred including bunkers consumed during such period of suspension shall be for Owners' account.

**Clause 71 - BIMCO ISPS Clause for Time Charter Parties**
(a)  (i)  From the date of coming into force of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) in relation to the Vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both the Vessel and "the Company" (as defined by ISPS Code) shall comply with the requirements of the ISPS Code relating to the Vessel and "the Company" Upon request the Owners shall provide a copy of the relevant International Ship Security Certificate (or the interim International Ship Security Certificate) to the Charterers. The Owners shall provide the Charterers with the full style contact details of the company Security Officer (CSO)

     (ii)  Except as otherwise provided in the Charter Party, loss, damage, expense or delay, excluding the consequential loss, caused by failure on the part of the Owners or "the Company" to comply with the requirements of the ISPS Code or this Clause shall be for the Owners' account.

RIDER CLAUSES TO M/V "AMIS INTEGRITY"
CHARTER PARTY DATED 30TH JUNE 2017

_____

(b)    (i)    The Charterers shall provide the CSO and the Ship Security Officer (SSO)/Master with their full style contact details and, where sub-letting is permitted under the term of this Charter Party, shall ensure that the contact f all sub-Charterers are likewise provide to the CSO and the SSO/Master. Furthermore, the Charterers shall ensure that all sub-Charter Parties they enter into during the period of this Charter Party Contain the following provision:

"The Charterers shall provide the Owners with their full style contact detail and, where sub-letting is permitted under the term of the Charter Party, shall ensure that the contact details of all sub-Charterers are likewise provide to the Owners"

(ii)    Except as otherwise provide in this Charter Party, Loss damage, expense or delay, excluding consequential loss, caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers' account.

(c)    (i)    Notwithstanding anything else contained in this Charter Party all delay, cost or expenses whatsoever arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code including, but not limited to, security guards, launch service, tug escorts, port security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the Owners' negligence. All measures required by the Owners to comply with the Ship Security Plan shall be for the Owners' account.

(d)    If either party makes any payment which is for the other party's account according to this Clause, the other party shall indemnity the paying party.

## Clause 72 - Capture, Seizure, Arrest

Should the Vessel be captured or seized or detained or arrested by any authority or by any legal process during the currency or this Charter-Party, for any reason which affect cargo loading / discharging operation and Vessel sailing / departure attributable to the Owners, the payment of hire shall be suspended until the time of her release, unless such seizure or detention of arrest was caused by the cargo carried or associated with Charterers of their agents, servants.

Any extra proven expenses directly incurred by and/or during such capture or seizure or detention or arrest shall be for Owners' account.

## Clause 73 - Additional Equipment, Fittings

The Charterers, subject to the Owners' approval shall be at liberty to fit/weld and additional equipment for fittings, for loading, discharging and/or securing cargo. Such work shall be done at the Charterers' expenses and time, and the Charterers shall remove such equipment and fittings at their expense and time prior to redelivery. The strength, location and fitting of additional fittings for cargo securing to be approved by class/Master and procedure for use to be entered into the Vessel's Class approved Cargo Securing Manual.

## Clause 74 - Quarantine

Normal quarantine time and expenses for the Vessel's entering port shall be for the Charterers' account, but any time of detention and expenses for quarantine due to pestilence, epidemics and illness of Captain, Officers and crew shall be for the Owners' account. However, if quarantine and/or detention is on account of the Vessel having been sent by the Charterers to an infected port, such detention time and expenses to be for the Charterers' account.

## Clause 75 - Oil Pollution Indemnity Clause for Penalties and Fines:

(a)    Subject to the terms of this Charter Party, as between Owners and Charterers, in the event of an oil pollution incident involving any discharge or threat of discharge of oil, oily mixture, or

RIDER CLAUSES TO M/V "AMIS INTEGRITY"
CHARTER PARTY DATED 30TH JUNE 2017

_____

oily residue from the Vessel (the "Pollution Incident"), Owners shall have sole responsibility for responding to the Pollution Incident as may be required of the Vessel interests by applicable law or regulation.

(b)      Without prejudice to the above, as between the parties it is hereby agreed that:
1.      Owners shall indemnify, defend and hold Charterers harmless in respect of any liability for criminal fine or civil penalty arising out of or in connection with a Pollution Incident, to the extent that such Pollution Incident results from a negligent act or omission, or breach of this Charter Party by Owners, their servants or agents.

2.      Charterers shall indemnify, defend and hold Owners harmless in respect of any liability for criminal fine or civil penalty arising out of or in connection with a Pollution Incident, to the extent that such Pollution Incident results from a negligent act or omission, or breach of this Charter Party by Charterers, their servants or agents, provided always that such fine or penalty has not been imposed by reason wholly or partly of any fault of the party seeking the indemnity and that the law governing the Charter Party does not prohibit recovery of such fines.

(c)      Nothing in this Clause shall prejudice any right of recourse of either party, or any defenses or right to limit liability under any applicable law.

(d)      Charterers shall procure that this Clause be incorporated into all Sub-Charters and contracts of carriage issued pursuant to this Charter Party.

### Clause 76 - Boycott
In the event that the Vessel is delayed by strikes, lockouts, labor stoppage or any other difficulties due to flag or Ownership of the Vessel or due to the terms and conditions under which members of the crew are employed, hire shall cease for such time lost and all other consequences, liabilities and proven expenses directly incurred are to be for Owners' account, including bunker fuel consumed during such periods. Any extra insurance, if any, owing to Vessel's age and/or class and/or management and/or flag, to be for Owners' account.

### Clause 77 - Deductions
Charterers will not deduct from hire payment for any estimated expense under this Charter-Party unless otherwise agreed by Owners. Owners agree Charterers to deduct from hire payment for all Owners disbursements subject to supporting voucher. Charterers will be allowed to deduct value of bunkers from the last sufficient hire payment(s), same towards end of the first maximum period or when intending to redeliver the Vessel.

### Clause 78 - I.T.F. Requirements
The Owners of the Vessel guarantee that the minimum terms and conditions of the Officer/crew of the Vessel are now or will be prior to presentation of the Vessel for loading and will remain for the period of this Charter Party covered-by an I.T.F, Agreement or a bona fide Trade Union Agreement acceptable to the I.T.F.

### Clause 79 - Owners Guarantee that Vessel is Entered with a P&I Club
Charterers have the benefit of Owners' P&I Club as far as the Club's rules permit. Cargo claims are to be settled in accordance with the New York Produce Exchange Interclub Agreement 1996 and any subsequent amendments thereto.

Charterers guaranteed full Charterers' liabilities covered by MS Amlin (https://www.msamlin.com) and will remain so throughout the duration of this Charter. (Charterers to provide the related documents / information for Owners' reference.)

RIDER CLAUSES TO M/V "AMIS INTEGRITY"
CHARTER PARTY DATED 30TH JUNE 2017

_____

**Clause 80 - IMO**
Vessel will comply with applicable IMO Regulations throughout the period of this Charter.

**Clause 81 - Ballast**
Owners undertake that the Vessel can navigate safely in ballast without requiring solid ballast.

**Clause 82 - War Risk Insurance**
Basic annual war risk insurance premium on Vessel's war risk value to be for Owners' account.

Any extra or additional war risk insurance premium on Vessel's war risk value and crew war bonus for trading to areas, in breach of war risk warranties to be for Charterers' account.

Additional war risk premium shall be reimbursed by the Charterers to the Owners following receipt copy of the invoice and supporting vouchers from Owners underwriters or underwriters' brokers.

**Clause 83 - Safety and Health Regulations**
Owners warrant that the Vessel shall be in possession of the necessary Certificates to comply with all Safety and Health Regulations concerning Health and Safety Requirements and all current requirements at all ports of call permitted under this Charter-Party during the currency of this Charter, without hindrance or delay.

**Clause 84 -BIMCO ISPS/MTSA Clause for Time Charter Parties 2005**

(a)    (i)    The Owners shall comply with the requirements of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) relating to the Vessel and "the Company" (as defined by the ISPS Code). If trading to or from the United States or passing through United States waters, the Owners shall also comply with the requirements of the U.S. Maritime Transportation Security Act 2002 (MTSA) relating to the Vessel and the "Owner" (as defined by the MTSA).

(ii)    Upon request the Owners shall provide the Charterers with a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) and the full style contact details of the Company Security Officer (CSO).

(iii)    Loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Owners or "the Company"/"Owner" to comply with the requirements of the ISPS Code/MTSA or this Clause shall be for the Owners' account, except as otherwise provided in this Charter Party.

(b)    (i)    The Charterers shall provide the Owners and the Master with their full style contact details and, upon request, any other information the Owners require to comply with the ISPS Code/MTSA. Where sub-letting is permitted under the terms of this Charter Party, the Charterers shall ensure that the contact details of all sub- Charterers are likewise provided to the Owners and the Master. Furthermore, the Charterers shall ensure that all sub-Charter parties they enter into during the period of this Charter Party contain the following provision:

"The Charterers shall provide the Owners with their full style contact details and, where subletting is permitted under the terms of the Charter Party, shall ensure that the contact details of all sub-Charterers are likewise provided to the Owners".

(ii)    Loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers' account, except as otherwise provided in this Charter Party.

RIDER CLAUSES TO M/V "AMIS INTEGRITY"
CHARTER PARTY DATED 30TH JUNE 2017
_____

(c)     Notwithstanding anything else contained in this Charter Party all delay, costs or expenses whatsoever arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code/MTSA including, but not limited to, security guards, launch services, Vessel escorts, security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the negligence of the Owners, Master or crew. All measures required by the Owners to comply with the Ship Security Plan shall be for the Owners' account.

(d)     If either party makes any payment which is for the other party's account according to this Clause, the other party shall indemnify the paying party.

## Clause 85 - Cargo and Equipment

Owners undertake that throughout this Charter Vessel's equipment shall comply with regulations and/or requirements in effect at all ports of call permitted under this Charter-Party, canals and countries in which Vessel will be employed under this Charter-Party. Owners also undertake that Vessel shall be at all times in possession of a valid and up-to-date certificate on board to comply with such regulations and/or requirements. If stevedores, longshoremen or other laborer are not permitted to work by reason of any failure of the Captain, Owners and/or their Agents to comply with such regulations or by reason that Vessel is not in possession of such valid and up-to-date certificate(s), then Owners shall take immediate corrective measures. Charterers may suspend hire for time lost thereby and any extra proven expenses directly incurred shall be for Owners' account.

## Clause 86 - Bunkering Privileges

Owners certify that the Vessel is and will remain so throughout the duration of this Charter, eligible of full bunkering privileges in the United States of America and its territories and possessions under all present and future United States Law and Regulations and is not, nor will be, restricted as to bunkering at any other countries of port of call during this Charter.

## Clause 87 - Weather

For the purpose of this Charter Party, the good weather conditions are to be defined as weather conditions in headwind speeds not exceeding headwinds Beaufort Force 4 and Sea State Douglas 3. Evidence of weather conditions to be taken from independent weather bureau reports and Vessel's logs. In the event of consistent discrepancies between the deck logs and the independent weather bureau reports, the average of the two shall be taken as ruling.

## Clause 88 - Stevedore Damage Clause

Charterers to be responsible for any damages caused by stevedores in loading and discharging and for any other damages caused by stevedores or their Agents provided that the Master obtain Statement of Facts or Damage Certificate signed by stevedores and/or their agents. In the event that the Master is unable to obtain Statement of Facts or damage acknowledgement certificate signed by the stevedores and/or their agents or if obtained but the Statement of Facts or damage acknowledgement certificate be remarked or annotated by the stevedores and/or their Agents repudiated responsibility or liability, the Master to report to Charterers and Owners the actual situation within 36 hours after the occurrence, otherwise Charterers shall not be held responsible for the damage and settlement to be made between Charterers and Owners through negotiation in accordance with the terms and conditions of this Charter Party. The repairs to such damages are to be paid for by Charterers and are to be effective whilst the Vessel is on hire, unless by mutual agreement, it is over sufficient minor nature to permit deferring the repairs until Vessel's next periodical survey, regardless whether these repairs are considered to be or not to be as items of periodical survey, Charterers to refund the cost to Owners of such repairs against the presentation of repairs billed.

If Owners sell the Vessel without effecting such repairs, Charterers to refund the Owners' loss as a result of the damages leading to a lower sale price.

RIDER CLAUSES TO M/V "AMIS INTEGRITY"
CHARTER PARTY DATED 30TH JUNE 2017

_____

**Clause 89**
If the Vessel is kept waiting off a port for a minimum of 45 days and requires replenishment of fresh water and/or provisions and such an extra barge supply cost for fresh water and/or provisions to be for Charterers' account, but cost of fresh water and/or provisions to be for Owners' account. But in case Charterers inform Owners in advance that such a port delay is possible, with Owners still having an opportunity to stem sufficient fresh water, then Charterers not responsible for same and all time/costs resulting for same to be for Owners' account.

**Clause 90 - Double Banking Clause**
BIMCO Double Banking Clause
(a)     The Charterers shall have the right, where and when it is customary and safe for Vessels of similar size and type to do so, to order the Vessel to go, lie or remain alongside another Vessel or Vessels of any size or description whatsoever or to order such Vessels to come and remain alongside at such safe dock, wharf, anchorage or other place for transshipment, loading or discharging of cargo and/or bunkering.

(b)     The Charterers shall pay for and provide such assistance and equipment as may be required to enable any of the operations mentioned in this Clause safely to be completed and shall give the Owners such advance notice as they reasonably can of the details of any such operations.

(c)     Without prejudice to the generality of the Charterers' rights under (a) and (b), it is expressly agreed that the Master shall have the right to refuse to allow the Vessel to perform as provided in (a) and (b) if in his reasonable opinion, it is not safe so to do.

(d)     The Owners shall be entitled to insure any deductible under the Vessel's hull policy and the Charterers shall reimburse the Owners any additional premium(s) required by the Vessel's Underwriters and/or the cost of insuring any deductible under the Vessel's hull policy.

(e)     The Charterers shall further indemnify the Owners for any costs, damage and liabilities resulting from such operation. The Vessel shall remain on hire for any time lost including periods for repairs as a result of such operation.

**Clause 91 – Hose Test**
Charterers to have the option to hose test the hatch covers at each and any loading port in their time and at their expense. If the hatch(es) are found not to be watertight, Owners will immediately take all the necessary steps and make all the necessary arrangements to make the hatch covers watertight.

**Clause 92 – Sea Waybills**
Charterers and/or their agents have the right to issue and sign seaway bills in lieu of Bills of Lading for cargo discharge in Japanese ports only. At the Japanese discharging ports, cargo to be released without presentation of non-negotiable seaway bill and Letter of Indemnity, in which case Charterers shall indemnify and keep Owners and the Vessel harmless from all consequences arising from doing so.

Charterers shall send a fax copy of sea waybills to the Master/Owners prior to the Vessel's arrival at discharging ports, in order for the Master to instruct Charterers' agent to indemnify the consignee and release the cargo in accordance with the terms of Sea Waybills.

**Clause 93 - Welding Pad-eyes**
Charterers to have the option of welding pad eyes/angle pieces at their own arrangement, risk and expense. Charterers to remove all pad eyes/angle pieces by redelivery unless Owners require Charterers to maintain same.

RIDER CLAUSES TO M/V "AMIS INTEGRITY"
CHARTER PARTY DATED 30TH JUNE 2017
_____

**Clause 94 - BIMCO War Risks Clause for Time Charters, 2004 (Code Name: CONWARTIME 2004)**

(a)    For the purpose of this Clause, the words:

    (i)    "Owners" shall include the Ship Owners, bareboat Charterers, Disponent Owners, managers or other operators who are charged with the management of the Vessel, and the Master; and

    (ii)    "War Risks" shall include any actual, threatened or reported:
    war; act of war; civil war; hostilities; revolution; rebellion; civil commotion; warlike operations; laying of mines; acts of piracy; acts of terrorists; acts of hostility or malicious damage; blockades (whether imposed against all Vessels or imposed selectively against Vessels of certain flags or Ownership, or against certain cargoes or crews or otherwise howsoever); by any person, body, terrorist or political group, or the Government of any state whatsoever, which, in the reasonable judgement of the Master and/or the Owners, may be dangerous or are likely to be or to become dangerous to the Vessel, her cargo, crew or other persons on board the Vessel.

(b)    The Vessel, unless the written consent of the Owners be first obtained, shall not be ordered to or required to continue to or through, any port, place, area or zone (whether of land or sea), or any waterway or canal, where it appears that the Vessel, her cargo, crew or other persons on board the Vessel, in the reasonable judgement of the Master and/or the Owners, may be, or are likely to be, exposed to War Risks.

    Should the Vessel be within any such place as aforesaid, which only becomes dangerous, or is likely to be or to become dangerous, after her entry into it, she shall be at liberty to leave it.

(c)    The Vessel shall not be required to load contraband cargo, or to pass through any blockade, whether such blockade be imposed on all Vessels, or is imposed selectively in any way whatsoever against Vessels of certain flags or Ownership, or against certain cargoes or crews or otherwise howsoever, or to proceed to an area where she shall be subject or is likely to be subject to a belligerent's right of search and/or confiscation.

(d)    (i)    The Owners may effect war risks insurance in respect of the Hull and Machinery of the Vessel and their other interests (including, but not limited to, loss of earnings and detention, the crew and their protection and Indemnity Risks), and the premiums and/or calls therefore shall be for their account.

    (ii)    If the Underwriters of such insurance should require payment of premiums and/or calls because, pursuant to the Charterers' orders, the Vessel is within, or is due to enter and remain within, or pass through any area or areas which are specified by such Underwriters as being subject to additional premiums because of War Risks, then the actual premiums and/or calls paid shall be reimbursed by the Charterers to the Owners at the same time as the next payment of hire is due, or upon redelivery, whichever occurs first.

(e)    If the Owners become liable under the terms of employment to pay to the crew any bonus or additional wages in respect of sailing into an area which is dangerous in the manner defined by the said terms, then the actual bonus or additional wages paid shall be reimbursed to the Owners by the Charterers at the same time as the next payment of hire is due, or upon redelivery, whichever occurs first.

(f)    The Vessel shall have liberty: -

    (i)    to comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of

RIDER CLAUSES TO M/V "AMIS INTEGRITY"
CHARTER PARTY DATED 30TH JUNE 2017
_____

cargo, delivery, or in any other way whatsoever, which are given by the Government of the Nation under whose flag the Vessel sails, or other Government to whose laws the Owners are subject, or any other Government, body or group whatsoever acting with the power to compel compliance with their orders or directions;

(ii)     to comply with the order, directions or recommendations of any war risks underwriters who have the authority to give the same under the terms of the war risks insurance;

(iii)    to comply with the terms of any resolution of the Security Council of the United Nations, the effective orders of any other Supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement;

(iv)    to discharge at any other port any cargo or part thereof which may render the Vessel liable to confiscation as a contraband carrier;

(v)     to call at any other port to change the crew or any part thereof or other persons on board the Vessel when there is reason to believe that they may be subject to internment, imprisonment or other sanctions.

(g)    If in accordance with their rights under the foregoing provisions of this Clause, the Owners shall refuse to proceed to the loading or discharging ports, or any one or more of them, they shall immediately inform the Charterers. No cargo shall be discharged at any alternative port without first giving the Charterers notice of the Owners' intention to do so and requesting them to nominate a safe port for such discharge. Failing such nomination by the Charterers within 48 hours of the receipt of such notice and request, the Owners may discharge the cargo at any safe port of their own choice.

(h)    If in compliance with any of the provisions of sub-Clauses (b) to (g) of this Clause anything is done or not done, such shall not be deemed a deviation, but shall be considered as due fulfilment of this Charter Party.

**Clause 95 - BIMCO Stowaways Clause for Time Charters**

a)      (i)      The Charterers warrant to exercise due care and diligence in preventing stowaways in gaining access to the Vessel by means of secreting away in the goods and/or containers shipped by the Charterers.

(ii)     If, despite the exercise of due care and diligence by the Charterers, stowaways have gained access to the Vessel by means of secreting away in the goods and/or containers shipped by the Charterers, this shall amount to breach of Charter for the consequences of which the Charterers shall be liable and shall hold the Owners harmless and shall keep them indemnified against all claims whatsoever which may arise and be made against them. Furthermore, all time lost and all expenses whatsoever and howsoever incurred, including fines, shall be for the Charterers' account and the Vessel shall remain on hire.

(iii)    Should the Vessel be arrested as a result of the Charterers breach of Charter according to sub-Clause (a) (ii) above, the Charterers shall take all reasonable steps to secure that, within a reasonable time, the Vessel is released and at their expense put up bail to secure release of the Vessel.

RIDER CLAUSES TO M/V "AMIS INTEGRITY"
CHARTER PARTY DATED 30TH JUNE 2017

---

b)    (i)    If, despite the exercise of due care and diligence by the Owners, stowaways have gained access to the Vessel by means other than secreting away in goods and/or containers shipped by the Charterers, all time lost and all expenses whatsoever and howsoever incurred, including fines, shall be for Owners' account and the Vessel shall be off-hire.

    (ii)    Should the Vessel be arrested as a result of stowaways having gained access to the Vessel by means other than secreting away in the goods and/or containers shipped by the Charterers, the Owners shall take all reasonable steps to secure that, within a reasonable time, the Vessel is released and at their expense put up bail to secure release of the Vessel.

## Clause 96 - Strike Clause

Ship not to be responsible for any loss, damage, or delay, directly or indirectly caused by, or arising from strikes, lockouts, labor disturbances, trade, disputes, or anything done in contemplation or further thereof, whether the Owners be parties thereto or not.

## Clause 97 - Guarantee Clause

Owners guarantee that Vessel shall be in all respect suitable for loading grain/grain products in accordance with Chapter VI/C of SOLAS and in accordance with booklet for the carriage of grain without additional securing/bagging/strapping/trimming.

Owners guarantee that neither the Vessel nor the management and the company are blacklisted from no one of the countries allowed to be traded under this Charter.

Owners guarantee that the Vessel as soon as possible after delivery shall be Rightship approved and maintained so through the currency of this Charter.

Owners guarantee that Vessel is fully ITF/P&I covered, classification society is an IACS member.

Owners confirm/guarantee that head Owner and/or Disponent Owners has no North Korean or Iran interest whatsoever in the Vessel/Owner/Management/ Crew etc.

Owners guarantee that Vessel shall not be owned, flagged or Chartered by any country, person or entity, which would cause violation of or be penalized by U.S. economic sanctions laws.

## Clause 98 - U.S. Security Clause

Please refer to Clause 50.

## Clause 99 - Slow Steam Clause

Charterers to have the option to slow steam the Vessel under weather permitting during the course of this Charter Party on the basis of speeds and consumptions to be advised but always within a range safe, operable and harmless to the engine. Nevertheless Owners/Master/Chief Engineer always to do utmost to assist Charterers in their requirements.

## Clause 100 - Oil Pollution Clause

Financial responsibility:

Vessel shall at all times have a valid certificate of financial responsibility under U.S. Government regulations enabling her to use the navigable water of the United States of America. Owners also undertake to comply with any law or regulation in force at any place of which the Vessel may be ordered concerning oil pollution or other pollutions.

RIDER CLAUSES TO M/V "AMIS INTEGRITY"
CHARTER PARTY DATED 30TH JUNE 2017
_____

**Clause 101**
All negotiations and fixture to remain strictly private and confidential.

**Clause 102**
Owners warrant Vessel is in all respect eligible for trading to the safe ports, safe places or countries specified in Charter Party and that at all necessary times the Vessel and/or Owners shall have valid certificates, records or their documents required for such trade. All documents/certificates to be valid/kept onboard by Owners including compliance with ISM regulations carrying an accredited SMS/ISM certificate issued by International recognized classification society.

**Clause 103 - BIMCO Piracy Clause for Time Charter Parties 2009**
(a)    Except as otherwise specifically agreed, the Vessel shall not be obliged to proceed or required to continue to or through, any port, place, area or zone, or any waterway or canal (hereinafter "Area") which, in the reasonable judgement of the Master and/or the Owners, is dangerous to the Vessel, her cargo, crew or other persons on board the Vessel due to any actual, threatened or reported acts of piracy and/or violent robbery and/or capture/seizure (hereinafter "Piracy"), whether such risk existed at the time of entering into this Charter Party or occurred thereafter. Should the Vessel be within any such place as aforesaid which only becomes dangerous, or is likely to be or to become dangerous, after her entry into it, she shall be at liberty to leave it.

(b)    If in accordance with sub-Clause (a) the Owners decide that the Vessel shall not proceed or continue to or through the Area they must immediately inform the Charterers. The Charterers shall be obliged to issue alternative voyage orders and shall indemnify the Owners for any claims from holders of the Bills of Lading caused by waiting for such orders and/or the performance of an alternative voyage. Any time lost as a result of complying with such orders shall not be considered off-hire.

(c)    If the Owners consent or if the Vessel proceeds to or through an Area exposed to the risk of Piracy the Owners shall have the liberty:

       (i)     to take reasonable preventative measures to protect the Vessel, her crew and cargo including but not limited to re-routing within the Area, proceeding in convoy, using escorts, avoiding day or night navigation, adjusting speed or course, or engaging security personnel or equipment on or about the Vessel;

       (ii)    to comply with the orders, directions or recommendations of any underwriters who have the authority to give the same under the terms of the insurance;

       (iii)   to comply with all orders, directions, recommendations or advice given by the Government of the Nation under whose flag the Vessel sails, or other Government to whose laws the Owners are subject, or any other Government, body or group, including military authorities, whatsoever acting with the power to compel compliance with their orders or directions; and

       (iv)    to comply with the terms of any resolution of the Security Council of the United Nations, the effective orders of any other Supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement;

               and the Charterers shall indemnify the Owners for any claims from holders of Bills of Lading or third parties caused by the Vessel proceeding as aforesaid, save to the extent that such claims are covered by additional insurance as provided in sub-Clause (d)(iii).

RIDER CLAUSES TO M/V "AMIS INTEGRITY"
CHARTER PARTY DATED 30TH JUNE 2017

_____

(d)    Costs
  (i)  If the Vessel proceeds to or through an Area where due to risk of Piracy additional costs will be incurred including but not limited to additional personnel and preventative measures to avoid Piracy, such reasonable costs shall be for the Charterers' account. Any time lost waiting for convoys, following recommended routing, timing, or reducing speed or taking measures to minimize risk, shall be for the Charterers' account and the Vessel shall remain on hire;

  (ii)  If the Owners become liable under the terms of employment to pay to the crew any bonus or additional wages in respect of sailing into an area which is dangerous in the manner defined by the said terms, then the actual bonus or additional wages paid shall be reimbursed to the Owners by the Charterers;

  (iii)  If the underwriters of the Owners' insurances require additional premiums or additional insurance cover is necessary because the Vessel proceeds to or through an Area exposed to risk of Piracy, then such additional insurance costs shall be reimbursed by the Charterers to the Owners;

  (iv)  All payments arising under Sub-Clause (d) shall be settled within fifteen (15) days of receipt of Owners' supported invoices or on redelivery, whichever occurs first.

(e)  If the Vessel is attacked by pirates any time lost shall be for the account of the Charterers and the Vessel shall remain on hire.

(f)  If the Vessel is seized by pirates the Owners shall keep the Charterers closely informed of the efforts made to have the Vessel released. The Vessel shall remain on hire throughout the seizure and the Charterers' obligations shall remain unaffected, except that hire payments shall cease as of the ninety-first (91st) day after the seizure and shall resume once the Vessel is released. The Charterers shall not be liable for late redelivery under this Charter Party resulting from seizure of the Vessel by pirates.

(g)  If in compliance with this Clause anything is done or not done, such shall not be deemed a deviation, but shall be considered as due fulfilment of this Charter Party. In the event of a conflict between the provisions of this Clause and any implied or express provision of the Charter Party, this Clause shall prevail to the extent of such conflict, but no further.

Owners can provide Charterers with scanned copies of original supported invoice.

**Clause 104 – Bill(s) of Lading / Letter of Indemnity Clause:**
(A)  Bill(s) of Lading:
  The Vessel to use Charterers/ sub-Charterers/ Shippers Bills of Lading which are to include: Both to Blame Collision Clause, New Jason Clause, Clause Paramount, U.S. trade-Drug Clause.

  The Master to sign Bills of Lading for cargo as presented in conformity with the Mate's or Tally Clerk receipt. However, at Charterers' option Charterers or their designated agents may sign Bills of Lading on behalf of the Master always in conformity with the Mate's or Tally Clerk's receipt.

  All Bills of Lading shall be without prejudice to this Charter and Charterers herewith indemnify Owners from all consequences arising from Charterers and or their designated agents signing Bills of Lading not in conformity with the remarks in Mate's receipts, also against all consequences or liabilities which may arise from any inconsistency between the

RIDER CLAUSES TO M/V "AMIS INTEGRITY"
CHARTER PARTY DATED 30TH JUNE 2017

Charter and any Bills of Lading signed by Charterer or their designated agents under this Charter.

(B)      In case original Bills of Lading are not available at the discharge port(s), Owners/Master will allow discharge and release the entire cargo against a single Letter of Indemnity (as attached to this Charter) signed by Charterers only.

(C)      If requested by Charterers, Owners/Master will allow discharge and release of the entire cargo at another port than stated on the original Bill of Lading and without presentation of and original Bill of Lading against a single Letter of Indemnity (as attached to this Charter) signed by Charterers only.

As per Owners' standard Letter of Indemnity wordings, will provide later.

## Clause 105 – Inspection Clause
The Charterers and/or their supercargo(es) and/or their representatives shall to have free access to Vessel's bridge and cargo holds during the Charter period. Whenever required and feasible Master must bring the Vessel to an even trim to ensure correct bunker soundings. The Charterers and/or their supercargo(es) and/or their representatives to have free access to the Vessel's deck log books, as requested and are allowed to make copies of same.

## Clause 106 – OFAC Clause
1.0      The Owners warrant and undertake that throughout the currency of this Charter Party:

1.1      The Vessel shall not be named on the list of Special Designated Nationals and Blocked Persons (the "SDN" list) as published and amended from time to time by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC"); and

1.2      The Vessel's registered Owner shall not be named on the SDN list; and

1.3      The Vessel shall not be owned, Chartered, operated or controlled by any person or entity named on the SDN list; and

1.4      The Vessel shall not be flagged or registered by a country that is subject to the U.S. Sanctions Laws administered by OFAC from time to time (the "U.S. Sanctions") and acceptance of the Vessel by Charterers shall not constitute a violation of U.S. Sanctions; and

1.5      The Vessel shall not be owned or Chartered by a person or entity that is registered, constituted or organized in, or that is a citizen or resident of or located in, a country that is subject to the U.S. Sanctions and acceptance or trading of the Vessel by Charterers would constitute a violation of U.S. Sanctions; and

1.6      Acceptance and trading of the Vessel by the Charterers throughout the Charter Party duration shall not constitute a violation of any sanctions laws of the United Nations, the United Kingdom, the European Union, the United States of America, by the Charterers as if it were subject to such sanctions laws, all as amended from time to time.

2.0      Should at any time during this Charter Party Owners be in breach of any of the provisions and/or warranties contained in this Clause, then:

2.1      Owners shall indemnify the Charterers against any losses or damages whatsoever resulting, and

2.2      Charterers shall have the right to immediately cancel the Charter Party.

RIDER CLAUSES TO M/V "AMIS INTEGRITY"
CHARTER PARTY DATED 30TH JUNE 2017

_____

**Clause 107 -  Co-Stowing Clause**
Owners and Master to undertake best efforts to co-operate with Charterers for best stowage of cargo, and Master to make best efforts to collect, re-stow and provide useful dunnage, lashings, etc., including pre- slings/wire slings, not broken for next use after completion of the voyage, during the currency of this Charter, if requested to do so by Charterers.

Charterers have the option of co-stowing cargos of different grades in the same hold, with or without artificial separations. In such case, Charterers indemnify Owners against risks of cargo claims and hold them harmless for any delays/ expenses / losses related to contamination which result whatsoever/howsoever from co-mingling where such cargos are co-stowed in the same hold. Charterers will be responsible for any claims / harms, which may arise from this co-mingling, to Vessel.

Charterers may install artificial steel cargo separations in holds, which may be spot-welded and same to be removed prior to redelivery at Charterers' time and expense and all operations to be under Master's supervision and satisfaction.

**Clause 108 - Arrest (Claim Against Vessel)**
Should the Vessel be arrested during the currency of this Charter at the suit of any person having or purporting to have a claim against or any interest in the Vessel, hire under this Charter shall not be payable in respect of any periods whilst the Vessel remains under arrest or remains unemployed as a result of such arrest. This Clause shall not apply should the arrest be caused through any fault on part of Charterers of sub-Charterers or their agents or the contractors or the cargo Shippers or consignees.

**Clause 109 - Self Trimming Warranty**
Owners warrant that the Vessel is a self-trimming bulk carrier and fully complies with all the latest regulations re carriage of grain in bulk and her grain loading stability booklet has been prepared in accordance with the provisions of 'Chapter VI-Carriage of Grain-Of Soles 74' including any amendments. In addition, an appendix is attached to the booklet in accordance with the provisions of IMO paper BC XIX/INF.4 dated July 13th, 1978 "National Practice for dispensation for trimming ends on certain especially suitable ships."

**Clause 110 – Dunnage Removal**
The Vessel shall be delivered and redelivered free of all dunnage, lining and packing materials.

During the currency of this Charter Party the Charterers shall provide dunnage, lining and packing materials as required at their expense.

Throughout the currency of the Charter Party and at redelivery, the Charterers shall remain responsible for all costs and time, including deviation, if any, associated with the removal and disposal of dunnage, lining and packing materials in accordance with MARPOL 73/78 Annex V or any other applicable rules relating to the disposal of such materials.

**Clause 111 – Stevedoring Machines**
Charterers to have the option to use rubber-wheeled forklifts / bulldozers in Vessel's holds, provided not exceeding tank top strength, and all operations to be under Master's supervision and satisfaction. If required, Vessel to lift onboard, shift from hold to hold and discharge the bulldozers by use of Vessel's cranes subject to not exceed the cranes SWL.

**Clause 112 – Other Lifting Devices**
Charterers are allowed to fit Vessel's cranes with grabs for loading/discharging subject to provided not exceeding the cranes' SWL and Vessel to supply sufficient power to operate all cranes simultaneously.

RIDER CLAUSES TO M/V "AMIS INTEGRITY"
CHARTER PARTY DATED 30TH JUNE 2017

_____

**Clause 113 – Bankruptcy Clause**
The Charterers/Owners shall have the right to terminate the Charter Party with immediate effect by tendering written notice to the Owners / Charterers, if the Owners/Charterers declare insolvency, bankruptcy, enters receivership and/or applies for any shelter similar to Chapter 11 of the United States Bankruptcy Code.

**Clause 114 – SOLAS Clause**
Owners warrant that the Vessel is compliant with latest applicable SOLAS regulations and recommendations. Owners further warrant that the Vessel is fully compliant with the SOLAS 2009 regulations, or any later amendments thereto, in particular but not limited to resolution MSC.216(82) so as not to change the Vessel's Charter Party deadweight and cargo intake. Owners further confirm that they have an IACS compliant and approved programme/software on board and will be maintained throughout the Charter Party duration.

**Clause 115 – Ukrainian Entertainment Clause**
In case Vessel calls any Ukrainian port, Master to contact Charterers immediately if being charged entertainment money. If actual money needs to be paid same to be compensated by Charterers.

**END**