# EXHIBIT 1

Caution
As of: October 18, 2019 5:01 PM Z

# Cardinal Shipping Corp. v. M/S Seisho Maru

United States Court of Appeals for the Fifth Circuit

October 22, 1984

Nos. 83-2338, 83-3030

**Reporter**
744 F.2d 461 *; 1984 U.S. App. LEXIS 17484 **; 1985 AMC 2630

CARDINAL SHIPPING CORPORATION, Plaintiff-Appellant Cross Appellee, v. M/S SEISHO MARU, her engines, tackle, etc., Defendant-Appellee, Aizawa Kaiun K.K., Claimant-Defendant Cross-Appellant. The GOVERNMENT OF the REPUBLIC OF INDONESIA and Bandan Urusan Logistik, Plaintiffs-Appellants Cross Appellees, v. M/V GLAFKOS, her engines, tackle, apparel, furniture, etc., in rem, et al., Defendants-Appellees, Glafkos Shipping Co., Ltd., Defendant-Appellee Cross Appellant

**Prior History:** [**1] Appeals from the United States District Court for the Eastern District of Louisiana. Appeals from the United States District Court for the Southern District of Texas.

**Disposition:** Affirmed.

## Core Terms

charter, vessel, cargo, Shipping, dispatch, charterparty, withdrawal, liens, bill of lading, loading, maritime lien, attorney's fees, anti-lien, shipper, contracts, hire, subcharterer, bad faith, affreightment, subcharter, demurrage, shipowner, contacts, parties, argues, terms, port, rem, voyage charter, charter party

## Case Summary

### Procedural Posture
Plaintiff shipper appealed from an order of the United States District Court for the Eastern District of Louisiana, which dismissed plaintiff's suit to recover damages for breach of a voyage charter. Also, plaintiffs, foreign government and consignee of cargo, appealed from an order of the United States District Court for the Southern District of Texas, which granted summary judgment to defendant shipper in a suit for dispatch.

### Overview
In one case, the district court dismissed plaintiff shipper's suit against defendant vessel-owner to recover damages for breach of a voyage charter. In another case, plaintiffs, foreign government and consignee of cargo, appealed from another district court's summary judgment to defendant shipper in a suit to collect dispatch. With both cases consolidated, the court noted that both cases involved charters and sub-charters, and that both cases involved maritime liens and the effectiveness of Prohibition-of-Lien clauses contained in the charter parties. Regarding the first case, the court held that plaintiff's lien could not have arisen because it conflicted with a chartering party's right to withdraw the vessel under its time charter. Also, it was barred by the Prohibition of Lien clause as plaintiff failed to meet its burden that a reasonable inquiry would not have brought the anti-lien clause of its time charter to its attention. As to the second case, the court also held that the Prohibition-of-Lien clause there also precluded plaintiffs' lien, as they also failed to show they could not discover the anti-lien provision contained in the subcharter. Both judgments were affirmed.

### Outcome
In two separate cases involving maritime liens, the court affirmed the dismissal of one suit to recover damages for a breach of a voyage charter, and a summary judgment to defendant shipper in a suit to collect dispatch, as the parties asserting the maritime liens both failed to meet their burdens of establishing that they would not have discovered a Prohibition of Lien clause contained in a subcharter relating to the vessels.

## LexisNexis® Headnotes

Admiralty & Maritime Law > Practice & Procedure > Choice of Law

Admiralty & Maritime Law > Maritime Contracts > General Overview

Admiralty & Maritime Law > Maritime Liens > General Overview

Admiralty & Maritime Law > ... > Priority & Sources > Contracts > General Overview

Civil Procedure > ... > Federal & State Interrelationships > Choice of Law > General Overview

Business & Corporate Compliance > ... > Transportation Law > Water Transportation > Licensing & Registration

HN1[⬇] **Practice & Procedure, Choice of Law**

In the absence of an effective choice of law by the parties, and in regard to resolving maritime choice-of-law problems, the forum contacts to be considered include: (a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicile, residence, nationality, place of incorporation and place of business of the parties. The court has also recognized, however, that a maritime lien does not arise solely by operation of contract law. Therefore, in addition to those contacts, the court considers more general factors which include (a) the needs of the international system, (b) relevant policies of the forum, (c) relevant policies of other interested states, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability, and uniformity of result, and (g) ease in the determination and application of the law to be applied.

Admiralty & Maritime Law > ... > Priority & Sources > Contracts > General Overview

Admiralty & Maritime Law > Maritime Contracts > General Overview

Admiralty & Maritime Law > Maritime Contracts > Types of Contracts

Admiralty & Maritime Law > Maritime Liens > General Overview

Admiralty & Maritime Law > Maritime

Liens > Priority & Sources > Tort Claims & Settlements

Admiralty & Maritime Law > Maritime Personal Injuries > General Overview

Civil Procedure > ... > In Rem & Personal Jurisdiction > In Rem Actions > True In Rem Actions

Business & Corporate Compliance > ... > Transportation Law > Water Transportation > Licensing & Registration

HN2[⬇] **Priority & Sources, Contracts**

The maritime lien is an ancient and unique feature of admiralty doctrine. It arises by operation of law to provide security to the victims of certain maritime torts and contract breaches. Plaintiffs bring an action directly against the vessel in rem. If they are victorious on the merits, they may enforce the judgment by condemnation and sale of the ship.

Admiralty & Maritime Law > Charterparties

Civil Procedure > ... > Jurisdiction > In Rem & Personal Jurisdiction > General Overview

Transportation Law > Carrier Duties & Liabilities > Bills of Lading

Admiralty & Maritime Law > General Overview

Admiralty & Maritime Law > Charterparties > Charter Contracts > General Overview

Admiralty & Maritime Law > Charterparties > Charter Contracts > Bills of Lading

Admiralty & Maritime Law > ... > Charter Contracts > Remedies > General Overview

Admiralty & Maritime Law > ... > Charter Contracts > Remedies > Maritime Liens

Admiralty & Maritime Law > Charterparties > Party Liability > General Overview

Admiralty & Maritime Law > ... > Business & Corporate Compliance > Admiralty &

Maritime > Owner Liability of Chartered Vessels

Admiralty & Maritime Law > Charterparties > Types of Charterparties > Voyage Charters

Admiralty & Maritime Law > Maritime Contracts > General Overview

Admiralty & Maritime Law > Maritime Contracts > Types of Contracts > Affreightment

Admiralty & Maritime Law > Maritime Liens > General Overview

Admiralty & Maritime Law > Maritime Liens > Enforcement

Admiralty & Maritime Law > ... > Priority & Sources > Contracts > General Overview

Admiralty & Maritime Law > ... > Priority & Sources > Contracts > Authority to Encumber

Admiralty & Maritime Law > Maritime Liens > Priority & Sources > Tort Claims & Settlements

Admiralty & Maritime Law > Shipping > General Overview

Admiralty & Maritime Law > Shipping > Bills of Lading > General Overview

Admiralty & Maritime Law > Shipping > Bills of Lading > Effectiveness & Validity

Admiralty & Maritime Law > Shipping > Bills of Lading > Signatures

Civil Procedure > ... > In Rem & Personal Jurisdiction > In Rem Actions > True In Rem Actions

Contracts Law > Breach > General Overview

Labor & Employment Law > Employment Relationships > Employment Contracts > Breaches

Business & Corporate Compliance > ... > Transportation Law > Water Transportation > Licensing & Registration

HN3[⬇] Admiralty & Maritime Law, Charterparties

A maritime lien typically arises when the owner has breached its contract with the charterer. Charterparties must, in the invariable regular course of business, be made, for the performance of which the law confers a lien on the vessel. The charterer may enforce its contract through an action in rem. The vessel may also become open to maritime liens if the owner, or his Master, accepts cargo on board and signs a bill of lading evidencing a contract of affreightment with the shipper. Breach of that contract, for example by the loss of the cargo during the voyage, would subject the vessel to in rem liability.

Admiralty & Maritime Law > Charterparties

Contracts Law > Breach > General Overview

Transportation Law > Carrier Duties & Liabilities > Bills of Lading

Admiralty & Maritime Law > General Overview

Admiralty & Maritime Law > Charterparties > Charter Contracts > General Overview

Admiralty & Maritime Law > Charterparties > Charter Contracts > Bills of Lading

Admiralty & Maritime Law > ... > Charter Contracts > Remedies > General Overview

Admiralty & Maritime Law > ... > Charter Contracts > Remedies > Damages

Admiralty & Maritime Law > ... > Charter Contracts > Remedies > Maritime Liens

Admiralty & Maritime Law > Charterparties > Party Liability > General Overview

Admiralty & Maritime Law > Charterparties > Types of Charterparties > Voyage Charters

Admiralty & Maritime Law > Maritime Contracts > General Overview

Admiralty & Maritime Law > Maritime Contracts > Types of Contracts > Affreightment

Admiralty & Maritime Law > Maritime Liens > General Overview

Admiralty & Maritime Law > Maritime Liens > Nature > General Overview

Admiralty & Maritime Law > ... > Priority & Sources > Contracts > General Overview

Admiralty & Maritime Law > ... > Priority & Sources > Contracts > Authority to Encumber

Business & Corporate Compliance > ... > Transportation Law > Water Transportation > Licensing & Registration

**HN4**[ ] Admiralty & Maritime Law, Charterparties

When the general owner entrusts the special owner with the entire control and employment of the ship, it is a just and reasonable implication of law that the general owner assents to the creation of liens binding upon his interest in the vessel, as security for the performance of contracts of affreightment made in the course of the lawful employment of the vessel. The general owner must be taken to know that the purpose for which the vessel is hired, when not employed to carry cargo belonging to the hirer, is to carry cargo of third persons; and that bills of lading, or charterparties, must, in the invariable regular course of that business, be made, for the performance of which the law confers a lien on the vessel. This language has been read to permit a maritime lien against the vessel when the charterer breaches its bill-of-lading contract with a shipper.

Admiralty & Maritime Law > Charterparties

Admiralty & Maritime Law > Charterparties > Charter Contracts > General Overview

Admiralty & Maritime Law > ... > Charter Contracts > Remedies > General Overview

Admiralty & Maritime Law > ... > Charter Contracts > Remedies > Maritime Liens

Admiralty & Maritime Law > Charterparties > Party Liability > General Overview

Admiralty & Maritime Law > Charterparties > Types of Charterparties > Time Charters

Admiralty & Maritime Law > Maritime Contracts > General Overview

Admiralty & Maritime Law > Maritime Contracts > Types of Contracts

Admiralty & Maritime Law > Maritime Liens > General Overview

Admiralty & Maritime Law > Maritime Liens > Priority & Sources > General Overview

Admiralty & Maritime Law > ... > Priority & Sources > Contracts > General Overview

Admiralty & Maritime Law > ... > Priority & Sources > Contracts > Executory Contracts

Admiralty & Maritime Law > Shipping > General Overview

Contracts Law > Breach > General Overview

Business & Corporate Compliance > ... > Contracts Law > Types of Contracts > Executory Contracts

Business & Corporate Compliance > ... > Transportation Law > Water Transportation > Licensing & Registration

**HN5**[ ] Admiralty & Maritime Law, Charterparties

Under the executory contract doctrine, a maritime lien for breach of charterparty arises once (and to the extent that) cargo is loaded on board. The fanciful courts have envisioned a union of ship and cargo, marking the commencement of the lien. Thus, even if the ship does not leave port with the cargo, it may be liable for a charter breach.

Admiralty & Maritime Law > Charterparties

Business & Corporate Compliance > ... > Transportation Law > Water Transportation > Maintenance & Safety

Admiralty & Maritime Law > General Overview

Transportation Law > Water Transportation > General Overview

**HN6**[ ] Admiralty & Maritime Law, Charterparties

The withdrawal of a vessel from a charter party means that the owner shall deprive the charterer of any further

enjoyment or use of the vessel and take it into his own exclusive possession. This can be presently done, even where the vessel is at sea, provided she is light; but if there be any cargo on board no withdrawal can be made until the cargo be relanded if the vessel is at the loading port, or until it be discharged if she is at sea or at destination. This rule serves to protect both the vessel owner who is able to regain control of his vessel by discharging the cargo, and the cargo owner whose property will be unloaded at either of the two safest points, the loading port or the destination. Once a vessel has put out to sea, she must continue the voyage and discharge her cargo before withdrawing from the charter.

Admiralty & Maritime Law > Charterparties

Admiralty & Maritime Law > ... > Charter Contracts > Remedies > General Overview

Admiralty & Maritime Law > ... > Charter Contracts > Remedies > Maritime Liens

Admiralty & Maritime Law > Maritime Liens > General Overview

Admiralty & Maritime Law > Maritime Liens > Nature > General Overview

Admiralty & Maritime Law > Maritime Liens > Priority & Sources > General Overview

Admiralty & Maritime Law > ... > Priority & Sources > Contracts > General Overview

HN7[↓] Admiralty & Maritime Law, Charterparties

The general owner assents to the creation of liens by the special owner. The general owner, however, can effectively negate that implication of assent by the inclusion of a clause prohibiting contract liens.

Admiralty & Maritime Law > Charterparties

Admiralty & Maritime Law > Charterparties > Charter Contracts > General Overview

Admiralty & Maritime Law > ... > Charter Contracts > Remedies > General Overview

Admiralty & Maritime Law > ... > Charter Contracts > Remedies > Maritime Liens

Admiralty & Maritime Law > Charterparties > Party Liability > General Overview

Admiralty & Maritime Law > Maritime Liens > General Overview

Admiralty & Maritime Law > Maritime Liens > Priority & Sources > General Overview

Admiralty & Maritime Law > ... > Priority & Sources > Contracts > General Overview

Admiralty & Maritime Law > ... > Priority & Sources > Contracts > Authority to Encumber

HN8[↓] Admiralty & Maritime Law, Charterparties

An owner should be able to shield himself against liens if he gives sufficient notice to shippers and subcharterers. The question becomes whether the notice was sufficient, or, more precisely, whether the charterer, at the time it chartered the vessel, knew, or by reasonable diligence could have ascertained, that the ship was already under charter and that the charter contained a Prohibition-of-Lien clause. The party entering a contract has a duty of inquiry. If he later seeks a lien for breach of that contract, he must meet the burden of showing that diligent inquiry would not have informed him of the higher charter or the anti-lien clause.

Admiralty & Maritime Law > Charterparties

Transportation Law > Carrier Duties & Liabilities > Demurrage

Admiralty & Maritime Law > Maritime Liens > General Overview

HN9[↓] Admiralty & Maritime Law, Charterparties

The mere fact that the owner has a right to demurrage, even one secured by a lien on the cargo, does not automatically give a right to dispatch.

Admiralty & Maritime Law > Maritime Liens > General Overview

Civil Procedure > Remedies > Costs & Attorney Fees > General Overview

*HN10*[ ] **Admiralty & Maritime Law, Maritime Liens**

In order to collect fees, the plaintiff must prove that the party seizing the vessel acted in bad faith, with malice, or with wanton disregard for the rights of his opponent.

**Counsel:** James J. Sentner, Jr., Haight, Gardner, Poor & Havens, Houston, Texas, for Amicus.

R. Glenn Bauer, Haight, Gardner, Poor & Havens, New York, New York, for Appellant.

Philip A. Fant, Leach & Paysse, New Orleans, Louisiana, for Appellant.

Daniel J. O'Callaghan, Delson & Gordon, New York, New York, for Appellant.

Ted C. Litton; William R. Towns, Royston, Rayzor, Vickery & Williams, Houston, Texas, for Appellee.

J. Francois Allain, John H. Clegg, Chaffe, McCall, Phillips, Toler & Sarpy, New Orleans, Louisiana, for Appellee.

**Judges:** Goldberg, Rubin and Reavley, Circuit Judges. Rubin, Judge, concurring.

**Opinion by:** GOLDBERG

# Opinion

[*463] GOLDBERG, Circuit Judge:

The two cases consolidated for this appeal both involve maritime liens and the effectiveness of "Prohibition-of-Lien" clauses contained in charter parties. We will treat the two cases separately, however, because they raise different peripheral issues and their factual settings differ.

I. CARDINAL SHIPPING v. M/S SEISHO [**2] MARU

Aizawa Kaiun K.K. ("Aizawa") owns the M/S Seisho Maru. Aizawa time-chartered the vessel to Nakamura Steamship Co., Ltd., ("Nakamura") under a charterparty dated August 17, 1979. Aizawa and Nakamura are both Japanese Corporations, and the Seisho Maru sails under a Japanese flag. The charterparty gave Nakamura the right to use or sublet the vessel for a set period. The actual operation of the vessel, however, would be the responsibility of a Master and crew provided by Aizawa. On November 17, 1980, Nakamura time-chartered the Seisho Maru to Clover Trading Corporation ("Clover"), a Liberian Corporation. The period of this charter was two years, plus or minus one month at the charterer's option. The charterparty provided for payment of hire to be made in London, semi-monthly in advance.

The time charter from Nakamura to Clover, as well as the head charter from Aizawa to Nakamura, were drawn on the standard New York Produce Exchange form. Both charters contained the following lien clause:

> 18. That the Owners shall have a lien upon all cargoes, and all sub-freights for any amounts due under this Charter, including General Average contributions, and the Charterers [**3] to have a lien on the Ship for all monies paid in advance and not earned, and any overpaid hire or excess deposit to be returned at once. *Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which might have priority over the title and interest of the owners in the vessel.*

(emphasis added).

On October 5, 1981, in Charlotte, N.C., Clover entered into a voyage charterparty with Cardinal Shipping Corporation ("Cardinal"), a United States Corporation. The charter contemplated the carriage of six thousand metric tons of steel coils from Oxeloesund, Sweden, the ports of Detroit and Chicago. Cardinal executed the [*464] charter in order to meet its contractual commitment with a shipper of the cargo.[1]

[**4] In accordance with the charterparty, Clover delivered the Seisho Maru to Cardinal in Oxelosund.[2] On November 3, 1981, Cardinal began loading the cargo of coils on board. In the meantime, a dispute had developed between Nakamura and Clover. Payment of hire under their time charter became due on October 28, 1981. The day before, Clover had advised Nakamura

---

[1] The shipper is Intercontinental Metals Corporation, a United States company. Its contract with Cardinal is evidenced by a Liner Booking Note executed in Charlotte, North Carolina, on October 13, 1981. We, like the trial court, consider it irrelevant that this note is dated eight days after the voyage charter between Cardinal and Clover.

[2] The charter originally designated the Dimitris P. Lemos as the carrying vessel but provided for substitution at the carrier's option. The Seisho Maru was substituted before the date of performance.

Markus Oberg

that it had instructed its bankers to transfer the amount due to Nakamura's bank. Nakamura's representatives, relying on this communication, waited several days for the transfer of funds. When the transfer had not occurred by November 3, Nakamura's representatives contacted Clover seeking clarification as to the non-payment of hire.

On the following day, November 4, 1981, Nakamura instructed the vessel that loading should cease immediately. Approximately [**5] 1800 of the 6000 metric tons had already been loaded; but neither Nakamura nor the Master of the Seisho Maru had signed bills of lading for the cargo. Since payment was not forthcoming, Nakamura gave formal notice on November 5 of the default in payment of hire, expressly reserving Nakamura's right under the charterparty to withdraw the vessel and affording Clover three banking days to cure the default.

When Clover failed to remit payment within that time, Nakamura announced that it would withdraw the vessel from the time charter. Some discussions ensued between Nakamura and Cardinal concerning the carriage of the cargo of steel coils, but no agreement could be reached. Thus, in mid-November, Nakamura discharged the cargo already on board and withdrew the Seisho Maru.

Cardinal made alternate arrangements to ship the cargo, allegedly suffering losses as a result. It filed suit in district court to recover damages for breach of the voyage charter. Cardinal brought this action *in rem*, asserting a lien against the Seisho Maru. Aizawa appeared as claimant of the vessel and filed a Motion to Dismiss Cardinal's *in rem* complaint. Cardinal, in turn, filed an Opposition to that [**6] motion as well as its own Cross-Motion for Summary Judgment. The trial court granted Aizawa's Motion to Dismiss, holding that the Prohibition-of-Lien Clause in Aizawa's charterparty precluded Cardinal's assertion of a lien. This appeal follows.

A. Issues

A major squall has brewed in this case because Cardinal is suing for breach of a charter to which Aizawa was not a party. Cardinal nevertheless asserts that the Seisho Maru itself is bound to that contract. Cardinal argues that ancient maritime doctrine creates reciprocal liens between the vessel and her cargo once the cargo is loaded on board. Aizawa responds that such a lien does not arise in this case and, in any event, is precluded by the Prohibition-of-Lien clause in the Nakamura-Clover charter. The shipowner argues that Cardinal had a duty of reasonable diligence to discover that clause. Finally, Aizawa argues that Swedish law should apply to this dispute under choice-of-law principles.

Approaching this storm line from the opposite heading, we hold that Swedish law does not apply but that American law precludes Cardinal's lien.

1. Choice of Law

This Circuit has held that the *Restatement (Second)* [**7] *of Conflicts of Law* [hereinafter cited as *Second Restatement*] provides the proper model for resolving maritime choice-of-law problems. *See Gulf* [*465] *Trading & Transportation v. the Vessel Hoegh Shield, 658 F.2d 363, 366 (5th Cir.1981)*, relying on *Lauritzen v. Larsen, 345 U.S. 571, 73 S. Ct. 921, 97 L. Ed. 1254*. [3] In *Gulf Trading*, an American supplier ("Gulf") had delivered bunker fuel to a vessel in American waters. Failing to receive payment from the charterer of the vessel, Gulf seized the vessel and asserted a maritime lien. This Court, in deciding whether American law should govern the validity of the lien, followed the analysis of the *Second Restatement* and evaluated the various points of contact between the transaction and the governments whose competing laws might apply.

[**8] Looking first at the bunkering contract between Gulf and the charterer, we considered the contacts specified in section 188 of the *Second Restatement*:

> HN1[↑] In the absence of an effective choice of law by the parties, the forum contacts to be considered include: (a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicile, residence, nationality, place of incorporation and place of business of the parties.

*Gulf Trading, 658 F.2d at 366.*

We also recognized, however, that a maritime lien does not arise solely by operation of contract law. Therefore,

---

[3] *Lauritzen* involved a Jones Act claim brought by an injured seaman. Therefore, the Supreme Court applied the *Second Restatement* rules relevant to tort actions. *See 345 U.S. at 583, 73 S. Ct. at 928*.

in addition to the section 188 contacts, we considered more general factors set forth in *Second Restatement § 6*:

> In the absence of statutory directives and subject to constitutional restrictions, the relevant factors include (a) the needs of the international system, (b) relevant policies of the forum, (c) relevant policies of other interested states, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, [**9] predictability and uniformity of result, and (g) ease in the determination and application of the law to be applied.

*658 F.2d at 367*.

We concluded that federal statutory law reflected a strong policy of protecting American suppliers and would lead to a uniform, predictable result in future cases. We also determined that the alternative forum (England) did not have a great interest in regulating the relationship between an American supplier and a non-English vessel. Therefore, we applied forum law rather than British law.

Now, directing the spyglass of precedent toward the deck of our own Seisho Maru, we likewise conclude that American law should govern. The voyage charter between Cardinal and Clover has the most significant contacts with the United States. The charterparty was executed in the United States between an American corporation (Cardinal) and a Liberian corporation (Clover). The places of performance included both Sweden, where the cargo was to be loaded, and the United States, where the cargo was to be discharged. Freight was to be paid by transferring money to a bank in New York. Disputes were to be arbitrated in New York. The only contacts [**10] with Sweden were the initial presence of the subject matter -- the steel coils to be shipped -- and the fact that performance began in Oxeloesund. Though the presence of the coils is an important factor, *see Gulf Trading, 658 F.2d at 367 n. 4*, we hold that the contacts with the United States predominate in this case. [4]

Furthermore, the more general factors listed in *Restatement Second § 6* do not favor Swedish law. Sweden has some interest in the handling of cargo within its waters, but little concern about liens asserted [*466] by an American corporation against a non-Swedish [5] vessel. *Cf. Gulf Trading, 658 F.2d at 358.* [**11] Aizawa has shown us no evidence of a strong policy in Swedish law regarding maritime liens in general. Nor has appellee demonstrated that the international maritime system is better served by Swedish rules than by American rules.

The effect of the parties' expectations is ambivalent at best. There is no reason to believe that Clover or Cardinal expected Swedish rather than American law to govern their dealings. Given that the charter called for performance in both hemispheres, Clover and Cardinal were at least as likely to anticipate that American law would control. Furthermore, the charter's incorporation of U.S. regulations in one technical area [6] and its reference to U.S. arbitration provide some evidence that the contracting parties intended American law to apply.

[**12] As to Aizawa itself, the company does not argue that it expected Swedish law to govern liens against the Seisho Maru when it first time-chartered the vessel. Such expectations could have arisen only when Aizawa's Master became aware of the Clover-Cardinal voyage charter. The evidence does not support a claim that the Master's expectations would have been any different from those of Cardinal and Clover.

The final factors -- certainty, uniformity, and easy application -- all favor American law in this case. Under Aizawa's view, Swedish law would apply to breaches of the charterparty while the Seisho Maru was still in Oxeloesund, but American law might kick in once the vessel reached Detroit or perhaps at some point in the Atlantic. Uncertainty about when American law became applicable and the resulting incongruity of legal rules would produce errant gusts disturbing the predictable tradewind of maritime law.

---

[4] It is conceivable that Japan has contacts with this case, because the owner is Japanese and the head charter (containing one of the anti-lien clauses) was drawn up between two Japanese corporations. However, Aizawa has not contended that the trial court erred in failing to apply Japanese law. Therefore, we need not consider whether Japanese law was preferable to American law.

[5] The Seisho Maru is a Japanese-flag vessel owned by a Japanese corporation.

[6] Clause 42 required that the vessel's gear comply with "regulations established by U.S. Public Law 85-742 Part 9 (safety and health regulations for longshoring)." These particular regulations are irrelevant to our case, but the reference to them is at least some indication of an intent that American law apply.

Markus Oberg

In sum, general choice-of-law principles as well as the relevant transactional contacts impel us to apply American law. We will follow the charts of the forum in navigating the rough seas ahead.

2. The Maritime Lien

HN2[↑] The maritime lien is an ancient and unique feature [**13] of admiralty doctrine. It arises by operation of law to provide security to the victims of certain maritime torts and contract breaches. See, e.g., The Barnstable, 181 U.S. 464, 21 S. Ct. 684, 45 L. Ed. 954 (1901); The Schooner Freeman v. Buckingham, 59 U.S. (18 How.) 182, 188, 15 L. Ed. 341 (1855); 2 Benedict on Admiralty § 21, at 2 (7th ed. 1983); G. Gilmore & C. Black, The Law of Admiralty Chapter IX (2d ed. 1975) [hereinafter cited as Gilmore & Black]. Plaintiffs bring an action directly against the vessel in rem. If they are victorious on the merits, they may enforce the judgment by condemnation and sale of the ship. See 2 Benedict on Admiralty, supra, § 21, at 2-3.

HN3[↑] A maritime lien typically arises when the owner has breached its contract with the charterer. See Rainbow Line v. M/V Tequila, 480 F.2d 1024 (2d Cir.1973); Belvedere v. Compania Plomari de Vapores, 189 F.2d 148 (5th Cir.1951).

> Charterparties must, in the invariable regular course of . . . business, be made, for the performance of which the law confers a lien on the vessel.

Rainbow Line, 480 F.2d at 1027 [**14] (quoting The Schooner Freeman v. Buckingham, 59 U.S. (18 How.) at 190, 15 L. Ed. 341). The charterer may enforce its contract through an action in rem.

The vessel may also become open to maritime liens if the owner (or his Master) accepts cargo on board and signs a bill of lading evidencing a contract of affreightment with the shipper. Breach of that contract (e.g., by the loss of the cargo during the voyage) would subject the vessel [*467] to in rem liability. See The Capitaine Faure, 10 F.2d 950, 954, 961 (2d Cir.1926); Tube Products of India v. S.S. Rio Grande, 334 F. Supp. 1039, 1041 (S.D.N.Y. 1971); W. Poor, American Law of Charter Parties and Ocean Bills of Lading § 10, at 33 (1968) [hereinafter cited as Poor on Charter Parties]; 2A Benedict on Admiralty, supra, § 35, at 4-19.

In the present case, however, no such bills of lading were issued, and the plaintiffs sue for a breach not of the head charter but of a subcharter to which Aizawa was not privy. Cardinal nevertheless argues that Aizawa entrusted the Seisho Maru to a time charterer and thereby assented to the creation [**15] of liens upon the vessel as security for the performance of the charterer's contracts of affreightment. As the Supreme Court stated in The Schooner Freeman:

> HN4[↑] When the general owner intrusts the special owner with the entire control and employment of the ship, it is a just and reasonable implication of law that the general owner assents to the creation of liens binding upon his interest in the vessel, as security for the performance of contracts of affreightment made in the course of the lawful employment of the vessel. The general owner must be taken to know that the purpose for which the vessel is hired, when not employed to carry cargo belonging to the hirer, is to carry cargo of third persons; and that bills of lading, or charterparties, must, in the invariable regular course of that business, be made, for the performance of which the law confers a lien on the vessel.

59 U.S. (18 How.) at 190, 15 L. Ed. 341.

The Second Circuit has read this language to permit a maritime lien against the vessel when the charterer breaches its bill-of-lading contract with a shipper. See United States v. S.S. Lucie Schulte, 343 F.2d 897, 900 (2d Cir.1965) [**16] (shipper suing in rem to recover overcharges collected by charterer). The same reasoning could be used to recognize a lien for the breach of a subcharter. Cf. Gilmore & Black, supra, at 668-69 (lien may arise if not "prohibited by an apt clause in the [head] charterparty"). Conceivably, even the breach of a sub-subcharter (like the Clover-Cardinal agreement) could give rise to liens, under the theory that the subcharterer (Clover) was entrusted with the use of the vessel. [7] And, if a subcharterer has authority thus to bind the vessel, why not a sub-subcharterer? The potential iterations of the theory are as multitudinous and repetitive as the chambers of the pearly nautilus.

We need not explore the full depths of those issues, however. Our case may be resolved on two narrower grounds. First, the lien cannot arise because it conflicts with Nakamura's right [**17] of withdrawal. Second, it is

---

[7] After all, the head charter permitted Nakamura to subcharter the Seisho Maru and thereby give control over the vessel to a subcharterer.

also barred by the Prohibition-of-Lien clause.

*(a) Right of Withdrawal*

Allowing a lien in this case would undermine Nakamura's right of withdrawal under its time charter. To clarify this point, we must provide some background information. HN5[↑] Under the "executory contract doctrine," a maritime lien for breach of charterparty arises once (and to the extent that) cargo is loaded on board. See Osaka Shosen Kaisha v. Pacific Export Lumber, 260 U.S. 490, 43 S. Ct. 172, 67 L. Ed. 364 (1923); Bulkley v. Naumkeag Steam Cotton, 65 U.S. (24 How.) 386, 16 L. Ed. 599 (1860); Belvedere v. Compania Plomari de Vapores, 189 F.2d at 149-50; The Capitaine Faure, 10 F.2d at 961; Gilmore & Black, supra, § 9-22, at 637-38, § 9-23, at 639. The fanciful courts have envisioned a "union of ship and cargo," marking the commencement of the lien. See Krauss Brothers Lumber v. Dimon S.S. Corp., 290 U.S. 117, 121, 54 S. Ct. 105, 106, 78 L. Ed. 216 (1933). Thus, even if the ship does not leave port with the cargo, it may be liable for a charter breach. The [*468] Seisho Maru in [**18] this case discharged its cargo before leaving Oxeloesund; but because it had taken the steel coils on board for a few days, Cardinal argues that the discharge gave rise to a lien.

However, the cargo was unloaded because Nakamura was exercising its rights under the charter with Clover. Nakamura withdrew the vessel from the charter after Clover had failed to meet payment obligations. The charterparty expressly authorized a withdrawal under those circumstances. Clause 5 provides that if Clover fails to make

> the punctual and regular payment of hire, . . . [Nakamura] shall be at liberty to withdraw the vessel from the service of [Clover], without prejudice to any claim [Nakamura] may otherwise have on [Clover].

Record at 167. Clause 49 is more specific:

> In default of prompt payment of the hire, or bank guarantee or deposit, or on any breach of this Charter, [Nakamura] shall notify [Clover] whereupon [Clover] shall rectify matters within three banking days of receipt of notification from [Nakamura], failing which [Nakamura] shall have the right to withdraw the vessel from the service of [Clover], without prejudice to any claim [Nakamura] may [**19] otherwise have on [Clover] under the Charter.

Record at 170. Under these terms, Nakamura was entitled to withdraw the Seisho Maru if Clover failed to meet its payments and if Nakamura gave the proper notice and allowed the appropriate grace period before acting. See Schirmer Stevedoring v. Seaboard Stevedoring, 306 F.2d 188, 189, 190, 191 (9th Cir.1962); Diana Compania Maritima v. Subfreights of the S.S. Admiralty Flyer, 280 F. Supp. 607 (S.D.N.Y.1968). Cardinal does not dispute that Nakamura met all of the procedural requirements and was entitled to withdraw the vessel.

Maritime law, however, required Nakamura to reland the cargo before effecting withdrawal of the vessel. As the Second Circuit declared in Luckenbach v. Pierson, 229 F. 130 (2d Cir.1915):HN6[↑]

> The withdrawal of a vessel from a charter party means that the owner shall deprive the charterer of any further enjoyment or use of the vessel and take it into his own exclusive possession. This can be presently done, even where the vessel is at sea, provided she is light; *but if there be any cargo on board no withdrawal can be made until the cargo be relanded* [**20] *if the vessel is at the loading port*, or until it be discharged if she is at sea or at destination. In the present case, when Luckenbach notified Pierson & Co. that he would withdraw the vessel on June 27th if the hire in arrear were not then paid, she was loading at Baltimore and he could have done so by relanding the cargo.

Id. at 132 (emphasis added); Diana Compania Maritima v. Subfreights of the S.S. Admiralty Flyer, 280 F. Supp. 607, 612 (S.D.N.Y. 1968); 2B Benedict on Admiralty, supra, § 6, at 53 (citing Luckenbach as the leading case on this issue); Poor on Charter Parties, supra, § 8, at 28 (same). This rule serves to protect both the vessel owner [8] who is able to regain "control of his vessel" by discharging the cargo, Diana Compania Maritima, 280 F. Supp. at 613, and the cargo owner whose property will be unloaded at either of the two safest points -- the loading port or the destination. The Luckenbach rule draws a reasonable line; once a vessel has put out to sea, she must continue the voyage and discharge her cargo before withdrawing from the charter.

[**21] If Cardinal were granted a lien in this case, however, it would directly conflict with the principles of

---

[8] Though Nakamura was not the ultimate owner of the vessel, it had the rights of the owner in this regard. Indeed, the charter referred to Nakamura as the "disponent owner."

*Luckenbach* and effectively torpedo the owner's right of withdrawal at the loading port. Once a charterer (in this case, Clover) allowed some cargo on board, the subcharterer's (or shipper's) lien would attach to ensure the carriage of the cargo. Even though the owner (or [*469] "disponent owner" Nakamura) [9] had received no pay from its charterer and had entered into no agreements with the subcharterer, the owner could not reland the cargo. We are not prepared thus to sink the good ship *Luckenbach*. Cardinal is not entitled to a lien against the Seisho Maru. [10]

(b) *Prohibition-of-Lien Clause*

The Prohibition-of-Lien clause in the two [**22] time charters provides an additional ground for rejecting a lien in this case. In *The Schooner Freeman*, the Supreme Court noted that it is "a just and reasonable implication of law that HN7[⇑] the general owner assents to the creation of liens" by the "special owner." 59 U.S. (*18 How.) at 190, 15 L. Ed. 341*. The general owner, however, can effectively negate that implication of assent by the inclusion of a clause prohibiting contract liens. See *The Valencia, 165 U.S. 264, 17 S. Ct. 323, 41 L. Ed. 710 (1897)*; *The Kate, 164 U.S. 458, 17 S. Ct. 135, 41 L. Ed. 512 (1896)*; United States v. S.S. Lucie Schulte, 343 F.2d at 900-901; Gilmore & Black, supra, § 9-39, at 668-69, § 9-46a, at 687-88.

Clause 18 of the Aizawa-Nakamura and Nakamura-Clover charters is the standard New York Produce Exchange provision, which has been enforced in a myriad of decisions. See, e.g., *Walsh Stevedoring v. M/S Slagen*, 361 F.2d 478, 479 (5th Cir. 1966); *Schilling v. A/S D/S Dannebrog*, 320 F.2d 628, 632 (2d Cir. 1963). Most of the cases involved materialmen who had furnished repairs and supplies to a [**23] ship under charter. Those cases are not particularly enlightening here because they turn on a construction of the Maritime Lien Act, 46 U.S.C. § 971 *et seq.*, which specifically addresses materialmen's liens. See infra at slip op. 380-381; *TTT Stevedores of Texas v. M/V Jagat Vijeta*, 696 F.2d 1135, 1139 and n. 2 (5th Cir. 1983); *Walsh Stevedoring*, 361 F.2d at 479.

However, in *The Lucie Schulte*, the Second Circuit held that the Prohibition-of-Lien clause also limits a charterer's authority to subject the vessel to liens arising out of contracts of affreightment. *343 F.2d at 900-901*. The shipowner (Schulte & Bruns) had time-chartered the S.S. Lucie Schulte to Three Bays Corporation. The charter contained exactly the same anti-lien provision as appears in our case. [11] Three Bays subsequently contracted with the United States Government to ship cargo on the Lucie Schulte. However, Three Bays overcharged its shipper. Eventually, the government discovered the error and brought an action *in rem* to recover the excess tariffs. The court held that the anti-lien clause in the head charter precluded [**24] a maritime lien against the vessel:

> Although the prime purpose of the clause may have been to trigger the pertinent provision of the Lien Act, we perceive no tenable ground for narrowing the broad language to materialmen's liens. Neither do we see any basis, either in policy or in authority, why an owner should be forbidden to protect himself against the creation of liens by a charterer under contracts of affreightment if he sufficiently brings the charterer's lack of authority home to the shipper.

*343 F.2d at 901*.

We agree that HN8[⇑] an owner should be able to shield himself against liens if he gives sufficient notice to shippers and subcharterers. [12] The question becomes whether the notice was sufficient -- or, more [**25] precisely, whether the charterer, at the time it [*470] chartered the vessel, "knew, or by reasonable diligence could have ascertained," that the ship was already under charter and that the charter contained a Prohibition-of-Lien clause. *The Kate, 164 U.S. at 470, 17 S. Ct. at 140*; *The Lucie Schulte, 343 F.2d at 901*. The party entering a contract has a duty of inquiry. See *Gilmore & Black*, at 672, 687-88. If he later seeks a lien

---

[9] Record at 167; *see supra* note 8.

[10] Incidentally, the parties have cited -- and our own research has dredged up -- no cases in which a subcharterer obtained a lien because the owner had exercised its right of withdrawal at the loading port.

[11] The charter provided:

> Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which might have priority over the title and interest of the owners in the vessel.

*343 F.2d at 898*.

[12] We speak only of contract liens. The owner cannot use an anti-lien clause to prevent tort claimants from asserting a lien against the vessel. See *Gilmore & Black, supra*, at 668.

for breach of that contract, he must meet the burden of showing that diligent inquiry would not have informed him of the higher charter or the anti-lien clause. See *The Lucie Schulte, 343 F.2d at 901*. The trial court found nothing in the record before it to indicate that Cardinal did not know and could not by reasonable diligence have discovered the Nakamura-Clover charter or Clause 18. Thus, Cardinal failed to bear its burden of proof on this matter.

[**26] Cardinal responds, however, that the rule of *The Lucie Schulte* should no longer apply. It points out that Congress amended the Maritime Lien Act in 1971, repealing a provision that required materialmen to exercise due diligence in ascertaining the terms of the ship's charterparty. See Pub.L. No. 92-79 (1971), amending 46 U.S.C. § 973. Cardinal argues that that amendment undermines the reasoning of *The Lucie Schulte*.

We disagree. The amendment certainly affected the power of the *materialman* to acquire a maritime lien, see *Atlantic and Gulf Stevedores v. M/V Grand Loyalty, 608 F.2d 197, 201-202 n. 7 (5th Cir.1979)*; but it had no effect on other contractors. The Maritime Lien Act delineated the rights only of materialmen. When enacted in 1910, it may have subsumed (and perhaps modified [13]) more ancient principles respecting maritime liens. However, it has never purported to govern the shipper's or subcharterer's lien. See *Gilmore & Black, supra*, at 687. Thus, the amendment in 1971 had no direct bearing on the effectiveness of a Prohibition-of-Lien clause vis-a-vis the claim of a subcharterer.

[**27] Moreover, the legislative policy supporting the amendment has much less force in the case of non-materialmen. The House Report on the 1971 bill pointed out that the materialman needs protection from anti-lien clauses because he works under great time pressure and usually does not have time to investigate the authority of a charterer:

> Testimony at the hearings on the bill would indicate that this problem is primarily encountered with foreign-flag vessels chartered to foreign operators. In order to protect themselves, the American materialman must ascertain whether a vessel requesting necessaries is under charter and if so, whether the charter contains a "no lien provision." Alternatively, he can make a credit check on the financial responsibility of the vessel operator. Generally, a vessel requiring necessaries is unable to give sufficient notice so that the American materialman can do either, and he usually ends up assuming the risk that his bill will be paid.
> 
> . . .
> 
> After careful consideration of the entire record, your Committee has concluded that, as a matter of equity, the owner should bear the loss in such a situation.
> 
> As a practical matter, the owner can more easily [**28] protect himself contractually by bonds or otherwise at the time he charters the vessel, than the American materialman who furnishes necessaries to a vessel under great economic pressure to put back to sea.

H.R. Report No. 92-340, *reprinted in* 1971 *U.S.Code Cong. & Ad.News*, 92nd Cong., 1st Sess., 1363, 1364, 1365. A would-be charterer, by contrast, is under much less time pressure and has earlier notice of his need to obtain a vessel. Consequently, he has greater freedom to conduct an adequate inquiry. Furthermore, the corporations that typically charter vessels are more sophisticated and have greater resources to devote to an investigation than has the local materialman. Cf. *The Lucie Schulte, 343 F.2d at 901*. As between a shipowner, charterer and subcharterer, it is not so obvious that the owner should bear all risks. Permitting a contractual allocation of risks between these parties is much [*471] more equitable than in the case of shipowner and materialman.

The Prohibition-of-Lien clause still serves a valid purpose. It encourages freer trade in the chartering and subchartering of vessels. Owners will be more likely to permit their [**29] charterers to enter freely into contracts of affreightment if the owners know that no "secret liens" will arise from obscure provisions in sub-agreements.

More important, the duty of inquiry that has been placed on shippers and charterers still serves a valid goal. It prevents them from "shutting their eyes" to facts that they could easily discover. See *Gilmore & Black, supra*, at 672. Because there are no strong counterreasons for shielding these parties from such an obligation, we hold that the rule of *The Lucie Schulte* is still binding.

Thus, Cardinal had the burden of showing that a reasonable inquiry would not have brought the anti-lien clause to surface. It failed to meet that burden, so its lien must likewise fail. The judgment of the trial court is

---

[13] See *Gilmore & Black, supra*, § 9-44 at 677 (specific form of anti-lien clause required).

AFFIRMED.

Now, leaving Oxeloesund, Sweden, we return to the treacherous Atlantic and point our bow to the south. We are bound to round the Cape of Good Hope and set sail for the fabled Orient -- our destination: Djakarta, Indonesia.

## II. THE GOVERNMENT OF THE REPUBLIC OF INDONESIA AND BANDAN URUSAN LOGISTIK v. M/V GLAFKOS AND GLAFKOS SHIPPING

This case, like the preceding one, involves a veritable Jacob's [**30] ladder of interlocking charters and sub-charters. Glafkos Shipping Company, Ltd. ("Glafkos Shipping") owns the M/V Glafkos. The company time-chartered the Glafkos to Forestships International Ltd. ("Forestships") for a term of eight to eleven months. Forestships subsequently time-chartered the vessel to Claybridge Shipping Co. S.A. ("Claybridge") for "one time chartered trip." Both of these charters were on the New York Produce Exchange form and contained "Clause 18", the Prohibition-of-Lien provision. [14]

[**31] They also provided that Glafkos Shipping would appoint the Master of the ship, who was to authorize charterers to issue bills of lading on his behalf. Amendment 33 to the Glafkos Shipping-Forestships Charter provided:

> The Master to authorize in writing the Charterers and/or their Agents to sign Bills of Lading on his behalf. Bills of Lading to be signed by the Charterers and/or their Agents only if in conformity with the Mate's Receipts. [15]

On December 3, 1979, Claybridge substituted the M/V Glafkos for the M/V Pamela, which it had previously chartered to the Government of the Republic of Indonesia ("Indonesia") under a voyage charter dated November 15, 1979. The terms of the voyage charter continued to apply, except [**32] that the Glafkos was now the vessel to be used by Indonesia.

The charter made the Glafkos available for a single voyage to carry rice from the southern United States to Indonesia. Freight was to be paid by the Indonesian government to Claybridge on the basis of a calculated price per ton of cargo. Indonesia [*472] also agreed to pay Claybridge demurrage of $8,500 per day, and Claybridge agreed to pay Indonesia dispatch of $4,250 per day. [16] Clause 6 of the charterparty provided: "Vessel to have a lien on the cargo for all freight, dead freight, demurrage or average."

[**33] Badan Urusan Logistik ("Bulog") was the consignee of the rice cargo. According to the affidavit of Frederick Toding, a Bulog representative, "the M/V Glafkos carried 509,263 bags of rice between Lake Charles, Louisiana, and [Djakarta], Indonesia in early 1980 pursuant to [the voyage charter]." Bills of lading covering the shipment were issued (apparently to the shipper, the East Asiatic Company [17]). Lake City Stevedores, agents of Claybridge, signed the bills "For the Master." The bills expressly incorporated the terms of the "covering charter party":

> All terms, conditions and exceptions as per covering charter party and any addenda thereto, to be considered as incorporated herein as if fully written; anything to the contrary contained in this bill of lading notwithstanding.

[**34] The Louisiana rice arrived in Djakarta in February, 1980. However, Indonesia and Bulog

---

[14] Again, the clause provides:

18. That the Owners shall have a lien upon all cargoes, and all sub-freights for any amounts due under this Charter, including General Average contributions, and the Charterers to have a lien on the Ship for all monies paid in advance and not earned, and any overpaid hire or excess deposit to be returned at once. Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which might have priority over the title and interest of the owners in the vessel.

[15] Amendment 41 to the Forestships-Claybridge charter provided:

> If required by Charterers and/or their Agents, Master to authorize Charterers or their Agents to sign Bills of Lading provided in accordance with tally clerks and/or mates receipts.

Record at 93.

[16] Demurrage is compensation of the "shipowner" for days that the ship lies useless at port because loading or unloading of cargo has proceeded more slowly than expected. Dispatch is the complementary payment to the charterer for loading or unloading the ship more rapidly than expected. Under the terms of the Claybridge-Indonesia charter, the parties agreed that loading and discharge would proceed at a minimum rate of 1,000 metric tons per working day (700 tons per working day if the discharge port were Cirebon).

[17] The history of these bills of lading is none too clear. The plaintiffs-appellants refer to the bills only in their Reply Brief and without giving any discussion of their issuance, transfer, or presentment. All that we know is gleaned from the face of the documents.

Markus Oberg

contend that the cargo was damaged. In addition, they allege that 23 days, 22 hours, and 57 minutes were saved by rapid loading and discharge of the cargo, entitling the plaintiffs to $101,814.05 in dispatch money.

Unfortunately, Claybridge filed for bankruptcy in the spring of 1980, before the plaintiffs could collect. Therefore, Indonesia and Bulog brought an action for cargo damage and dispatch against Glafkos Shipping, Claybridge, and Kontozamis Shipping (an alleged agent of Glafkos Shipping) *in personam*. They also brought an action *in rem* against the M/V Glafkos, asserting a maritime lien. After the case was filed in district court, the plaintiffs settled their claim for cargo damage. In addition, the trial court dismissed Claybridge and Kontozamis as parties defendant. Thus, the only remaining issues concern the claim for dispatch brought against Glafkos Shipping and its vessel. On September 10, 1982, Glafkos Shipping filed a Motion for Summary Judgment, seeking to dismiss the dispatch claim. The plaintiffs filed a Crossmotion for Summary Judgment, seeking enforcement of the [**35] claim. The court granted the defendant's motion on the ground that plaintiffs could assert no lien against the vessel. *553 F. Supp. 272*. The plaintiffs have appealed from that judgment.

Again, the central question on appeal is whether a lien could arise under these circumstances. Glafkos Shipping also contends that if the lien was invalid, then the plaintiffs are liable for attorney's fees as damages resulting from the wrongful seizure of the Glafkos. We hold that the Prohibition-of-Lien clause precludes the lien, but that Glafkos Shipping is not entitled to attorney's fees.

A. The Lien

If a lien could be asserted in this case, it would arise under an argument similar to that outlined in *Cardinal Shipping v. M/S Seisho Maru*. Claybridge was entrusted with the use of the *Glafkos*. Therefore, it could arguably enter into a contract of affreightment subjecting the vessel to maritime liens. See *The Schooner Freeman v. Buckingham, 59 U.S. (18 How.) at 190, 15 L. Ed. 341*; *The Lucie Schulte, 343 F.2d at 900*. Claybridge's failure to pay dispatch would, then, amount to [*473] a breach of the charter, entitling the plaintiffs [**36] to a lien. As in *Cardinal Shipping* and *The Lucie Schulte*, however, the first question becomes whether the anti-lien clause in the time charters effectively stripped Claybridge of the power to incur liens.

Claybridge attempts to avoid this reef by taking a broader reach and characterizing the dispatch obligation as one arising initially between the vessel and the cargo owner. The anti-lien clause only bars liens incurred by the charterer (or his agents). Claybridge argues that the vessel itself incurred the lien in the first instance, and, therefore, that Clause 18 does not apply. Claybridge relies on *The Corvus, 282 F. 939 (D.Md.1922)*, aff'd, *288 F. 973 (4th Cir.1923)*, in which the district court [18] concluded that contractual obligations for dispatch and demurrage are "reciprocal" in the sense that the party who would pay demurrage is also the proper recipient of dispatch when it is earned. *282 F. at 940*. The owners [19] of the vessel had entered into a voyage charterparty with Universal Transportation Company ("Universal" or "charterer"). The charter contemplated the carriage of coal for one voyage and provided [**37] that the owners could collect demurrage if the vessel were held too long in port. On the other hand, the charter provided that the owners would pay dispatch if the vessel were unloaded more quickly than expected. The cargo was shipped, dispatch was earned, and the consignee [20] brought an action *in rem* to recover the dispatch amounts due. At trial, a question arose about who was entitled to the dispatch -- the charterer or the consignee. The court concluded that the consignee had the right to collect dispatch because it would have been liable for demurrage. [21] It was entitled to a lien in the action because the shipowners had breached their charter. *Id.*

Nothing in the case [**38] suggests that the plaintiff would have a lien if the shipowner had not contracted to pay dispatch. *HN9*[↑] The mere fact that the owner has a right to demurrage, even one secured by a lien on the cargo, does not automatically give a right to dispatch. There must be a contractual agreement to pay the dispatch.

Moreover, the case does not hold that every right to dispatch confers a lien. It merely holds that where the owner has breached his own contract for dispatch, a lien arises. Thus, *The Corvus* does not govern our case. Claybridge undertook the dispatch obligation in a subcharter to which Glafkos Shipping was not a party.

---

[18] The Court of Appeals affirmed the trial court on this issue, *288 F. at 974*, but the basic reasoning is stated in the district court opinion.

[19] Oddly, neither opinion names them.

[20] Direzione Generale Combustilibi.

[21] The charterparty expressly provided a lien on the cargo for demurrage.

There is no evidence that the shipowner was even aware of the agreement. If a lien arose at all, it arose by virtue of the charterer's arguable authority to bind the ship to contracts of affreightment. See The Lucie Schulte, 343 F.2d at 900. [22]

[**39] [*474] Thus, the currents of inevitability drive us back upon the reef that the plaintiffs hoped to skirt. We must ask whether the anti-lien clause in the Glafkos Shipping-Forestships charter and the Forestships-Claybridge charter precludes the plaintiffs' action against the vessel. The clause in each charter is the same New York Produce Exchange provision that we held to be effective in Cardinal Shipping. Here, as in Cardinal, the clause appeared in the time charters under which Claybridge took possession of the vessel. Therefore, the question becomes whether the plaintiffs knew or could have ascertained that the Glafkos was under charter and that the charter contained a Prohibition-of-Lien clause. The plaintiffs have the burden of proving that deligent inquiry would has been unavailing. See supra [Slip Op.] at 382.

Again, they have failed to put forward any convincing evidence on this score. Their sole argument is that the Glafkos Shipping-Forestships charter was expressly secretive. Amendment 70 to that charter provides: "This fixture to be kept strictly private and confidential." Record at 85. The plaintiffs claim that diligent inquiry could not have [**40] discovered such a confidential document.

They have not argued, however, that the Forestships-Claybridge subcharter contains a similar "secrecy clause." Nor can we find one. Thus, they have given no reason why they could not discover the anti-lien provision contained in the subcharter. Awareness of that clause alone would have been sufficient to put the plaintiffs on notice as to the constraints on Claybridge's authority. This is particularly true since Claybridge was the very "Charterer" referred to in Clause 18 of that subcharter. In sum, plaintiffs did not sufficiently carry their burden of proof. Clause 18 bars their purported lien.

B. Attorney's Fees

Glafkos Shipping brings a cross-appeal seeking attorney's fees on the ground that Indonesia and Bulog wrongfully seized the Glafkos. [23] The shipowner argues that such fees are a basic element of damages for the tort of wrongful seizure.

[**41] Without deciding whether there was a wrongful seizure, we hold that the claim for attorney's fees is unsupported. HN10[↑] In order to collect fees, the plaintiff must prove that the party seizing the vessel acted in bad faith, with malice, or with wanton disregard for the rights of his opponent. See Frontera Fruit v. Dowling, 91 F.2d 293, 297 (5th Cir.1937); see also Platoro Ltd. v. Unidentified Remains of a Vessel, 695 F.2d 893, 905-906 (5th Cir.1983); Noritake Co. v. M/V Hellenic Champion, 627 F.2d 724, 730-31 n. 5 (5th Cir.1980). The pleadings of Glafkos Shipping did not allege, and the company has not proven, any acts of bad faith, wantonness, or malice on the part of

---

[22] The plaintiffs also urge that a lien arose from the breach because bills of lading were signed "For the Master" by Lake City Stevedores. The bills expressly incorporated the covering charter -- including presumably the voyage charter and its dispatch terms. Therefore, Claybridge contends that the owner (through its agents) signed and became a party to bills of lading containing those terms. See The Capitaine Faure, 10 F.2d 950, 954 (2d Cir.1926); Poor on Charter Parties, supra, § 10, at 33.

The weakness in this argument is that Claybridge has never proved the agency. Clause 33 of the Glafkos Shipping-Forestships time charter provided that charterers would be authorized to sign bills of lading for the Master if the Master gave authorization in writing. See Record at 81. We can find no evidence in the record -- nor have the plaintiffs contended in their pleadings at trial or on appeal -- that the Master gave such authorization. Claybridge has the burden of proving authority to sign the bills for Master and owner. See Associated Metals & Minerals v. SS Portoria, 484 F.2d 460, 462 (5th Cir.1973). It failed to meet that burden.

Of course, some cases have held that even if a signature "For the Master" is not authorized, the bills may be "ratified" when cargo is loaded and shipped aboard the vessel. At that point, a breach of the terms in the bills of lading may give rise to a lien against the vessel. See Demsey & Associates v. SS Sea Star, 461 F.2d 1009, 1015 (2d Cir.1972); Tube Products of India v. S.S. Rio Grande, 334 F. Supp. 1039, 1041 (S.D.N.Y.1971); United Nations Children's Fund v. S/S Nordstern, 251 F. Supp. 833, 837 (S.D.N.Y.1965). However, this liability is but a variant of the charterer's ability to bind the vessel to contracts of affreightment. Thus, his authority may be constrained by a Prohibition-of-Lien clause. See The Lucie Schulte, 343 F.2d at 898 (breach of bill-of-lading contracts); Gilmore & Black, supra, at 687.

[23] Glafkos Shipping sought attorney's fees in the trial court. See Defendant's Answer, Record at 43. The court ordered Indonesia and Bulog to post bond to secure the wrongful seizure claim, but it never ruled on that claim.

Indonesia and Bulog.

The owner argues that the Supreme Court did not require bad faith in awarding fees in *The Apollon, 22 U.S. (9 Wheat) 362, 372, 6 L. Ed. 111 (1824)*; see also *Ocean Ship Supply v. M/V Leah, 1982 A.M.C. 2740, 2751 (C.D.S.C.1982)*. It contends that the Court recently explained *The Apollon* as drawing a line between fees awarded as "costs" and those awarded as "damages," bad faith not being required for the latter. [**42] See *Vaughan v. Atkinson, 369 U.S. 527, 530, 8 L. Ed. 2d 88, 82 S. Ct. 997 (1962)* (discussing attorney's fees in the context of a seaman's suit for maintenance and cure). The *Vaughan* court, however, never explicitly declared that bad faith was not required; on the contrary, it emphasized that [*475] the defendant had been "callous . . . willful and persistent" and that his "recalcitrance" had forced the plaintiff "to hire a lawyer and go to court to get what was plainly owed him." *Id. at 530-31, 82 S. Ct. at 999-1000*; Gilmore & Black, supra, at 313. This Court has read *Vaughan* to require bad faith, see *Noritake, 627 F.2d 724 at 731 n. 5*, and we have required bad faith or malice long since *The Apollon* was decided. See *Frontera Fruit; Platoro Ltd.; Noritake*.

In this case, there was a bona fide dispute over the validity of Indonesia's and Bulog's lien. Given the scarcity of Fifth Circuit precedent in this area, the parties could have legitimately and honestly believed that a lien would stand up. There is no evidence of wantonness, bad faith, or malice. Thus, the record does not support an award of attorney's [**43] fees.

Glafkos Shipping may sail away on its vessel but not with the lienors' dollar nailed to the mast.

AFFIRMED.

Concur by: RUBIN

## Concur

RUBIN, Judge, concurring.

Bound by the decision in *Frontera Fruit Co., Inc. v. Dowling*, [1] [**44] I concur in the denial of attorney's fees as well as in the remainder of the opinion. A half century ago, in that case, we denied damages for wrongful libel of a vessel save when the seizure resulted from bad faith, malice, or gross negligence. [2] Incidental thereto, on the same grounds we denied recovery for attorney's fees incurred in obtaining the release of the vessel seized, without differentiating between attorney's fees and other damages. The sum sought for fees was only $300. Now, securing release of a vessel may occasion the payment of attorney's fees in amounts never dreamed of in 1937. It is time to reconsider whether wrongful seizure, even if provoked in good faith, should not entail liability for attorney's fees, by statute if need be. Those who, like seamen, are exempt from providing security, should, of course, retain their privileged status.

---

End of Document

.

---

[1] *91 F.2d 293 (5th Cir.1937)*.

[2] *Id., 91 F.2d at 297*.

Markus Oberg