# EXHIBIT 1

The "AMIS INTEGITY"

**O P I N I O N**

1.  On the 17th October 2019, the m.v. "AMIS INTEGRITY" ("the vessel") was arrested in Vancouver, Washington by Dry Bulk Singapore Pte Limited ("the Sub-Charterers") who had chartered the vessel from 24Vision Chartering Solutions DMCC ("the Charterers") by a Charterparty dated the 10th January 2019. The Charterers in turn had chartered her from her Owners ("the Owners") under a Charterparty dated the 25th June 2018.

2.  I am asked to advise the Owners as to the answer, as a matter of English law, to the following 2 questions:

    (1) If the Sub-Charterers paid hire in advance to the Charterers, did that payment create a lien over the vessel by virtue of clause 23 of the Charterparty, which is said also to be contained in the Sub-Charterparty.

    (2) Would the action of concluding a Charterparty with a third party amount to withdrawal of the vessel?

    I understand that this Opinion will be relied on by the Owners in support of an application for counter-security before the US District Court for the District of Oregon, Portland Division.

**If hire was paid in advance by the Sub-Charterers, did that create a lien over the vessel by virtue of the terms of clause 23 of the Charterparty or the Sub-Charterparty?**

3.  Clause 23 of the Charterparty provides that *"the Charterers shall have a lien on the Vessel for all monies paid in advance and any overpaid hire or excess deposit to be returned at once."*

4.   On the facts, as I understand them, this clause does not, as a matter of English law, create any rights in the Sub-Charterer over the Head Owner's vessel.

5.   I am instructed that the Charterers did not pay hire in advance to the Owners. Since they did not do so, there can be no question of a lien in their favour attaching to the vessel by virtue of clause 23 of the Head Charter.

6.   The Sub-Charterers say that they have paid unearned hire in advance to the Charterers. If so then, if the Sub-Charterparty also contained clause 23[1], they have a claim against the Charterers under that Sub-Charterparty for the return of that hire insofar as it has not been earned or returned. But that clause does not give them any rights against the Owners or against the vessel for at least 3 reasons:

   (1)   first, the Owners were not party to the Sub-Charterparty. They did not agree that the Sub-Charterers should have a lien over their vessel for hire paid in advance to the Charterers;

   (2)   second, as a matter of English law a charterer does not have a general authority to create liens over a vessel in favour of a sub-charterer in respect of the sub-charterers' claims under a sub-charterparty and there was, so far as I am aware, no agreement between the Owners and the Charterers by which the Owners gave the Charterers the authority to create such liens over the vessel. On the contrary, clause 23 specifically provides that the Charterers will not suffer or permit to be continued, any lien or encumbrance incurred by them or their agents which might have priority over the interests of the Owners;

   (3)   third, the types of claim which, as a matter of English law, give parties a claim *in rem* against a vessel (which claims might be said to be a *"lien"* for the purposes of clause 23: see The Vestland [1980] 2 Ll. Rep. 171 at 182) are listed in section 20(2) of the Senior Courts Act 1981. That section broadly

---

[1]   I have seen the recap dated the 10th January 2019 by which the Sub-Charterparty was made. That provides *"Otherwise as per Owner Pro Forma Charter Party as attached with logical alterations as per mainterms agreed…"* I note that the Sub-Charterer alleges that the Head Charterparty, including clause 23, was incorporated into the Sub-Charterparty.

{29293-00577076;1} - 2 -

reflects the categories listed in the Arrest Convention of 1952 with 2 additional categories which are not material for present purposes. The only category under which the Sub-Charterers' claim for advance hire (and indeed their claim for damages for wrongful withdrawal) might be said to fall is that described in s 20(2)(h) (*"any claim arising out of any agreement relating to the carriage of goods in a ship or to the use or hire of a ship"*). However, s 21(4) of the Act[2] makes it clear that a claim of that kind can only be brought against a ship if:

(a)  the claim arises in respect of a ship;

(b)  the person who would be liable on the claim in an action in personam ("the relevant person") was, when the cause of action arose, the owner or charterer of or in possession of the ship or in control of the ship;

(c)  at the time when the action is brought the relevant person is either the beneficial owner of the ship as respects all the shares in it or a demise charterer of the ship.

In the present case the claim is in respect of a ship and the person who would be liable on the claim was the charterer of it when the cause of action arose so that the first 2 conditions are satisfied. However at the time when the claim was brought the Charterers were neither the owners of the vessel nor the demise charterers of it. Accordingly the claim for the return of unearned advance hire (and their claim for damages for wrongful withdrawal) does not give the Sub-Charterers a right *in rem*.

---

[2]  Section 21(3) permits an action *in rem* against *any* vessel over which there is *"a maritime lien or other charge"*. However English law recognises *"maritime liens"* only in respect of claims for damage done by a ship, salvage, wages, master's disbursements and liabilities, bottomry and possibly pilotage (see The Tolten [1946] P 135 at 144 and The Ambetelios [1923] P 68). The other heads of claim listed in section 20(2) (sometimes inaccurately referred to as statutory liens) are not maritime liens. The term *"or other charge"* in s 30(3) of the Administration of Justice Act 1956, which s 21(3) of the Supreme Court Act replaced, was held by Hewson J in The St Merriel [1963] P 247 to mean charges arising under the Merchant Shipping Acts. In The Acrux (No 3) [1964] the same judge said that *"other charge"* meant *"any charge on a vessel given under the law of any nation to secure claims similar to those recognised by this court as carrying a maritime lien such as wages, damage, salvage and bottomry. The categories of maritime lien as recognised by this court cannot, in my view, be extended except by the legislature."* He therefore held that a claim for unpaid insurance premiums which, as a matter of Italian law, created the equivalent of a maritime lien, did not give a right *in rem* against the vessel, presumably on the basis that the claim was not similar to those recognised by the English court as creating a maritime lien.

7. The nature of the "lien" in clause 18 of the 1946 NYPE form (the precursor to clause 23) was considered by Robert Goff J in <u>The Lancaster</u> [1980] 2 Ll. Rep. 497. In that case the vessel became a constructive total loss as the result of a collision and the charterers claimed repayment of hire paid in advance but not earned at the date of the collision. They argued that the clause created an equitable lien or charge over the vessel which could be enforced against the proceeds of the hull policy. That argument was rejected by Robert Goff J who held that the clause created no proprietary or possessory right but simply meant that:

> *"the time charterer redelivers the ship subject to his lien, which means that he can restrain the shipowner (presumably by injunction) from resuming his control over the use of the ship so long as the lien is being lawfully exercised."*

8. The judge did not express a view as to whether that restraint could still be exercised once the shipowner had in fact resumed control of the ship but in the present case that question is academic. Here the persons whom the Sub-Charterers could restrain by injunction from resuming control of the vessel were the Charterers to whom the advance hire has been paid and who, so far as the Sub-Charterparty is concerned, were *"the shipowners"* (although obviously in the present circumstances that right is valueless as the Charterers will not be resuming control of the vessel anyway). The clause gives no right against the Owners and no proprietary or possessory right against the vessel.

**Would the action of concluding a Charterparty with a third party amount to withdrawal of the vessel?**

9. The Sub-Charterers allege that the Owners concluded a fixture of the vessel to other charterers, United Bulk Carriers ("UBC"), on the 11th July and that the making of that fixture itself amounted to the withdrawal of the vessel by the Owners from the Charterers.

10. Even if a fixture with UBC was made before midnight GMT on the 11th July that in itself did not, as a matter of English law, amount to the withdrawal of the vessel. In

order for a withdrawal to be effective, unequivocal notice must be given to the Charterers: see <u>The Georgios C</u> [1971] 1 Ll. Rep. 7 at 14 and <u>The Aegnoussiotis</u> [1977] 1 Ll. Rep. 268 at 275.  Obviously, the mere making of an alternative Charterparty does not amount to unequivocal notice to the Charterers that the vessel is being withdrawn.

**CONCLUSION**

11. To summarise, it is my opinion that:

    (1) clause 23 of the Sub-Charterparty did not create a lien enforceable by the Sub-Charterers against the vessel for unearned advance hire not repaid by the Charterers to the Sub-Charterers;

    (2) as a matter of English law, the Sub-Charterers' claim for damages for wrongful withdrawal and that for the return of unearned advance hire, both of which arise under the Sub-Charterparty, do not give rise to rights *in rem* against the vessel;

    (3) if, on the 11th July, the Owners concluded a charter with UBC, their action in doing so did not amount to a withdrawal of the vessel from the Charterers' service.

Quadrant Chambers,                                                                MICHAEL NOLAN Q.C.
10 Fleet Street,
LONDON EC4Y 1AU                                                                   13th January 2020

The "AMIS INTEGITY"

———————————————
**O P I N I O N**
———————————————

**The North of England P & I Association Limited,**
80 Anson Rd,
26-03 Fuji Xerox Towers,
SINGAPORE 079907