# EXHIBIT 3



**RIDER CLAUSES TO M.V. "AMIS INTEGRITY" CHARTER
PARTY DATED 12.07.2019**

**Clause 46 – Vessel Description & Bunker Spec.**
MV Amis Integrity

Built/Year: 2017

Vessel Type: Bulk Carrier

Builder: Imabari Shipbuilding Co

Flag: Panama

Class: ABS

DWT: 63,483 M/T

Draft (summer): 13.418 m

Length (L.O.A.) / (L.B.P.): 199.98 m / 195.00 m

Breadth : 32.24 m

GROSS / NET tonnage: 35,825 / 21,075

Capacity(grain/ bale) : 80,497.70 m3 / 76,176.27 m3

Hold / Hatch: 5/5

Hatch Cover : FOLDING Type (Hydraulic driven) Hatch Open

1.: L. 18.40m x B. 18.72m

2.~5.: L. 23.20m x B. 18.72m

- Vessel is CO2 fitted.
- Vessel is fitted with A60 bulkhead
- Cargo Gear:  Crane 4 sets x 30 mt
- Crane unable tandem at same time
- GRAB x 4 (12M3)

- Speed & Consumption (daily):

Ballast: about 14.0 kts on about 23.2 MT IFO + about 0.1 MT MDO

Laden : about 13.3 kts on about 24 MT IFO + about 0.1 MT MDO

In port (daily):

Working: about 4.7 MT IFO + about 0.2 MT MDO

Idle      : about 2.3 MT IFO + about 0.2 MT MDO

(D.O.to be used in case of low load running (below 30%) of G/E)

ECO Speed / Consumption basic below: (Ref only/Wog)

- 1 -

AMIS0276



**RIDER CLAUSES TO M.V. "AMIS INTEGRITY" CHARTER**
**PARTY DATED 12.07.2019**

Ballast about 12.0 kts on about 15.4 MT IFO + about 0.1 MT MDO

Laden  about 11.5 kts on about 16.7 MT IFO + about 0.1 MT MDO


Ballast  about 12.5 kts on about 17.3 MT IFO + about 0.1 MT MDO

Laden  about 12.0 kts on about 18.5 MT IFO + about 0.1 MT MDO


- Eco/Speed Consumption clause:

Owners confirm that vessel is capable of being continuously operated on minimum main engine load safely close to the cut-in point of the vessel's engine auxiliary blowers. Owners confirm they will allow the vessel to sail at 50% of the main engine load (but with main engine always operating above the cut-in point of the vessel's engine auxiliary blowers).

All low load operations will be performed under Owners/Owners technical managers' supervision and always in strict conformity with the recommendations from vessel's main engine manufacturers.

Owners/owners' technical managers will provide proper guidance and instructions to the Master/ship staff and ensure strict compliance with applicable low load operating procedures as deemed necessary by owners/engine manufacturers.

Owners/Master to provide Charterers with all ME parameters and logs upon Charterers' request.


- Speed and consumption basis good weather conditions, no adverse current, no negative influence of swell and not exceeding Beufort scale force 4 and Douglas sea state scale 3.


- Vessel may consume MDO for main engine when steaming in shallow, confined waters, manoeuvering in/out port(s), transiting canals and also has liberty to consume for auxiliary engine when starting, stopping and working with low load.


- Charterers have full use of vessel's bunker tank capacity up to 80pct


- No commingling of IFO is allowed for the duration of this c/p


+++ ALL DETAILS ABOUT +++


- ITINERARY:  ETA Paranagua: on about 18-19 / July IAGW

- LAST 5 CARGOES/CALLS:

Last 5 cargoes: Wheat-Bagged Cement-Coal-Coal-Coal

Last 5 ports: Cape Town-Durban-Singapore-Belawan-Gresik


- PNI CLUB:  Britannia

AMIS0277



**RIDER CLAUSES TO M.V. "AMIS INTEGRITY" CHARTER
PARTY DATED 12.07.2019**

- CP CHAIN: No CP Chain

ISO 8217:2010 category RMG 380 and DMA (sulfur below 0.5%) or any subsequent amendments thereto

Charterers shall not supply the vessel with any bunkers that contain any material which is in a concentration that adversely affects the performance or longevity of the vessel"s machinery. During bunkering 4 samples will be taken by drip sampling from barge manifold. Two to be retained by the vessel, one by charterers / supplier and the third to be sent at owners" cost for analysis if so desired. All samples to be sealed and signed by the suppliers and the chief engineer. IMO 2009 guidelines for the sampling of fuel oil (resolution MEPC 182(59) to be followed. should any problems arise from the quality of bunker supplied, a joint analysis  to take place and findings to be binding on both parties.

### Clause 47 – Cargo Hold

Vessel's holds on arrival at first load port to be clean, dried, free of rust scale and previous cargo residues, and in every respect fit and ready to receive charterers' intended cargo to local independent shipper surveyor's satisfaction. Should the vessel fail hold inspection, the vessel to be off-hire from time of rejection until she fully passes; and any proven expenses directly incurred for hold cleaning whilst vessel off hire to be for owners' account. In case the vessel partially passes hold inspection and loading operation commences, charterers to pay hire pro-rata till all holds pass the re-inspection.

The charterers shall have the option of redelivering the vessel with unclean holds of compensation of lumpsum of USD 6,000 (six thousand dollars U.S. currency) to Owners in lieu of hold cleaning.

### Clause 48 – Certificates

Owners guarantee vessel holding valid certificate of financial responsibility/international tonnage certificate during the entire charter party period.

### Clause 49 - Cargo Exclusions

It is understood that the vessel is not to be employed in the carriage of:

Ammonium nitrate ( But some types of Ammonium nitrate can be allowed subject to vessel"s IMSBC certificate), asbestos, ashes, asphalt, bones, borates, borax, calcium carbide, cement, cement clinker, copra and it's products, direct reduced iron (DRI), ferro-silicon, fishmeal, hide, hot briquetted iron (HBI), injurious, inflammable or dangerous goods (such as acids, explosives, aims, ammunition or warlike materials, nuclear material or radioactive products or wastes or chemical products), livestock, motor blocks and turnings, motor spirit, naphtha, nickel ore, oilcakes and meals, petroleum or it's products (But petroleum coke allowed, see below), pig iron, pitch in bulk, pond coal, pyrites, raw cotton, round logs, resin, scrap, silica sand, soda ash, sulphur ( But some types of sulphur can be allowed subject to vessel"s IMSBC certificate with protective clause , see below ), tobacco, tar or any of their products, raw cotton , all cargoes listed in the IMDG Code should be subject to Vessels" certificate(s) and Owners" prior approval so permit(s) and to be loaded strictly in accordance with IMO and local rules and relevant regulations. All cargoes to be loaded/stowed/carried within IMO and local rules and relevant regulations and always in accordance with what is allowed by the authorities issuing vessel's certificates.

All cargoes falling under Appendix B of the B.C. Code and any subsequent amendment ( except for coal ) are always to be excluded.

Charterers is not allowed to load Alumina / Australian grain for the first voyage

In case bagged cargo is carried, owners are not responsible for all bags torn/shortlanded/damaged/ leakage/pilferage or any circumstances arising out of its stowage except for ones wet or other damage caused by vessel's unseaworthiness.

Cargo to be loaded, stowed, trimmed, secured and discharged at Charterers" risk and expenses. Vessel to be

AMIS0278



**RIDER CLAUSES TO M.V. "AMIS INTEGRITY" CHARTER**
**PARTY DATED 12.07.2019**

always left in a seaworthy trim to the Master''s satisfaction during her sailing and/or shifting between all berths and ports. All cargo is to be carried as per the IMO regulation in respect of carriage of cargo.

Deck cargo is NOT allowed

Charterers are disallowed to use California block stowage for stowing steel cargo.

All cargoes belong to Group A cargo must be provided with a certificate that cargo moisture limit is within transportable moisture limit, which should be duly certified by Owners' P and I Club or his appointed surveyor before loading on board, and all related expenses and time for the survey shall be borne by the Charterers. BIMCO Solid Bulk Cargoes that Can Liquefy Clause to apply in full

All concentrates listed as per vessel's IMSBC certificate to be allowed during the currency of this Charter Party provided always loaded in line with IMO/local regulations. For loading concentrates, the stowage to be within vessel's strength, all necessary separation if required to be properly erected up to surveyor's and Master's satisfaction at Charterers' expense and time and cargo to be loaded, stowed, separated, trimmed and discharged etc. according to latest IMO and other authorities' regulations At Master's request Charterers to allow Owners to appoint P&I surveyor or independent surveyor to supervise loading, stowing, execution of separation etc., to surveyor's agreement and Master's satisfaction at Charterers' time and expenses. Charterers/Shippers prior to loading, or upon request from owners/master, to provide certificates stating moisture content be less than the Transportable Moisture Limit ( TML ) with sampling date within 7 days prior to loading commencement of the cargo.

Charterers to have the option to carry two (2) dirty cargoes out of petcoke / salt / sulphur and as per charter party agreed during this charter party but consecutive voyage is not allowed and not last cargo before redelivery.

**Petcoke Protective Clause:**
Charterers have the liberty to carry petroleum coke (whether it be full or part cargo), during the entire currency of this charter-party on following conditions:

a) Petcoke mentioned herein is only limited to the type of non-hazardous / non-dangerous type which is not falling within Group B of BC Code.

b) If Charterers exercise such option, Charterers undertake to use holds as little as possible, provided vessel's stability, trim and stress permitting.

c) Such cargo to be loaded / stowed / trimmed / discharged strictly according to latest IMO and/or any other latest regulations / rules applicable to such cargo.

d) Should any additional / special washdown of holds before loading the reasonably recommended / proposed / required by Master, Charterers undertake to arrange the same at their expense / time.

e) After discharge, Charterers to arrange at their expense / time any additional / special washdown of holds carrying such cargo by chemicals, as master reasonably considers necessary.

f) Such cargo not to be the last cargo prior redelivery.

g) Any extra expenses resulting therefrom / incurred thereby Charterers and any detention through any of above causes, to be for Charterers' account.

h) It is understood that, if required by Charterers, cleaning of holds to be done by crew against Charterers paying lumpsum of US$6,000 after carrying petcoke , crew will render utmost assistance provided weather and time between last discharging port and next load port allows , as far as possible , without responsibility of the result , but arrangement / time / expense including cost of extraextra material are  always  for Charterers' account

**Salt and/or Sulphur Protective Clause:**
When carriage of bulk formed sulphur, Charterers shall confirm, the intended cargo is formed to a specific solid shapes (e.g., prills, granules, pellets, pastilles or flakes)and listed in the IMSBC code Group C .

- 4 -

AMIS0279



**RIDER CLAUSES TO M.V. "AMIS INTEGRITY" CHARTER**
**PARTY DATED 12.07.2019**

Charterers undertake to provide a cargo survey report prior to loading, stating that the sulphur is formed into shapes of prills, granules, pellets, pastilles or flakes.

Before loading salt or bulk formed sulphur, vessel's holds are to be coated with holdblock/limewash and holdblock/limewash to be introduced into the bilge openings to master's/shippers' representatives' satisfaction in Charterers' time and for Charterers' account.Charterers may request ship crew to carry out holdblock/limewash coating/decoating in which case ship crew to render utmost assistance as per the recommendations from Charterers, but without Owners' responsibility for then result. Charterers to pay lumpsum US$400.- per hold coating with holdblock/limewash and lumpsum US$500 per hold decoating as well as the cost of holdblock/limewash and extra material required. Alternatively Charterers may arrange shore labour to carry out it under master's supervision.

Hold cleaning bonus after decoating will be for Charterers' account as per intermediate hold cleaning clause. Salt or Bulk formed sulphur not to be last cargo before redelivery.

**Steel Cargo Protective Clauses:**

Where the vessel is required to load steel cargo, owners shall be entitled to carry out preloading/ pre-discharge survey/tally using a P. & I. Club approved surveyor, a copy of whose reports are to be given to Charterers, which shall be considered a joint survey, and all preloading/pre-discharge survey/tally fees to be equally shared between/among Owners, Charterers, and Sub-Charterers if any. Bills of lading to be in strict conformity with mate's receipt and include all remarks from preloading survey report. Charterers are disallowed to use California block stowage for stowing steel cargo.

Charterers to load steel coils then Owners confirm that coils may be loaded line for line in as many tiers as is necessary and dependent on the weight and dimensions of same but always within Vessel"s permissible tank-top strengths and in compliance with builders / class point stress limitations and according to Vessel"s loading manual prescribed for coils and to Master"s satisfaction with regard to stress, trim and stability requirements. This stowage of 25 tons / per unit steel coil two tiers is not always allowed

**Clause 50 - Trading limits / exclusions**

Vessel always to trade within International Warranty Limits / International Navigating Limits, always afloat at any time of tide, always via safe port(s)/berth(s)/anchorage(s) excluding

Abkhazia , Alaska, Albania, Algeria, Angola (including Luanda, Cabinda), Benin, Cambodia, Cuba, Eritrea, Ethiopia, Georgia, Great Lakes, Haiti, Iran, Iraq, Israel, Kenya, Lebanon, Liberia, Libya, Nigeria, North Korea, Serbia, Somalia, Syria, Tanzania , Togo, Tunisia, Turkish occupied Cyprus, Yemen/People's Republic of Yemen (North and South Yemen), Zaire, and any area and/or country banned or boycotted/blacklisted by UN / US / EU/any international sanctions , countries prohibited from calling by country of registry of the vessel, or vessel's flag state, or are likely to be exposed to piracy threat, any countries subject to UN Embargo, and any other hull war, strikes, terrorism and related perils listed area as defined by Joint War Committee from time to time.

Oman is allowed subject to additional premium applied and coastal sailing as long as the situation is calm as today

- No direct trade between People's Republic of China and Taiwan.

- BIMCO Piracy clause 2013 to apply in full

- BIMCO Infectious or Contagious Diseases Clause for Time Charter Parties to apply in full

- BIMCO Sanctions Clause for Time Charter Parties to apply in full

- BIMCO Ice Clause for Time Charter Parties to apply in full

Transit of Indian Ocean, Gulf of Aden and Red Sea / Piracy Clause:

BIMCO Piracy Clause for Time Charter Parties 2013 and BIMCO War Risks Clause(Conwartime2013) to apply in full. Transit of Indian Ocean, Gulf of Aden and Red Sea to be allowed and comply with JWC's and

AMIS0280



**RIDER CLAUSES TO M.V. "AMIS INTEGRITY" CHARTER**
**PARTY DATED 12.07.2019**

Owners" trading exclusions map with additional clause to apply as follows:

- Charterers to pay for all additional costs including but not limited to premium covering hull and machinery, extra war risk insurance, kidnap & ransom insurance, loss of hire insurance, crew war risk bonus, armed guards, installation anti-piracy/hardening materials crew bonus ( if any ) and anti-piracy hardening materials required by Master against Owners underwriters" invoices.

- When passing high risk area, 4(four) armed guards to be arranged/employed by Owners and embark before vessel entering the risk area. Armed security personnel which is approved by ship"s flag state and in compliance with the latest recommendations of owners" P&I Club

- All time and costs for armed guards arrangement to be for Charterers" account against copy of vouchers from Owners and any waiting time for embarkation / disembarkation of the armed guards is to be for Charterers" account

- All anti-piracy/hardening materials required by Master to be supplied/arranged by Charterers before vessel entering the risk area at Charterers" time ( including waiting time if any )and cost.

- Charterers confirm the vessel upon entry into and during the duration of the Charter is BMP5 and any subsequent amendments/version compliant subject to the arrangement of anti-piracy materials by Charterers in advance.

- Crew war risk bonus to be USD 7,000 per trip

Owners agree that transiting between WC India/Arabian gulf does not require armed guards on the basis of the current situation normalizes and the vessel can be kept within 12 nautical miles from shore along the Indian coast line provided safe navigation permits, during the whole navigation time within such area.

Trading to CIS pacific coast ports is allowable except winter / ice season and during the high risk periods for gypsy moth but always excluding the period 01/June through to 01/October each year. After each call to CIS pacific coast ports Charterers to ensure that the vessel is issued with all necessary certificates stating that the vessel is free from infestation of gypsy moth.

**Asian Gypsy Moth Clause:**
When Charterers direct the vessel to the area infested by Asian Gypsy Moth during high risk period which designated by USA/Canadian authorities and any competent authorities, Charterers shall at Charterers' time and expense, undertake to arrange a certificate issued by an appropriate authority of such area / port certifying that the vessel is free from infestation by Asian Gypsy Moth or its eggs and thereby Owners shall not be held liable for any consequences at the next destined ports. In case the vessel has traded at high-risk ports during high risk period for Asian Gypsy Moth in far-eastern Russia, Japan, China or S. Korea within six months prior redelivery, Charterers shall arrange the inspection to obtain a quarantine proof certificate at their account.

**United States Security Clause:**
If the vessel calls in the United States, including any United States territory, the following provisions shall apply with respect to any applicable security regulations or measures:

Notwithstanding anything else contained in the Charter Party all costs or expenses arising out of or related to security regulations or measures required by any United States authority including, but not limited to, security guards (in spite of crew without United States visas on board), launch services, tug escorts, port security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expense result solely from the negligence of the Owners, master or crew. All measures required by the Owner comply with the ship security plan shall be for the Owners' account.

**NAABSA Clause:**
Owners agree to allow the vessel calling at East Coast South America: Brazil, Argentina and places where it is customary for similar size of vessels to lie aground. In consideration Charterers hereby indemnify Owners from damages to the vessel in consequence of her l pay for such damage's cost incurred and vessel shall remain on hire during such time. Ov to perform a diving inspection at Charterers' time and cost to establish potential da



**RIDER CLAUSES TO M.V. "AMIS INTEGRITY" CHARTER PARTY DATED 12.07.2019**

inspection to be carried out at the Charterers' time and cost, as soon as any damage is sighted, the class survey shall be arranged by Owners at the Charterers" time and costs. The findings of the underwater inspection and the class surveyor's notes/recommendations/conditions are to be fully binding to the Charterers. The Charterers shall be obliged to arrange all necessary repairs in accordance with the class surveyor's notes/recommendations/conditions entirely at the Charterers' time and cost, the vessel remaining on hire during the entire duration of the repairs.

**Longview:**

When vessel calls at Longview, Owners should be exempted from any unreasonable request from any third party to vessel"s loose gear as long as it is fully Class maintained and certified as required for trading West Coast of Canada and West Coast of U.S.A.

**Pilotage:**

For trading to areas where pilotage is compulsory / customary, the same to be on Charterers' account. For trading to Orinoco River / Amazon River, the pilotage (including transportation cost) between pilot station and fairway although not compulsory, must be employed and paid by Charterers.

**Clause 51 – ISM Clause**

BIMCO STANDARD ISM CLAUSE FOR VOYAGE AND TIME CHARTER PARTIES

From the date of coming into force of the international safety management (ISM) code in relation to the vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both the vessel and „The Company" (as defined by the ISM Code) shall comply with the requirements of the ISM Code. Upon request the Owners shall provide a copy of the relevant Document of Compliance (DOC) and Safety Management Certificate (SMC) to the Charterers. Except as otherwise provided in this Charter Party, loss damage, expense or delay caused by failure on the part of the Owners or "the company" to comply with the ISM Code shall be for the Owners" account.

**Clause 52 - Trading excluded area in Japan**

Vessel shall not enter within 80 Kilo meters of Fukushima NR 1 nuclear power plant, "37-25.5N 141-02.0E"

and BIMCO Radioactivity Risk Clause for Time Charter Parties as below to be applied.

BIMCO Radioactivity Risk Clause for Time Charter Parties

(a) The Vessel shall not be obliged to proceed or required to continue to or through or remain at, any port, place, area or zone, or any waterway or canal (hereinafter "Area") which may expose the Vessel, her cargo, crew or other persons on board the Vessel to danger from levels of ionizing radiations from or contamination by radioactivity from any nuclear fuel, nuclear waste or from the combustion of nuclear fuel, or the radioactive, toxic, explosive or other hazardous or contaminating properties of any nuclear installation, reactor or other nuclear assembly or component thereof (hereinafter "Radioactivity") determined by a competent local, national or international authority (including but not limited to the International Atomic Energy Authority and the World Health Organization) to be harmful to human health.

(b) If in accordance with sub-clause (a) the Owners decide that the Vessel shall not proceed or continue to or through or remain in the Area they must immediately inform the Charterers. The Charterers shall be obliged to issue alternative voyage orders and shall indemnify the Owners for any claims from holders of the Bills of Lading caused by waiting for such orders and/or the performance of an alternative voyage. Any time lost as a result of waiting for or complying with such orders shall not be considered off-hire.

(c) The Vessel shall have liberty to comply with all orders, directions, recommendations or advice of competent authorities and/or the Flag State of the Vessel in respect of arrival, routes, ports of call, destinations, discharge of cargo, delivery, or in any other way whatsoever.

(d) The Charterers warrant that they shall not load cargoes and/or empty containers and/or supply bunkers that have levels of Radioactivity in excess of normal background radiation levels for the Area. The Owners, at their discretion, may arrange for a radioactive survey by an independent qualified surveyor, at the Charterers" cost, expense and time. If the level of Radioactivity in the cargoes, empty containers and/or

AMIS0282



**RIDER CLAUSES TO M.V. "AMIS INTEGRITY" CHARTER
PARTY DATED 12.07.2019**

bunkers is determined by the surveyor to exceed normal background levels, the Owners shall have the right to refuse to load such cargoes, empty containers and/or bunkers.

(e) Any delays arising out of measures taken by port authorities to screen the Vessel for radiation either in the countries affected by Radioactivity or at subsequent ports of call shall be for the Charterers" account. Any time lost as a result of complying with such screening shall not be considered off-hire.

(f) If in compliance with this Clause anything is done or not done, such shall not be deemed a deviation, but shall be considered as due fulfilment of this Charter Party. In the event of a conflict between the provisions of this Clause and any implied or express provision of the Charter Party, this Clause shall prevail to the extent of such conflict, but no further.

### Clause 53 – Cables / Victualling / Entertainment Clause

Charterers will remit to Owners with each hire payment a lump sum equivalent of USD 1,600 per month (30 days) or pro rata for the whole Time-Charter period. This payment shall be in consideration of:

All victualling as per Line 195 – 196.

Cost of incidentals such as cigarettes, drinks and petty expenses incurred by Master / Officers of the vessel on Charterers" behalf.

The cost of radio telegrams, telexes, fax and telephone communications made by the Master / Officers to the Charterers or their Agents of servants in direct performance of this Charter Party.

Owners confirm vessel is email fitted and Owners authorize Charterers to communicate with this system free of charge and Owners also confirm according to GMDSS requirements that vessel is fitted with Inmarsat telex for Charterers to access.

### Ukrainian Entertainment Clause:
In case vessel calls any Ukrainian port, charterers shall pay the owners lump sum of us$ 5,000 per port in consideration of Ukrainian entertainment and representation expenses.

### Clause 54 – Compliance with International Conventions

In the event of the vessel being prevented from or unable to perform in accordance with the terms of this Charter-Party by reason of:

a) Action on the part of relevant authorities resulting from non compliance with any compulsory applicable enactments enforcing all or part of any of the International convention in force.
b) Labour stoppages in services essential to the operation of the vessel owing to her flag or Ownership or management or the conditions of employment on board.

Any loss of time in the event a) and/or b) shall result in the vessel being off-hire and shall be dealt with in accordance with the off-hire Clause.

### Clause 55 - Crew Work

All opening and closing of hatches to be done by vessel's crew, if requested by Charterers, provided it is allowed by shore regulations and weather conditions.

### Clause 56 – Fumigation / Watchmen

Owners to supply valid fumigation or Sanitary Control / Exemption certificates on delivery of the vessel and if this does not cover the whole period of time charter and fumigation/sanitization is necessary, the cost of same and the detention to be for Owners' account.

Fumigation ordered because of cargoes carries or ports visited while vessel is employed under this Charter to be for Charterers' account.

AMIS0283



**RIDER CLAUSES TO M.V. "AMIS INTEGRITY" CHARTER PARTY DATED 12.07.2019**

Watchmen, if compulsory / customary (particularly for African ports / South American Ports/Russia ports) to be Charterers' account; otherwise watchmen for cargo for Charterers' account, watchmen for vessel for owners' account.

Normal immigration should be on Charterers' account. Immigration for crews embarking from ship including the application of shore passes to be on owners' account to Master's application.

When Charterers direct the vessel to ports in USA and/or Canada and or other ports where applicable, to comply with local oil spill prevention regulations, owners to be responsible for annual fee. For each call, charges incurred for complying with such regulation (including reporting charge for complying with oil spill contingency plan) to be on Charterers' account.

### Clause 57 - Black List

Owners guarantee that this vessel has never called at an Israeli port, and Charterers guarantee that the vessel will not call at any such port prior to or during the currency of this Charter. Owners also guarantee that this vessel is not black-listed by any Arab Countries.

### Clause 58 – HME Cargo Residues Disposal

If the cargo is harmful to the marine environment (HME) in accordance with MARPOL Annex V, the Charterers shall, without prejudice to ILOHC payment, be responsible for all extra costs and time and/or losses incurred by the Owners associated with the storage, removal and disposal of HME cargo related residues and/or hold washing water and/or chemicals and detergents and/or waste. And in such case, vessel shall be redelivered to Owners after removal and disposal of HME cargo related residues and/or hold washing water and/or chemicals and detergents and/or waste. Storage, removal and disposal shall always be in accordance with MARPOL Annex V, Section 1 or other applicable rules.

### Clause 59 - Fuel Sulphur Content Clause

(a) Without prejudice to anything else contained in this Charter Party, the Charterers shall supply fuels of such specifications and grades to permit the Vessel, at all times, to comply with the maximum sulphur content requirements of any emission control zone when the Vessel is ordered to trade within that zone.

The Charterers also warrant that any bunker suppliers, bunker craft operators and bunker surveyors used by the Charterers to supply such fuels shall comply with Regulations 14 and 18 of MARPOL Annex VI, including the Guidelines in respect of sampling and the provision of bunker delivery notes.

The Charterers shall indemnify, defend and hold harmless the Owners in respect of any loss, liability, delay, fines, costs or expenses arising or resulting from the Charterers" failure to comply with this Sub-clause (a).

(b) Provided always that the Charterers have fulfilled their obligations in respect of the supply of fuels in accordance with Sub-clause (a), the Owners warrant that:

(i) the Vessel shall comply with Regulations 14 and 18 of MARPOL Annex VI and with the requirements of any emission control zone; and
(ii) the Vessel shall be able to consume fuels of the required sulphur content when ordered by the Charterers to trade within any such zone.

Subject to having supplied the Vessel with fuels in accordance with Sub-clause (a), the Charterers shall not otherwise be liable for any loss, delay, fines, costs or expenses arising or resulting from the Vessel"s failure to comply with Regulations 14 and 18 of MARPOL Annex VI.

(c) For the purpose of this Clause, "emission control zone" shall mean zones as stipulated in MARPOL Annex VI and/or zones regulated by regional and/or national authorities such as, but not limited to, the EU and the US Environmental Protection Agency.

AMIS0284



**RIDER CLAUSES TO M.V. "AMIS INTEGRITY" CHARTER
PARTY DATED 12.07.2019**

**Clause 60 - Option to sell**

Deleted.

**Clause 61 - Bottom Fouling Clause**

In the event of the Charterers ordering the vessel to port(s) or place where vessel's stay is more than 25 consecutive days or to lay-up so as to avoid bottom fouling, Charterers to clean vessel at their time and expense, otherwise Owner's representation of vessel's speed/consumption to be non operative from the time of sailing from such port(s) or place until vessel's next dry dock. Such cleaning shall always be carried out prior to the redelivery of this vessel , unless otherwise agreed by the Owners

**Clause 62 - Panama/Suez Canal Transit**

The Owners guarantee that the vessel shall be fitted for Panama/Suez canal transit and in possession of valid necessary certificate and equipments during the currency of this Charter to comply with current regulations and requirements of both Canals. If required, the Suez Canal Projector light, rent of same to be for Charterers account.

**Clause 63 - Owners' Bank Full Style**

Beneficiary: WISDOM MARINE LINES S.A
Beneficiary Bank: BANK OF TAIWAN, OFFSHORE BANKING BRANCH
Swift Code: BKTWTWTP048
Account No: 069-007-77798-7

**Clause 64 – Owners' Agents**

Charterers agree that their Officers and/or Agents will assist the Master over minor ship's husbandry matters, debiting Owners with the actual costs involved. If required by Owners, Charterers" Agents to attend extraordinary matters (like attending repairs, crew change etc.) in which case Owners to refund Agents outlays and pay agency fee agreed between Owners and Charterers" Agents.

**Clause 65 – Adding Off-Hire Period**

Deleted.

**Clause 66 – Burning MDO**

The vessel has a liberty to burn diesel oil for main engine when maneuvering in shallow and/or narrow water, canals, rivers and in and / or out of port. The vessel also has a liberty to burn diesel oil for auxiliary engine when starting, stopping and working with low load.

**Clause 67 - Dry Docking Clause**

Vessel not to be drydocked unless in cases of emergency.

**Clause 68 – L.O.I. / Bank Guarantee - Clause**

If the original Bills of Lading cannot be presented at discharging port, Owners/Master agree to discharge/release the entire cargo without presentation of the original Bills of Lading only against Charterers' Letter of Indemnity in Owners' standard P and I Club form and without bank guarantee or bank endorsement. Charterers' Letter of Indemnity to be faxed or e-mailed to Owners via broker channel before commencement of discharge in order to grant Owners reasonable time to check/approve same and instruct the Master accordingly, otherwise owners will not be held liable for any delay of discharging operation.

**Clause 69 – Bill of Lading Reference**

a) The Master shall sign the Bills of Lading or Waybills for cargo as presented in conformity with mates receipts. However, the Charterers or their Agents may sign Bills of Lading or Waybills on behalf of the

- 10 -

AMIS0285



**RIDER CLAUSES TO M.V. "AMIS INTEGRITY" CHARTER
PARTY DATED 12.07.2019**

Master, always in conformity with mate's receipts.

b) All Bills of lading or Waybills shall be without prejudice to this Charter Party and the Charterers shall indemnify the Owners against all consequences or liabilities which may arise from any inconsistency between the Charter Party and any Bills of Lading or Waybills signed by the Charterers or by the Master at their request.

c) English law to apply.

d) All Bills of Lading and Waybills and any other documents issued evidencing contracts of carriage (shipping documents) which are issued under this Charter Party shall incorporate a Clause Paramount, War Risk, New Jason, General Average, and Both-to-Blame Collision clause, in the form set out in this Charter Party and will expressly and effectively incorporate all terms, conditions and exceptions of this Charter Party and will expressly incorporate the arbitration and lien clauses of this Charter Party. Failure to incorporate such clauses by the Charterers or those, for whom they are responsible, will constitute a breach of this Charter Party

## Clause 70- Deviation / Put Back

In the event of loss of time either in port or at sea, deviation from the course of the voyage or putting back whilst on the voyage, caused by sickness of or an accident to or misconduct by Master/Officer/Crew, or caused by stowaway, refugee on board the vessel, or breakdown to vessel (or drydocking or periodical survey), the hire shall be suspended from the time of inefficiency in port or at sea, deviation or putting back (except for any Government or similar authority ordered rescue operation) until vessel become again efficient in the same position or regain the line of voyage whichever shorter distance for the port where vessel is originally destined for and the voyage resumed therefrom, and all direct proven expenses incurred including bunkers consumed during such period of suspension shall be for Owners'' account.

## Clause 71    – Prolonged Port Stay

If the vessel is kept waiting off a port for a minimum of 30 days and requires replenishment of fresh water and/or provisions and such an extra barge supply cost for fresh water and/or provisions to be for Charterers' account, but cost of fresh water and/or provisions to be for Owners' account. But in case Charterers inform Owners in advance that such a port delay is possible, with Owners still having an opportunity to stem sufficient fresh water, then Charterers not responsible for same and all time / costs resulting for same to be for Owners'' account.

## Clause 72 – Capture, Seize, Arrest

Should the vessel be captured or seized or detained or arrested by any authority or by any legal process during the currency or this Charter-Party, for any reason which affect cargo loading / discharging operation and vessel sailing / departure attributable to the Owners, the payment of hire shall be suspended until the time of her release, unless such seized or detention or arrested was caused by the cargo carried or associated with Charterers or their agents, servants.. Any extra proven expenses directly incurred by and/or during such capture or seizure or detention or arrest shall be for Owners'' account.

## Clause 73 – Additional Equipment, Fittings

The Charterers, subject to the Owners'' approval shall be at liberty to fit / weld and additional equipment for fittings, for loading, discharging and/or securing cargo. Such work shall be done at the Charterers'' expenses and time, and the Charterers shall remove such equipment and fittings at their expense and time prior to redelivery. The strength, location and fitting of additional fittings for cargo securing to be approved by class and procedure for use to be entered into the Vessel"s Class approved Cargo Securing Manual.

## Clause 74 – Quarantine

Normal quarantine time and expenses for the vessel"s entering port shall be for the Charterers'' account, but any time of detention and expenses for quarantine due to pestilence, epidemics and illness of Captain, Officers and crew shall be for the Owners'' account. However if quarantine and/or detention is on account of the vessel having been sent by the Charterers to an infected port, such detention time and expenses to be for

AMIS0286



**RIDER CLAUSES TO M.V. "AMIS INTEGRITY" CHARTER
PARTY DATED 12.07.2019**

the Charterers" account.

Charterers shall be responsible for the time and cost of obtaining the following certificates: Argentina: Pest Control Certificate, Brazil: Pest Control Certificate/Deratting and Fumigation Certificate and Air Quality Control Certificate, Indonesia: Indonesia Health Book, Medical Chest Certificate and Water Test Certificate.

### Clause 75 – Oil Spillage During Bunkering

a) If the Owners are required to establish or maintain financial security or responsibility in respect of oil or other pollution damage to enable the vessel lawful to enter, remain in or leave any port, place, territorial or contiguous waters of any country or state in performance of this Charter Party, the Owners shall make all arrangements by bond or otherwise may be necessitated to satisfy such requirements at the Owners" sole expense.

b) The Charterers shall be under no responsibility for all consequences (including loss of time) of oil or other pollution damage and any failure or inability of the Owners to do so as provided for above and any loss of time incurred thereby to be off-hire.

c) The Owners shall indemnify the Charterers harmless against all consequences (including fines if any imposed to the Charterers) of oil or other pollution damage and any failure or inability of the Owners to do so as provided for in preceding Paragraph (a) above.

### Clause 76 – Boycott

In the event that the vessel is delayed by strikes, lockouts, labour stoppage or any other difficulties due to flag or Ownership of the vessel or due to the terms and conditions under which members of the crew are employed, hire shall cease for such time lost and all other consequences, liabilities and proven expenses directly incurred are to be for Owners" account, including bunker fuel consumed during such periods. Any extra insurance, if any, owing to vessel"s age and/or class and/or management and/or flag, to be for Owners" account.

### Clause 77 – Deductions

Charterers will not deduct from hire payment for any estimated expense / disputed claim amount under this Charter-Party unless otherwise agreed by owners. Owners agree Charterers to deduct from hire payment for all Owners" disbursements subject to supporting voucher. Charterers are at liberty to deduct estimated value of bunkers on redelivery from last or paenultimate hire payments.

### Clause 78 – I.T.F. Requirements

The Owners of the vessel guarantee that the minimum terms and conditions of the Officer / crew of the vessel are now or will be prior to presentation of the vessel for loading and will remain for the period of this Charter-Party covered-by an I.T.F. Agreement or a bona fide Trade Union Agreement acceptable to the I.T.F.

### Clause 79 – Owners guarantee that vessel is entered with a P. and I. Club

Charterers have the benefit of Owners" P. and I. Club as far as the Club"s rules permit. Cargo claims are to be settled in accordance with the New York Produce Exchange Interclub Agreement 1996 and any subsequent amendments thereto.

### Clause 80 – IMO

Vessel will comply with applicable IMO Regulations throughout the period of this Charter.

### Clause 81 - Ballast

Owners undertake that the vessel can navigate safely in ballast without requiring solid ballast.

### Clause 82 – War Risk Insurance

AMIS0287



### RIDER CLAUSES TO M.V. "AMIS INTEGRITY" CHARTER
### PARTY DATED 12.07.2019

Basic annual war risk insurance premium on vessel"s war risk value to be for Owners" account. Any extra or additional war risk insurance premium on vessel"s war risk value and crew war bonus for trading to areas, in breach of war risk warranties to be for Charterers" account. Additional war risk premium shall be reimbursed by the Charterers to the Owners following receipt copy of the invoice and supporting vouchers from Owners underwriters or underwriters" brokers.

This extra insurance premium to be in accordance with available prices at the Lloyds London market.

**Clause 83 – Safety and Health Regulations**

Owners, warrant that the vessel shall be in possession of the necessary Certificates to comply with all Safety and Health Regulations concerning Health and Safety Requirements and all current requirements at all ports of call permitted under this Charter-Party during the currency of this Charter, without hindrance or delay.

**Clause 84 – ISPS/MTSA Clause for Time Charter Parties 2005**

(a)(i) The Owners shall comply with the requirements of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) relating to the Vessel and "the Company" (as defined by the ISPS Code). If trading to or from the United States or passing through United States waters, the Owners shall also comply with the requirements of the US Maritime Transportation Security Act 2002 (MTSA) relating to the Vessel and the "Owner" (as defined by the MTSA).

(ii) Upon request the Owners shall provide the Charterers with a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) and the full style contact details of the Company Security Officer (CSO).

(iii) Loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Owners or "the Company"/"Owner" to comply with the requirements of the ISPS Code/MTSA or this Clause shall be for the Owners' account, except as otherwise provided in this Charter Party.

(b)(i) The Charterers shall provide the Owners and the Master with their full style contact details and, upon request, any other information the Owners require to comply with the ISPS Code/MTSA. Where sub-letting is permitted under the terms of this Charter Party, the Charterers shall ensure that the contact details of all sub-charterers are likewise provided to the Owners and the Master. Furthermore, the Charterers shall ensure that all sub-charter parties they enter into during the period of this Charter Party contain the following provision:
"The Charterers shall provide the Owners with their full style contact details and, where sub-letting is permitted under the terms of the charter party, shall ensure that the contact details of all sub-charterers are likewise provided to the Owners".

(ii) Loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers' account, except as otherwise provided in this Charter Party.

(c) Notwithstanding anything else contained in this Charter Party all delay, costs or expenses whatsoever arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code/MTSA including, but not limited to, security guards, launch services, vessel escorts, security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the negligence of the Owners, Master or crew. All measures required by the Owners to comply with the Ship Security Plan shall be for the Owners' account.

(d) If either party makes any payment which is for the other party's account according to this Clause, the other party shall indemnify the paying party.

**Clause 85 – Cargo and Equipment**

Owners undertake that throughout this Charter vessel"s equipment shall comply with regulations and/or requirements in effect at all ports of call permitted under this Charter-Party, canals and countries in which vessel will be employed under this Charter-Party. Owners also undertake that vessel shall be at all times in

- 13 -

AMIS0288



**RIDER CLAUSES TO M.V. "AMIS INTEGRITY" CHARTER
PARTY DATED 12.07.2019**

possession of a valid and up-to-date certificate on board to comply with such regulations and/or requirements. If stevedores, longshoremen or other labourers are not permitted to work by reason of any failure of the Captain, Owners and/or their Agents to comply with such Regulations or by reason that vessel is not in possession of such valid and up-to-date Certificate(s), then Owners shall take immediate corrective measures. Charterers may suspend hire for time lost thereby and any extra proven expenses directly incurred shall be for Owners" account.

### Clause 86 – Bunkering Privileges

Owners certify that the vessel is and will, remain so throughout the duration of this Charter, eligible of full bunkering privileges in the United States of America and its territories and possessions under all present and future United States Law and Regulations and is not, nor will be, restricted as to bunkering at any other countries of port of call during this Charter.

### Clause 87 – Weather Routing Clause

For the purpose of this Charter Party, good weather conditions are to be defined as weather conditions in headwind speeds not exceeding headwinds Beaufort Force 4 and sea state Douglas 3. Evidence of weather conditions to be taken from independent weather bureau reports and vessel"s logs. In the event of consistent discrepancies between the deck logs and the independent weather bureau reports, the report of one independent weather company mutually agreed by Owners and Charterers and cost shared equally.

### Clause 88 – Stevedore damage Clause

Charterers to be responsible for any damages caused by stevedores in loading and discharging and for any other damages caused by stevedores or their Agents provided that the Master obtain Statement of Facts or Damage Certificate signed by stevedores and/or their Agents. In the event that the Master is unable to obtain Statement of Facts or damage acknowledgement certificate signed by the stevedores and/or their Agents or if obtained but the Statement of Facts or damage acknowledgement certificate is remarked or annotated by the stevedores and/or their Agents repudiated responsibility or liability, the Master to report to Charterers and Owners the actual situation within 48 hours after the occurrence, otherwise Charterers shall not be held responsible for the damage.

Owners to try to settle damages directly with the party involved and Charterers to give their best assistance in settling same and to remain ultimately responsible for such damage or loss that is not compensated by the party involved in such stevedore damage.

Damages that are affecting class to be repaired immediately and damages that are not affecting class and that can be postponed to dry dock will be evaluated at the time of occurrence and the Charterers and the Owners to mutually agree whether to repair same during such dry dock or to reimburse same as evaluated at the time of occurrence.

### Clause 89 – BIMCO EU Advance Cargo Declaration Clause for Time Charter Parties 2012

**(a)** If the Vessel loads cargo in any EU port or place destined for a port or place outside the EU ("Exported") or loads cargo outside the EU destined for an EU port or place or passing through EU ports or places in transit ("Imported"), the Charterers shall, for the purposes of this Clause, comply with the requirements of the EU Advance Cargo Declaration Regulations (the Security Amendment to the Community Customs Code, Regulations 648/2005; 1875/2006; and 312/2009) or any subsequent amendments thereto and shall, in their own name, and in their time and at their expense:

(i) Have in place an EORI number (Economic Operator Registration and Identification);
(ii) Provide the Owners with a timely confirmation of (i) above as appropriate; and
(iii) Where the cargo is being:
1. Exported: Submit, or arrange for the submission of, a customs declaration for export or, if a customs declaration or a re-export notification is not required, an exit summary declaration; or
2. Imported: Submit, or arrange for the submission of, an entry summary declaration.
Unless otherwise permitted by the relevant customs authorities, such declarations shall be submitted to them electronically.

AMIS0289



**RIDER CLAUSES TO M.V. "AMIS INTEGRITY" CHARTER**
**PARTY DATED 12.07.2019**

(b) The Charterers assume liability for and shall indemnify, defend and hold harmless the Owners against any loss and/or damage and/or any expenses, fines, penalties and all other claims of whatsoever nature, including but not limited to legal costs, arising from the Charterers'' failure to comply with any of the provisions of sub-clause (a). Should such failure result in any delay then, notwithstanding any provision in this Charter Party to the contrary, the Vessel shall remain on hire.

### Clause 90 – BIMCO Ship to Ship Transfer Clause for Time Charter Parties

(a) The Charterers shall have the right to order the Vessel to conduct ship to ship cargo operations, including the use of floating cranes and barges. All such ship to ship transfers shall be at the Charterers'' risk, cost, expense and time.

(b) The Charterers shall direct the Vessel to a safe area for the conduct of such ship to ship operations where the Vessel can safely proceed to, lie and depart from, always afloat, but always subject to the Master''s approval. The Charterers shall provide adequate fendering, securing and mooring equipment, and hoses and/or other equipment, as necessary for these operations, to the satisfaction of the Master.

(c) The Charterers shall obtain any and all relevant permissions from proper authorities to perform ship to ship operations and such operations shall be carried out in conformity with best industry practice.

(d) If, at any time, the Master considers that the operations are, or may become, unsafe, he may order them to be suspended or discontinued. In either event the Master shall have the right to order the other vessel away from the Vessel or to remove the Vessel.

(e) If the Owners are required to extend their existing insurance policies to cover ship to ship operations or incur any other additional cost/expense, the Charterers shall reimburse the Owners for any additional premium or cost/expense incurred.

(f) The Charterers shall indemnify the Owners against any and all consequences arising out of the ship to ship operations including but not limited to damage to the Vessel and other costs and expenses incurred as a result of such damage, including any loss of hire; damage to or claims arising from other alongside vessels, equipment, floating cranes or barges; loss of or damage to cargo; and pollution.

### Clause 91 – BIMCO North American Advance Cargo Notification Clause for Time Charter Parties

1. US Notification Requirements for Time Charter Parties

(a) If the Vessel loads or carries cargo destined for the US or passing through US ports in transit, the Charterers shall comply with the current US Customs regulations (19 CFR 4.7) or any subsequent amendments thereto and shall undertake the role of carrier for the purposes of such regulations and shall, in their own name, time and expense:

(i) Have in place a SCAC (Standard Carrier Alpha Code);
(ii) Have in place an ICB (International Carrier Bond);
(iii) vide the Owners with a timely confirmation of (i) and (ii) above; and
(iv) Submit a cargo declaration by AMS (Automated Manifest System) to the US Customs and provide the Owners at the same time with a copy thereof.

(b) The Charterers assume liability for and shall indemnify, defend and hold harmless the Owners against any loss and/or damage whatsoever (including consequential loss and/or damage) and/or any expenses, fines, penalties and all other claims of whatsoever nature, including but not limited to legal costs, arising from the Charterers'' failure to comply with any of the provisions of sub-clause (a). Should such failure result in any delay then, notwithstanding any provision in this Charter Party to the contrary, the Vessel shall remain on hire.

(c) If the Charterers' ICB is used to meet any penalties, duties, taxes or other charges which are solely the responsibility of the Owners, the Owners shall promptly reimburse the Charterers for those amounts.

(d) The assumption of the role of carrier by the Charterers pursuant to this Clause and for the purpose of the US Customs Regulations (19 CFR 4.7) shall be without prejudice to the identity of carrier under any bill of lading, other contract, law or regulation.

AMIS0290



**RIDER CLAUSES TO M.V. "AMIS INTEGRITY" CHARTER
PARTY DATED 12.07.2019**

2. Canadian Notification Requirements for Time Charter Parties

(a) As between Owners and Charterers, Charterers shall be deemed to be the Conveyance Operating Carrier for the purposes of the Canada Customs Act and any related regulations, memorandums or notices issued by the Canada Border Services Agency ("CBSA").

(b) Subject to sub-clause (c) below, Charterers will be responsible for obtaining a Marine Carrier Code (Bonded or Non-Bonded) as may be required and for providing the CBSA with the Advance Commercial Information by Electronic Data Interchange or otherwise on a timely basis.

(c) When the vessel calls at a port in Canada other than as instructed by Charterers, Owners shall provide Charterers with all information necessary for the timely and accurate submission of Advance Commercial Information to the CBSA.

(d) Each party shall indemnify the other party for any and all fines, penalties, expenses, loss, damage, delay or any other claim, including attorney"s fees, arising from its failure to comply with this clause.

(e) For the avoidance of doubt, nothing contained in this clause is intended to vary any other provision of this charter as to responsibility for cargo and identity of carrier.

**Clause 92 – Seaway Bills**

Charterers and/or their agents have the right to issue and sign seaway bills in lieu of bills of lading for cargo discharge in Japanese ports only. At the Japanese discharging ports, cargo to be released without presentation of non-negotiable seaway bill and letter of indemnity, in which case Charterers shall indemnify and keep owners and the vessel harmless from all consequences arising from doing so.

Charterers shall send a fax copy of sea waybills to the Master/Owners prior to the vessel"s arrival at discharging ports, in order to the Master to instruct Charterers agent to indemnify the consignee and release the cargo in accordance with the terms of seaway bills.

**Clause 93 – Welding Padeys**

Charterers to have the option of welding pad eyes/angle pieces at their own arrangement and expense. Charterers to remove all pad eyes/angle pieces by redelivery unless Owners require Charterers to maintain same.

**Clause 94 – BIMCO War Risks Clause for Time Charters, 2013
(Code Name: CONWARTIME 2013)**

(a) For the purpose of this Clause, the words:

(i) "Owners" shall include the shipowners, bareboat charterers, disponent owners, managers or other operators who are charged with the management of the Vessel, and the Master; and

(ii) "War Risks" shall include any actual, threatened or reported:

war, act of war, civil war or hostilities; revolution; rebellion; civil commotion; warlike operations; laying of mines; acts of piracy and/or violent robbery and/or capture/seizure (hereinafter "Piracy"); acts of terrorists; acts of hostility or malicious damage; blockades (whether imposed against all vessels or imposed selectively against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever), by any person, body, terrorist or political group, or the government of any state or territory whether recognised or not, which, in the reasonable judgement of the Master and/or the Owners, may be dangerous or may become dangerous to the Vessel, cargo, crew or other persons on board the Vessel.

(b) The Vessel shall not be obliged to proceed or required to continue to or through, any port, place, area or zone, or any waterway or canal (hereinafter "Area"), where it appears that the Vessel, cargo, crew or other persons on board the Vessel, in the reasonable judgement of the Master and/or the Owners, may be exposed to War Risks whether such risk existed at the time of entering into this Charter Party or occurred thereafter. Should the Vessel be within any such place as aforesaid, which only becomes dangerous, or may become dangerous, after entry into it, the Vessel shall be at liberty to leave it.

(c) The Vessel shall not be required to load contraband cargo, or to pass through any blockade as set out in Sub-clause (a), or to proceed to an Area where it may be subject to search and/or confiscation by a

- 16 -



**RIDER CLAUSES TO M.V. "AMIS INTEGRITY" CHARTER**
**PARTY DATED 12.07.2019**

belligerent.

(d) If the Vessel proceeds to or through an Area exposed to War Risks, the Charterers shall reimburse to the Owners any additional premiums required by the Owners' insurers and the costs of any additional insurances that the Owners reasonably require in connection with War Risks.

(e) All payments arising under Sub-clause (d) shall be settled within fifteen (15) days of receipt of Owners" supported invoices or on redelivery, whichever occurs first.

(f) If the Owners become liable under the terms of employment to pay to the crew any bonus or additional wages in respect of sailing into an Area which is dangerous in the manner defined by the said terms, then the actual bonus or additional wages paid shall be reimbursed to the Owners by the Charterers at the same time as the next payment of hire is due, or upon redelivery, whichever occurs first.

(g) The Vessel shall have liberty:

(i) to comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery, or in any other way whatsoever, which are given by the government of the nation under whose flag the Vessel sails, or other government to whose laws the Owners are subject, or any other government of any state or territory whether recognised or not, body or group whatsoever acting with the power to compel compliance with their orders or directions;

(ii) to comply with the requirements of the Owners" insurers under the terms of the Vessel"s insurance(s);

(iii) to comply with the terms of any resolution of the Security Council of the United Nations, the effective orders of any other Supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement;

(iv) to discharge at any alternative port any cargo or part thereof which may expose the Vessel to being held liable as a contraband carrier;

(v) to call at any alternative port to change the crew or any part thereof or other persons on board the Vessel when there is reason to believe that they may be subject to internment, imprisonment, detention or similar measures.

(h) If in accordance with their rights under the foregoing provisions of this Clause, the Owners shall refuse to proceed to the loading or discharging ports, or any one or more of them, they shall immediately inform the Charterers. No cargo shall be discharged at any alternative port without first giving the Charterers notice of the Owners" intention to do so and requesting them to nominate a safe port for such discharge. Failing such nomination by the Charterers within 48 hours of the receipt of such notice and request, the Owners may discharge the cargo at any safe port of their own choice. All costs, risk and expenses for the alternative discharge shall be for the Charterers" account.

(i) The Charterers shall indemnify the Owners for claims arising out of the Vessel proceeding in accordance with any of the provisions of Sub-clauses (b) to (h) which are made under any bills of lading, waybills or other documents evidencing contracts of carriage.

When acting in accordance with any of the provisions of Sub-clauses (b) to (h) of this Clause anything is done or not done, such shall not be deemed a deviation, but shall be considered as due fulfilment of this Charter Party.

**Clause 95 – BIMCO Stowaways Clause for Time Charters**

(a)(i) The Charterers warrant to exercise due care and diligence in preventing stowaways in gaining access to the Vessel by means of secreting away in the goods and/or containers shipped by the Charterers.
(a)(ii) If, despite the exercise of due care and diligence by the Charterers, stowaways have gained access to the Vessel by means of secreting away in the goods and/or containers shipped by the Charterers, this shall amount to breach of charter for the consequences of which the Charterers shall be liable and shall hold the Owners harmless and shall keep them indemnified against all claims whatsoever which may arise and be

AMIS0292



**RIDER CLAUSES TO M.V. "AMIS INTEGRITY" CHARTER**
**PARTY DATED 12.07.2019**

made against them. Furthermore, all time lost and all expenses whatsoever and howsoever incurred, including fines, shall be for the Charterers' account and the Vessel shall remain on hire.

(a)(iii) Should the Vessel be arrested as a result of the Charterers' breach of charter according to sub-clause (a)(ii) above, the Charterers shall take all reasonable steps to secure that, within a reasonable time, the Vessel is released and at their expense put up bail to secure release of the Vessel.

(b)(i) If, despite the exercise of due care and diligence by the Owners, stowaways have gained access to the Vessel by means other than secreting away in the goods and/or containers shipped by the Charterers, all time lost and all expenses whatsoever and howsoever incurred, including fines, shall be for the Owners' account and the Vessel shall be off hire.

(b)(ii) Should the Vessel be arrested as a result of stowaways having gained access to the Vessel by means other than secreting away in the goods and/or containers shipped by the Charterers, the Owners shall take all reasonable steps to secure that, within a reasonable time, the Vessel is released and at their expense put up bail to secure release of the Vessel.

## Clause 96 – BIMCO Solid bulk cargoes that can liquefy clause

(a) The Charterers shall ensure that all solid bulk cargoes to be carried under this Charter Party are presented for carriage and loaded always in compliance with applicable international regulations, including the International Maritime Solid Bulk Cargoes (IMSBC) Code 2009 (as may be amended from time to time and including any recommendations approved and agreed by the IMO).

(b) If the cargo is a solid bulk cargo that may liquefy, the Charterers shall prior to the commencement of loading provide the ship"s Master, or his representative, with all information and documentation in accordance with the IMSBC Code, including but not limited to a certificate of the Transportable Moisture Limit (TML), and a certificate or declaration of the moisture content, both signed by the shipper.

(c) The Owners shall have the right to take samples of cargo prior to loading and, at Charterers" request, samples to be taken jointly, testing of such cargo samples shall be conducted jointly between Charterers and Owners by an independent laboratory that is to be nominated by Owners. Sampling and testing shall be at the Charterers" risk, cost, expense and time. The Master or Owners" representative shall at all times be permitted unrestricted and unimpeded access to cargo for sampling and testing purposes.

If the Master, in his sole discretion using reasonable judgement, considers there is a risk arising out of or in connection with the cargo (including but not limited to the risk of liquefaction) which could jeopardize the safety of the crew, the Vessel or the cargo on the voyage, he shall have the right to refuse to accept the cargo or, if already loaded, refuse to sail from the loading port or place. The Master shall have the right to require the Charterers to make safe the cargo prior to loading or, if already loaded, to offload the cargo and replace it with a cargo acceptable to the Master, all at the Charterers" risk, cost, expense and time. The exercise by the Master of the aforesaid rights shall not be a breach of this Charter Party.

(d) Notwithstanding anything else contained in this Charter Party, all loss, damage, delay, expenses, costs and liabilities whatsoever arising out of or related to complying with, or resulting from failure to comply with, such regulations or with Charterers" obligations hereunder shall be for the Charterers" account. The Charterers shall indemnify the Owners against any and all claims whatsoever against the Owners arising out of the Owners complying with the Charterers" instructions to load the agreed cargo.

(e) This Clause shall be without prejudice to the Charterers" obligations under this Charter Party to provide a safe cargo. In relation to loading, anything done or not done by the Master or the Owners in compliance with this Clause shall not amount to a waiver of any rights of the Owners.

## Clause 97 - BIMCO Infectious or Contagious Diseases Clause for Time Charter Parties

(a) For the purposes of this Clause, the words:
   "Disease" means a highly infectious or contagious disease that is seriously harmful to humans.
   "Affected Area" means any port or place where there is a risk of exposure to the Vessel, crew or other

AMIS0293



## RIDER CLAUSES TO M.V. "AMIS INTEGRITY" CHARTER
## PARTY DATED 12.07.2019

persons on board to the Disease and/or to a risk of quarantine or other restrictions being imposed in connection with the Disease.

(b) The Vessel shall not be obliged to proceed to or continue to or remain at any place which, in the reasonable judgement of the Master/Owners, is an Affected Area.

(c) If the Owners decide in accordance with Sub-clause (b) that the Vessel shall not proceed or continue to an Affected Area they shall immediately notify the Charterers.

(d) If the Vessel is at any place which the Master in his reasonable judgement considers to have become an Affected Area, the Vessel may leave immediately, with or without cargo on board, after notifying the Charterers.

(e) In the event of Sub-clause (c) or (d) the Charterers shall be obliged, notwithstanding any other terms of this Charter Party, to issue alternative voyage orders. If the Charterers do not issue such alternative voyage orders within forty-eight (48) hours of receipt of the Owners'' notification, the Owners may discharge any cargo already on board at any port or place. The Vessel shall remain on hire throughout and the Charterers shall be responsible for all additional costs, expenses and liabilities incurred in connection with such orders/delivery of cargo.

(f) In any event, the Owners shall not be obliged to load cargo or to sign, and the Charterers shall not allow or authorize the issue on the Owners'' behalf of, bills of lading, waybills or other documents evidencing contracts of carriage for any Affected Area.

(g) The Charterers shall indemnify the Owners for any costs, expenses or liabilities incurred by the Owners, including claims from holders of bills of lading, as a consequence of the Vessel waiting for and/or complying with the alternative voyage orders.

(h) If, notwithstanding Sub-clauses (b) to (f), the Vessel does proceed to or continue to or remain at an Affected Area:

    (i) The Owners shall notify the Charterers of their decision but the Owners shall not be deemed to have waived any of their rights under this Charter Party.

    (ii) The Owners shall endeavor to take such reasonable measures in relation to the Disease as may from time to time be recommended by the World Health Organization.

    (iii) Any additional costs, expenses or liabilities whatsoever arising out of the Vessel visiting or having visited an Affected Area, including but not limited to screening, cleaning, fumigating and/or quarantining the Vessel and its crew, shall be for the Charterers' account and the Vessel shall remain on hire throughout.

(i) The Vessel shall have liberty to comply with all orders, directions, recommendations or advice of competent authorities and/or the Flag State of the Vessel in respect of arrival, routes, ports of call, destinations, discharge of cargo, delivery or in any other respect whatsoever relating to issues arising as a result of the Vessel being or having been ordered to an Affected Area.

(j) If in compliance with this Clause anything is done or not done, such shall not be deemed a deviation, nor shall it be or give rise to an off-hire event, but shall be considered as due fulfilment of this Charter Party. In the event of a conflict between the provisions of this Clause and any implied or express provision of this Charter Party, this Clause shall prevail to the extent of such conflict, but no further.

(k) The Charterers shall indemnify the Owners if after the currency of this Charter Party any delays, costs, expenses or liabilities whatsoever are incurred as a result of the Vessel having visited an Affected Area during the currency of this Charter Party.

(l) The Charterers shall procure that this Clause shall be incorporated into all sub-charters and bills of lading, waybills or other documents evidencing contracts of carriage issued pursuant to this Charter Party.

### Clause 98 - Strike Clause

Ship not to be responsible for any loss, damage, or delay, directly or indirectly caused by, or arising from strikes, lockouts, labour disturbances, trade, disputes, or anything done in contemplation or further thereof, whether the owners be parties thereto or not.

### Clause 99

All negotiations and fixture shall be kept strictly private and confidential.

### Clause 100

The following vessel gear clause shall be applied for the charter party.

The Owners shall maintain the cargo handling gear of the Vessel as fitted, providing gear (for all derricks or

AMIS0294



### RIDER CLAUSES TO M.V. "AMIS INTEGRITY" CHARTER
### PARTY DATED 12.07.2019

cranes) capable of lifting capacity as described. The Owners shall also provide on the Vessel for night work lights as on board, but all additional lights over those on board shall be at the Charterers' expense. The Charterers shall have the use of any gear on board the Vessel. If required by the Charterers, the Vessel shall work night and day and all cargo handling gear shall be at the Charterers' disposal during loading and discharging. In the event of disabled cargo handling gear, or insufficient power to operate the same, the Vessel is to be considered to be off hire to the extent that time is actually lost to the Charterers and the Owners to pay stevedore stand-by charges(max one shift), unless such disablement or insufficiency of power is caused by the Charterers' stevedores. If required by the Charterers, subject to the Owners" consent to hire shore gear, the Owners shall bear the cost of hiring shore gear in lieu thereof, in which case the Vessel shall remain on hire.

Vessel is equipped with grabs, Charterers have the right to use free of charge. Owners undertake to carry out usual maintenance of the grabs and their accessories. Owners are not to be responsible for the breakdown of grabs if such breakdown/lack of performance is caused by default of shore labor/stevedores and vessel to remain on-hire at all times. If such breakdown of grabs is caused by lack of usual maintenance of the grabs and its accessories, then actual time lost as a result of breakdown to be prorate by actual working grabs shall be for Owners" account and the vessel shall be off-hire and if vessel"s grabs breakdown don"t delay vessel"s schedules in ports then vessel shall remain on hire.

### Clause 101 - CONTRACT LAW AND ARBITRATION FORUM
The contract to be construed in accordance with English law.
Arbitration to be in London

***END***

THE OWNERS:                                      THE CHARTERERS:

AMIS0295