# EXHIBIT B



**GP GLOBAL**

# General terms of sale of Bunker Fuel

by GP Global APAC PTE LTD.

v. August 2017



GP
GLOBAL

1. **APPLICATION**

    1.1 These General Terms of Sale of Bunker Fuel in conjunction with the Bunker Confirmation shall collectively form this Bunker Contract and shall contain all agreements, arrangements and stipulations in respect of the sale of bunker fuel contemplated herein. Each sale shall constitute a separate contract.

    1.2 In the event of any conflict between the Bunker Confirmation and these General Terms of Sale of Bunker Fuel, including any amendments thereto, the Bunker Confirmation shall be given priority over these General Terms of Sale of Bunker Fuel.

    1.3 The Bunker Contract shall supersede any conflicting terms of other contracts which the Buyer may seek to enforce against the Seller.

2. **DEFINITIONS**

    2.1 Except where the context otherwise requires, the following definitions shall be applied throughout this Bunker Contract:
    
    (a) **"Affiliates"** means any legal entity which controls, is controlled by, or is under common control with, another legal entity, and "control" means legal or beneficial ownership of fifty percent (50%) or more of the shares in a legal entity entitled to appoint directors or the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such entity.

    (b) **"Banking Day"** shall mean a day on which banks are open in the places of business of the Seller and the Buyer and, where a remittance is in US dollars, in New York or, if other than US dollars, in the country of the price currency.

    (c) **"BDN"** means Bunker Delivery Note or Bunker Delivery Receipt or equivalent delivery document.

    (d) **"Bunker Confirmation"** means a confirmation in writing from the Seller to the Buyer setting forth the particular terms of each sale of Bunker Fuel.

    (e) **"Bunker Contract"** means this contract of sale and delivery of Bunker Fuel on the terms hereof as agreed by and between the Parties.

    (f) **"Bunker Fuel"** means marine bunker fuel and related products of whatever type or grade delivered by the Seller under and pursuant to the terms of this Bunker Contract.

1



(g) **"Buyer"** means jointly and severally the party taking delivery and paying for the Bunker Fuel and, the owners, managers, operators, time charterers, bareboat charterers and charterers of the Vessel or any party requesting offers or quotations for or ordering Bunker Fuel and any party on whose behalf the said offers, quotations, orders and subsequent agreements or contracts have been made.

(h) **"Delivery Date Range"** means the date range designated in the Bunker Confirmation during which the Bunker Fuel is to be delivered to the Vessel.

(i) **"General Terms"** means these set of General Terms of Sale of Bunker Fuel in force as of August 2017 and any amendments thereto.

(j) **"Party"** means the Seller or the Buyer and **"Parties"** means the Seller and the Buyer collectively.

(k) **"Seller"** means **GP GLOBAL APAC PTE LTD.**, a company with registration no. as 201011862M and its registered office at 8 Temasek Boulevard #24-03 Singapore 038988, acting through any of its agents.

(l) **"Seller's Invoice"** shall have the meaning attributed to it in Clause 9.2.

(m) **"Vessel"** means the vessel nominated by the Buyer, including any on-shore tank, rig, or other unit or installation supplied by the Seller, to which the delivery of Bunker Fuel is made.

3. **PRICE AND OTHER CHARGES**

   3.1 The price of the Bunker Fuel shall be the amount expressed (in US dollars) per unit in the Bunker Confirmation for each grade of Bunker Fuel delivered to the Vessel.

   3.2 In addition to the price payable for the Bunker Fuel, the Buyer shall be liable for and pay any and all additional applicable charges associated with the delivery, including but not limited to:
   
       3.2.1    wharfage charges, barging charges including demurrage or other similar charges;

       3.2.2    mooring and unmooring charges and port duties;

       3.2.3    duties, taxes, charges, freights or other costs in the country where delivery takes place.

   3.3 Unless otherwise stated in the Bunker Confirmation, the price is exclusive of duties and taxes (which shall include, without limitation, customs duty, excise duty, GST, VAT and sales tax). The Seller is entitled, at any time, to charge and the Buyer undertakes to pay



additional GST and/or other taxes in respect of sale and delivery under a Bunker Contract if such GST and/or other taxes is imposed by local authorities.

3.4 Unless confirmed otherwise by the Seller in the Bunker Confirmation, the price stipulated in accordance with this clause, and additional applicable charges associated with delivery, are only valid for delivery performed to the Vessel during the Delivery Date Range. The Seller is entitled to revise the price for sale and delivery of Bunker Fuel where (i) the Delivery Date Range as agreed upon and stated in the Bunker Confirmation changes for any reason, or (ii) if the Vessel's actual arrival time is more than forty-eight (48) hours after the arrival time specified in the Buyer's notice pursuant to Clause 4.2.

**4. DELIVERY**

4.1 Each sale of Bunker Fuel shall be confirmed by a Bunker Confirmation.

4.2 Notwithstanding Clause 4.1 but always subject to these General Terms, the Seller may, at the request of the Buyer, agree to sell and deliver Bunker Fuel in the absence of a Bunker Confirmation and in each such case the sale of Bunker Fuel shall be confirmed and binding against the Buyer upon the Buyer's acceptance of price, quoted by Seller. The Seller may thereafter provide the Bunker Confirmation confirming the price accepted by the Buyer but the absence of such Bunker Confirmation shall not render the Bunker Contract void.

4.3 The Buyer shall provide the Seller with a minimum of three (3) working days prior written notice before the arrival of Vessel specifying the following: Vessel's name, estimated date and time of arrival of the Vessel, delivery location at the port, method of delivery and confirmation of the receiving rates, grades and quantities of Bunker Fuel required.

4.4 In the event that the Buyer provides a notice of less than three (3) working days as required in Clause 4.3, the Seller shall use its reasonable endeavours, but shall be under no obligation to make the delivery. Where despite short notice the Seller agrees to make delivery, the Seller shall not be liable for any resulting delay in delivery and the Buyer shall reimburse any and all costs incurred by the Seller in making such delivery.

4.5 The Buyer, or its agents at the port or place of delivery, shall give the Seller or its representatives at the port or place of delivery, seventy-two (72) and forty-eight (48) hours approximate and twenty- four (24) hours definite notice of the Vessel's arrival and the location and time at which delivery is required. If the Seller agrees to supply Bunker Fuel in circumstances where the Buyer does not give notice in the time periods required above, then the Seller's supply obligation shall be limited to a reasonable endeavours obligation.

3



GP
GLOBAL

4.6 At all relevant times, delivery of Bunker Fuel shall be subject to the customs and regulations of the port or place of delivery. The Seller shall not be liable for any inability to delivery on public or dock holidays. The Seller shall not be liable for delays or for demurrage or loss incurred by the Buyer due to congestion in ports, at terminal installations or bunkering pier.

4.7 The Seller shall deliver the Bunker Fuel during regular working hours. Where, permitted by applicable regulations, the Buyer requires delivery outside such regular working hours, the Seller shall use its reasonable endeavours, but shall be under no obligation to deliver outside such regular working hours. Where the Seller delivers outside regular working hours as above, all additional costs including overtime charges incurred by Seller or its agents or contractors in making such delivery shall be borne by the Buyer.

4.8 The Seller is entitled to arrange deliveries based on the principle of "First Come-First Served" but reserves the right to arrange bunkering sequence following the Seller's logistics, prior engagements, priorities, obligations and deliveries. The Seller shall not be liable for demurrage or loss incurred by the Buyer due to congestion affecting the Seller's suppliers' delivery facilities, prior commitments of available barges or to any other delay in delivery. The Seller shall not be responsible for on-board safety or storage failures that may affect the delivery and shall have the right to recover from the Buyer any resulting cost incurred.

4.9 In the event Seller's capacity to perform becomes impracticable for any reason, including but not limited to a request, suggestion or direction by any official body in charge of supplies, priorities, rationing or allocations of bunker fuels, the Seller may, without liability, reduce or stop deliveries in such manner as it may in its sole discretion determine.

4.10 The Buyer shall render all necessary assistance and provide all necessary equipment required to receive delivery of the Bunker Fuel. The Buyer and the Vessel shall be responsible for all connections and disconnections between the delivery hose(s) and the Vessel's manifold and shall require the hose(s) to be properly secured and connected to the Vessel's manifold prior to the commencement of delivery of Bunker Fuel. In the event of delay in the use of delivery or barging facilities due to the Buyer or the Vessel for any reason whatsoever, the Buyer shall reimburse the Seller for any expenses, including demurrage, incurred due to such delay.

4.11 The Buyer warrants that the Vessel can safely receive the Bunker Fuel and shall ensure that the Vessel has all certificates required to comply with all relevant regulations relating to delivery of the Bunker Fuel at the port or place of delivery. If in the Seller's opinion the Vessel cannot safely receive Bunker Fuel, then the Seller has the option to suspend, without any liability, the delivery until, in the Seller's opinion, the Vessel can safely receive Bunker Fuel. In case of delivery by barge, delivery into the

4



Vessel shall not be made whenever, in the opinion of Seller or the fuel barge contractor, safe passage or clear and safe berth for the barge, whether alongside the Vessel or otherwise, is not available, or when, for any other reason, in the opinion of the Seller or the fuel barge contractor, delivery would be unsafe or inadvisable.

4.12   If the Seller is, on behalf of Buyer, requested to make any arrangements with and secure any permission of port authorities prior to making delivery, an appropriate and early notice from Buyer notifying the Seller of the same is required.

4.13   If Buyer or the Vessel fails to take delivery, in whole or in part, of the agreed quantities of Bunker Fuel in accordance with the Buyer's notice under Clause 4.2, whether pursuant to a cancellation of nomination by the Buyer or for any other reason, the Buyer shall be responsible for any costs, losses and expenses incurred by the Seller in connection with the Buyer's failure to take delivery, including loss of profit and loss of the value of the Bunker Fuel and any losses to downgrade and/or pump back of the Bunker Fuel.

5. **QUALITY**

    5.1 The Buyer shall be solely responsible for nominating to the Seller the grade of Bunker Fuel for each delivery from the range of Bunker Fuel supplied by the Seller at the location in question. The Bunker Fuel supplied by the Seller shall confirm to the specifications contained in the Bunker Confirmation. The quality of the Bunker Fuel shall be determined in accordance with Clause 7.

    5.2 There are no conditions, guarantees or warranties, express or implied, by common law, statute, or otherwise as to the satisfactory quality, merchantability, fitness, durability or suitability of the Bunker Fuel for any particular purpose or otherwise, which extend beyond the description in Clause 5.1.

    5.3 The Buyer hereby warrants that it has not relied upon any representations made by or on behalf of the Seller but has relied exclusively on its own knowledge and judgement as to the fitness for its purpose of the Bunker Fuel nominated.

6. **QUANTITY**

    6.1 The quantity of Bunker Fuel to be sold and delivered by the Seller shall be specified in the Bunker Confirmation. The Buyer undertakes to purchase and receive the quantity specified in the Bunker Confirmation in the manner agreed to between the Parties and in accordance with the terms hereunder.

    6.2 The determination of quantity shall be made solely by the Seller (or its representative). The Seller (or its representative) shall measure the quantity of the Bunker Fuel delivered

5



and the Buyer (or its representative) shall witness such measurement at its own expense and without delaying or hindering the delivery operations, but the absence of the Buyer (or its representative) during all or any part of the measurement process shall not prejudice the validity of the measurements.

6.3 The quantity of Bunker Fuel delivered shall solely be determined by the gauge or meter or ullage of the barge or tank effecting the delivery or of the gauge or meter or ullage of the shore tank in case of delivery by ex pipe and shall be conclusive of the quantity delivered. The Seller (or its representative) shall record the quantity of fuel delivered on the BDN. The Buyer accepts that the Seller's measurements in accordance with this Clause 6 shall be final and binding save for manifest error or fraud and shall be the only measurements that will be referred to in the event of a dispute in relation to quantity. The Bunker Fuel to be delivered under this Bunker Contract shall be measured and calculated in accordance with the ISO-ASTM-API-IP Petroleum Measurement Tables.

7. **SAMPLING**

    7.1 The Seller (or its representative) shall arrange for samples to be drawn at the time of delivery of the Bunker Fuel. The Buyer (or its representative) shall witness such sampling process at its own expense and without delaying or hindering the delivery operations but the absence of the Buyer (or its representative) during all or any part of the sampling process shall not prejudice the validity of the samples.

    7.2 Unless otherwise agreed between the Parties prior to entering into this Bunker Contract, samples shall be drawn from a point and in a manner chosen by the Seller (or its representative) in accordance with the MARPOL sampling procedures at the port or place of delivery of the Bunker Fuel.

    7.3 The Seller shall take a minimum of four (4) representative samples of each grade of Bunker Fuel delivered. On completion of sampling, all samples drawn by the Seller or its representatives are to be securely sealed and labelled by the Seller (or its representative) as well as signed by the Seller (or its representative) and, if present, the Buyer (or its representative). At least two (2) of these representative samples shall be given to the Buyer, one (1) of which is for MARPOL compliance purposes. Two (2) samples shall be retained by the Seller for a period of thirty (30) days following delivery.

    7.4 If the Buyer submits a claim in accordance with Clause 10.4, the results of analysis of the Seller's or its representative's drawn samples performed by an independent laboratory mutually appointed by the Buyer and Seller shall be conclusive to determine the quality of the Bunker Fuel supplied and shall be the sole binding evidence for the quality of the Bunker Fuel supplied to the Vessel. Should the independent laboratory determination of

quality fall within the established test precision range (repeatability and reproducibility) for said parameter, no claim to the Seller shall be made by the Buyer.

7.5 If the Seller and the Buyer cannot agree on an independent laboratory to perform mutual analysis or if the Buyer fails to reply to the Seller's notice hereof within 7 (seven) days from receipt of such notice, the Seller can at its sole discretion decide which laboratory to perform the analysis, which shall be final and binding for all parties involved.

## 8. RISK AND TITLE

8.1 Risk in the Bunker Fuel, including loss, damage, deterioration, evaporation, or any other condition or incidents related thereto shall pass to the Buyer as the Bunker Fuel passes through the flange of the Vessel's manifold.

8.2 Title in the Bunker Fuel shall remain with the Seller until the Buyer has paid for the Bunker Fuel in full. Until that time, the Buyer shall hold the Bunker Fuel as bailee, store it in such a way that it can be identified as the Seller's property and keep it separate from Buyer's own property and the property of any other person. In the event that the Buyer fails to make payment in accordance with Clause 9, the Seller has the right to demand immediate return of the Bunker Fuel. The Buyer shall remain liable to the Seller in conversion even if the Bunker Fuel is consumed by a third party.

8.3 The Buyer shall be responsible to keep the delivered Bunker Fuel segregated from any bunker fuel(s) onboard the Vessel or from a different delivery to the Vessel. In no event shall the Seller be responsible for the quality of the Bunker Fuel delivered if the Bunker Fuel delivered is mixed or comingled with any other product(s) onboard the receiving Vessel. The Buyer shall be solely responsible for any losses caused by mixing or comingling the Bunker Fuel with any other oil, including any damage the Bunker Fuel may cause on other products on board the receiving Vessel.

## 9. PAYMENT

9.1 Unless otherwise agreed between the Parties at the time of the issuing of the Bunker Confirmation Payment for the delivery and all other charges shall be made in US dollars in full and without any set-off, counterclaim, abatement, deduction and/or discount and free of bank charges.

9.2 Payment shall be in accordance with the Seller's Invoice which may be sent by facsimile, transmission, email, mail or courier. A copy of BDN shall be provided to Buyer alongwith the Seller's Invoice but payment shall not be conditioned upon Buyer's receipt of the original BDN. The Seller's Invoice shall be based on the quantity of Bunker Fuel delivered, as determined in accordance with Clause 6, and shall contain other applicable

7



charges associated with the delivery. The volume stated in BDN is to be considered final in respect of the quantity to be invoiced.

9.3  Subject always to Clause 9.4, payment shall be due with effect from the date of delivery and the Buyer shall make the payment no later thirty (30) days (or such other credit period as is agreed in between the Parties and confirmed in writing in the Bunker Confirmation) from the completion of delivery of the Bunker Fuel in question.

9.4  Credit granted to the Seller shall at all times be subject to the following terms:
(i)   Credit (including for the 30 days payment period or any period otherwise agreed referred to in Clause 9.3) will only be granted on the basis that it is secured by a maritime lien on the Vessel in accordance with Clause 9.9.

(ii)  Any notice by the Buyer that a maritime lien on the Vessel may not be created for any reason must be given to Seller in the initial order for Bunker Fuel, in which case no credit can be granted to Buyer and the Buyer shall, at the option of the Seller, make payment in accordance with Clause 9.5 or any other payment terms determined by the Seller. Any notice of such restriction given by Buyer, its agents, ship's personnel or other person later than in the initial order shall not effect a modification of the terms of sale of Bunker Fuel, except that any granting of credit by the Seller shall be rescinded on receipt of the notice, with full payment due forthwith. Any cancellation thereafter shall make the Buyer liable for cancellation charge hereunder. For avoidance of doubt, it is stated that any notice or any stamp in the BDN or similar document cannot adversely affect the Seller's maritime lien on the Vessel.

(iii) If credit is granted to the Buyer, the Seller may withdraw such credit at any time, for any reason, and require full payment upon delivery or at any time after delivery. If credit is withdrawn and payment is not made upon demand, interest shall be payable from date of delivery at the rate set forth in Clause 9.7.

(iv)  If payment is not made within thirty (30) days or any number of days otherwise agreed, or if credit is withdrawn and payment not made upon demand, the Buyer shall be liable for all costs (whether or not suit is filed) incurred by the Seller to recover such amounts including but not limited to attorneys' fees, court costs and collection expenses. If suit is filed, the Buyer shall be liable for all court costs in addition to attorneys' fees and expenses. All such charges, together with interest, shall be secured under the Seller's maritime lien on the Vessel under Clause 9.9.

(v)   If the party requesting Bunker Fuel is not the owner of the Vessel, the Seller shall have the right to insist as a precondition of sale that a payment guarantee is provided by the owner of the Vessel. The Seller shall have the right to cancel

8



the Bunker Contract with the Buyer at any time, if the owner's payment guarantee is not received upon request thereof from the Seller to the Buyer and/or owner. The Seller's decision to forego obtaining a payment guarantee shall have no effect on the Seller's right to a lien on the Vessel for any Bunker Fuel sold and delivered under the Bunker Contract.

9.5 Notwithstanding Cause [9.3], the Seller is entitled to require the Buyer to make payment in advance of the delivery and where the Buyer has made payment in advance of the delivery, such payment shall be adjusted on the basis of actual quantities of Bunker Fuel delivered and confirmed in the BDN and additional payment, if any, shall be made by the Buyer within seven (7) after completion of delivery.

9.6 Unless otherwise stated in the Bunker Confirmation, payment in every instance shall be made by telegraphic transfer of funds to the bank account designated by the Seller in the Seller's Invoice and the date of payment shall be deemed to be the date on which payment is credited to such designated bank account. If payment falls due on a non-Banking Day, then payment shall be made on or before the last Banking Day before the due date. All bank charges in respect of payments shall be for the Buyer's account.

9.7 Delay in payment period by the Buyer beyond the due date or the expiration of the applicable credit period shall entitle the Seller to interest at the rate of two (2) per cent per month or any part thereof or as otherwise agreed as per the Bunker Confirmation. Moreover, where the currency of payment is other than US dollars, the Buyer shall indemnify the Seller against any loss which is caused by adverse currency fluctuations between the invoice currency as against the value of the USD for the period between the due date and the date of payment.

9.8 In the event of non-payment by the Buyer of the amounts due, including any interest thereon, the Seller reserves the right to pursue such legal remedies as may be available to them to recover the amount owed.

9.9 The Buyer accept that Bunker Fuel are delivered under this Bunker Contract are on credit of the Buyer as well as the credit of the Vessel, and it is agreed and Buyer warrants that, in addition to any rights against the Buyer, the Seller will have and may assert a maritime lien against the Vessel for the amount of the purchase price of such Bunker Fuel together with all other applicable charges payable under this Bunker Contract.

9.10 Notwithstanding any agreement to the contrary, payment will be due immediately and the Seller shall be entitled to cancel all outstanding stems and/or withhold future deliveries in case of:
(i) bankruptcy, liquidation or suspension of payment or comparable situation of the Buyer, or

9



(ii)   arrest of assets of the Buyer including, but not limited to, the Vessel, or

(iii)  liquidation/bankruptcy or any other changed financial or legal position of the parent company, sister companies or affiliated companies to the Buyer which in the sole discretion of the Seller is deemed to adversely affect the financial position of the Buyer, or

(iv)  if the Buyer fails to pay any Seller's Invoice at the time of maturity set forth in such invoice, or

(v)   if the Buyer fails to comply with any other obligation pursuant to this Bunker Contract, including, but not limited to, the Buyer's failure to take delivery of Bunker Fuels in full or in part, or

(vi)  in case of any other situation which in the sole discretion of the Seller is deemed to adversely affect the financial position of the Buyer.

In any of the foregoing situations the Seller shall have the option to either (a) cancel this Bunker Contract, (b) to store the Bunker Fuel in full or in part for the Buyer's account and risk, (c) to demand that the Buyer complies with its obligations pursuant to this Bunker Contract or (d) to make use of any other remedy available under the law.

9.11   Should the Bunker Fuel be purchased by an intermediary such as a manager, broker, trader or agent then such manager, broker, trader or agent shall (in addition to the Buyer) be bound by and liable for all obligations as fully and completely as if they were themselves the Buyer whether such principal be disclosed or undisclosed and whether or not such manager, broker, trader or agent purports to contract as manager, broker, trader or agent only. Furthermore, delivery shall always take place for the account of the registered owners and for the account of the current charterers all of whom shall, together with any intermediary, remain jointly and severally liable for the payment of the delivery as Buyer until payment has been received by the Seller in full. The Buyer warrants that it is authorized as agent to order the Bunker Fuel for delivery to the Vessel, and that the Seller has a lien on the Vessel for its claim. The Buyer agrees to keep all persons covered in Clause 2(g) informed of the warranty given by the Buyer pursuant to these presents.

**10. CLAIMS**

10.1   A claim regarding the quantity of the Bunker Fuel delivered shall be notified verbally as well as in writing by the Buyer (or its representative) or the master of the Vessel to the Seller (or its representative) as soon as practicable at the conclusion of the delivery

10



of the Bunker Fuels while the delivery hoses are still connected. Where notification of quantity claim is received by the Seller (or its representative) after completion of the delivery, such claim shall be deemed to be waived and barred. A notification inserted in the BDN or in a separate protest handed to the physical supplier of the Bunker Fuel shall not qualify as notice under this section and the Seller shall under no circumstances be deemed to have accepted such notice or protest handed to the physical supplier of the Seller.

10.2    In making a claim under Clause 10.1, the Buyer shall furnish all necessary information, including any analysis of the Bunker Fuel made by the Buyer and/or Vessel interests, as shall be required by the Seller to satisfactorily evaluate the claim. The Buyer shall immediately give the Seller all reasonable opportunity to inspect the Vessel, including, without limitation, its engines, fuel tanks, equipment, logs, records and copies of communications, including communications between the Vessel and the Buyer (and/or between the Vessel and its owner or operator) as well as communications to and from fuel testing organizations consulted by the Buyer or Vessel interests.

10.3    Quantity claims can be avoided by ensuring proper pre-delivery and post-delivery checking by the duty officer of the Vessel or any other senior representative of the Buyer (**"the Procedures"**). The delivery must be supervised at all times, and documentations be checked to ensure completeness and accuracy, with signings and stampings. Failure in proper documentations and/or the Procedures will not substantiate a claim. The Seller will not hesitate to reject claims whereby these Procedures are not followed. For the avoidance of doubt, the Seller will not accept a claim for short delivery based on figures obtained by measuring Bunker Fuel in the Vessel's tanks.

10.4    Any claim regarding the quality of the Bunker Fuel delivered shall be presented in writing to the Seller as soon as an alleged quality problem has occurred or the Buyer is notified of any alleged quality problem and in any event no later than 14 (fourteen) day from the date of delivery to the Vessel, filing which such claim shall be deemed waived and barred.

10.5    The Seller shall not be responsible for any claim arising from the commingling of Bunker Fuel delivered by the Seller with other fuel or substances aboard the Vessel or aboard the fuel barge.

10.6    In the event of any claim presented in accordance with Clauses 10.1 and 10.4, the Buyer shall:

(i)    Cooperate with the Seller and make all necessary arrangements for the Seller (or its representative) to investigate such claim, including but not limited to boarding and inspecting the Vessel, interviewing the crew and others in charge of delivery and reviewing and copying the Vessel documents.

11



    (ii)    Take all reasonable steps and actions to mitigate any damages, losses, costs, expenses and any other consequences related to any claim of alleged off-specification or defective Bunker Fuel.

    (iii)    Take all reasonable steps to preserve the Seller's recourse against the physical supplier of the Bunker Fuel or any culpable third party.

10.7    A breach by the Buyer of any part of Clause 10 will entitle the Seller to set off losses caused by the breach against any liability by the Seller to the Buyer.

10.8    Subject to Clauses 10.1 and 10.4, any claims against the Seller in respect of this Bunker Contract shall be brought before the relevant arbitral tribunal in accordance with Clause 19, within 6 (six) months of the date of delivery of the Bunker Fuel, failing which such claims shall be deemed waived and barred.

10.9    Claims of any nature shall not relieve the Buyer of the responsibility to make full and timely payment of all amounts payable to the Seller pursuant to Clause 9.

## 11. LIABILITY

11.1    The Buyer acknowledge that it is the Buyer's responsibility to test the fuel provided and to ensure that it is proper in all respects prior to the use of such fuel in the Vessel. Accordingly, the Seller shall not be responsible for any damage to the Vessel, including but not limited to its machinery or tanks or their contents caused by use of improper Bunker Fuel.

11.2    Sellers shall not be liable to the Buyer for any of the following:
    (i)    any loss of profit, loss of use or loss of production whatsoever and whether arising directly or indirectly from the performance or non-performance of this Bunker Contract, and whether or not the same is due to negligence or any other fault on the part of the Seller, its servants or agents; and

    (ii)    any consequential loss or damage for any reason whatsoever, whether or not the same is due to any breach of contract, negligence or any other fault on the part of the Seller, its servants or agents, without limitation delay, detention, demurrage, charter hire, crew wages, towage, pilotage, port or wharf charges, lost profits, barge delivery charges and increased costs or expenses for obtaining replacement fuel; and

    (iii)    subject to Clause 11.1, damage to the Vessel or the Buyer's other property or for any other loss sustained by the Vessel, its owners, charterers, underwriters, or other parties in interest, in contract, tort or otherwise, unless the such damage



or loss is directly and solely caused by the negligence of the Seller's employees. In such event, the Seller's liability shall be strictly limited to repair the damage or loss that was directly and solely caused by the negligence of the Seller's employees provided that where the repair requires replacement, the Seller's liability for damage or loss shall be reduced by 20 (twenty) percent of the invoice value of spare parts for each year or fraction thereof in which the replaced part has been in use.

11.3    In no event including supply of defective or improper Bunker Fuel shall the Seller's liability for any loss, damage, claim or other expenditure, however arising under this Bunker Contract and whether caused by negligence or not and whether based in tort or contract, exceed the value of the Bunkers Fuel as set out in the Seller's Invoice. The Buyer undertakes to indemnify the Seller against any claims, losses or costs of whatever kind related to this Bunker Contract instituted by third parties against the Seller to the extent such claims exceeds the Seller's liability towards the Buyer according to this clause 11.

11.4    The Buyer shall fully indemnify, and keep fully indemnified and hold the Seller harmless against any and all liabilities, claims, losses, damages, fines, expenses, penalties whatsoever and howsoever incurred arising out of or in connection with (but not limited to) the delivery of the Bunker Fuel to the Vessel in accordance with the terms of the Bunker Contract, save to the extent that such liabilities, claims, losses, damages, fines expenses, penalties are incurred as a direct consequence of the negligence or omission of the Seller.

## 12. INDEMNITY

12.1    The Buyer shall indemnify and hold harmless the Seller, the fuel barge contractor and their agents and employees from and against all claims, damages, losses and expenses, including attorney's fees, arising out of or resulting from the performance of services or the providing of Bunker Fuel under this Bunker Contract, including claims, damages, losses, penalties or expenses arising under any air, water quality or hazardous waste statute, regulation or ordinance, hereinafter referred to "pollution claims", provided that any such claim, damage, loss or expense:

(i)     is attributable to bodily injury, sickness, disease or death, or to injury to or destruction of tangible property including the loss of use resulting therefrom, or to pollution claims, and

(ii)    is caused in whole or in part by any negligent or intentional act or omission of the Buyers, the Vessel or Vessel interests, their agents or employees or anyone directly or indirectly employed by any of them or anyone for whose acts any of them may be liable, regardless of whether or not such claim, damage, loss, or

13



expense is also caused in part by the Seller, the fuel barge contractor, their agents or employees.

12.2  The Buyer agrees to pay any and all expenses, legal fees and court costs incurred by the Seller:

(i)  to collect and obtain payment of any amount due to the Seller, including but not limited to legal fees and court costs associated with enforcing any maritime lien, attachment, right of arrest, or other available remedy in law, equity or otherwise; and

(ii)  to recover any damages or losses suffered by the Seller as a result of any breach by the Buyer of any provision of this Bunker Contract.

**13. FORCE MAJEURE**

13.1  The Seller shall not be liable for any loss and/or damage of whatever nature resulting from any delay and/or failure in performance under this Bunker Contract for any of the following events (**"Force Majeure Event"**):

(i)  caused by any circumstance beyond the Seller's direct control, and/or

(ii)  if the supply or source of the Bunker Fuel from any facility of production, distribution, storage, transportation or delivery contemplated or intended by the Seller's supplier is disrupted, unavailable or inadequate due to war or war-like situations, riots, strikes, congestion, governmental order or intervention, unavailability of barges or other means of transport or stem, weather, act of God, changed market conditions, or similar situations.

13.2  In the event of a failure of performance as provided in Clause 13.1, the Seller may, but is under no obligation, to source, procure or obtain alternative Bunker Fuel or product, and in such case the Seller shall be entitled to receive from the Buyer payment of any and all additional costs of such performance by the Seller.

13.3  The occurrence of a Force Majeure Event shall not relieve the Buyer of responsibility to make full and timely payment of all amounts payable to the Seller pursuant to Clause 9.

**14. SAFETY**

14.1  It shall be the sole responsibility of the Buyer to ensure that the Vessel, its crew and those responsible for its operation and management observe and comply with all health, safety and environmental laws and regulations with regard to the receipt, handling and use of the Bunker Fuel.

14



## 15. ENVIRONMENTAL PROTECTIONS

15.1    In the event of a spill or discharge, before, during or after supplying the Bunker Fuel, the Buyer and the Vessel shall, at their own expense, immediately take whatever action is necessary to give prompt notice to the official bodies and to affect cleanup. Failing prompt action, the Buyer and the Vessel authorize Seller to conduct and/or contract for such cleanup at the expense of the Buyer and the Vessel. The Buyer warrants that the Vessel is in compliance with all national, state and local statutes, regulations and ordinances, including those requiring proof of financial ability in regard to spills or discharges of oil. The Buyer shall hold the Seller harmless as to any delays, claims, losses, expenses or penalties arising from breach by the Buyer of this warranty, including legal fees.

15.2    The Buyer warrants that the Vessel is in compliance with all national, state and local statutes, regulations and ordinances, including those requiring proof of financial ability in regard spills of oil and hazardous materials. The Buyer shall hold the Seller harmless as to any delays, claims, losses, expenses or penalties arising from breach by the Buyer of this warranty, including attorney fees.

15.3    It is the responsibility of the master of the Vessel to notify the Seller of any conditions, difficulties, peculiarities, deficiencies or defects with respect to engines, boilers, fuel tanks, piping, navigation equipment, mooring lines, tackle, gear, and any other types of equipment, which might jeopardize or impose hazards or problems in connection with handling, mooring, unmooring or bunkering of the Vessel. The Vessel will not be moored at wharf or alongside any other marine loading facilities, or a fuel barge brought alongside the Vessel, unless the Vessel is free of the aforesaid conditions, difficulties, peculiarities, deficiencies or defects.

## 16. DISCLAIMERS OF WARRANTIES AND CONDITIONS

16.1    Any implied warranties and conditions whatsoever, whether statutory or otherwise, including the warranties of merchantability and fitness for a particular purpose or of condition and any oral or implied agreements inconsistent with this Bunker Contract are expressly excluded and disclaimed.

## 17. SECURITY

17.1    Notwithstanding the provisions of Articles 18 and 19, the Seller shall be entitled to avail itself of any and all remedies under law to obtain security for its claims against the Vessel, her owners, its agents, managers, servants, buyers and/or charterers including but not limited to vessel arrest and attachment procedures. Where the Seller elects to take such action, the Seller has the option to submit to the jurisdiction of the Court where security is obtained and to the laws of that jurisdiction.



**18. TERMINATION**

18.1    Notwithstanding anything to the contrary express or implied herein, the Seller (without prejudice to its other rights) may at its sole discretion either terminate this Bunker Contract immediately or immediately suspend delivery under this Bunker Contract until further notice, on notifying the Buyer either orally (confirming such notification in writing) or by notice in writing, if a liquidator, administrator, trustee in bankruptcy, receiver, receiver or manager or equivalent officer is appointed in respect of the assets and/or undertaking of the Buyer, or the Buyer enters into an arrangement or composition with its creditors, or any similar appointment, arrangement or composition is made under any applicable law, or if the Seller has a reason to anticipate any such appointment, arrangement or composition.

**19. GOVERNING LAW AND DISPUTE RESOLUTION**

19.1    Subject to Clause 19.3, this Bunker Contract shall be governed and construed in accordance with the laws of Singapore. The 1980 United Nations Convention on Contracts for the International Sale of Goods (CISG) shall not apply.

19.2    Any dispute arising out of or in connection with this contract, including any question regarding its existence, validity or termination, shall be referred to and finally resolved by arbitration administered by the Singapore International Arbitration Centre ("SIAC") in accordance with the Arbitration Rules of the Singapore International Arbitration Centre ("SIAC Rules") for the time being in force, which rules are deemed to be incorporated by reference in this clause. The seat of the arbitration shall be Singapore. The Tribunal shall consist of three (3) arbitrator(s). The language of the arbitration shall be English.

19.3    The General Maritime Law of the United States shall always apply with respect to the existence of a maritime lien, regardless of the country in which Seller takes legal action. Seller shall be entitled to assert its rights of lien or attachment or other rights, whether in law, in equity or otherwise, in any jurisdiction where the Vessel may be found.

19.4    If any procedure of any nature whatsoever is instituted under Clause 19, in connection with any dispute arising out of this Bunker Contract or to interpret or enforce any rights under this Bunker Contract, the prevailing party shall have the right to recover from the losing party its reasonable costs and attorneys' fees incurred in such proceeding.



## 20. MISCELLANEOUS

20.1    If any part of this Bunker Contract is declared invalid, it shall not affect the validity of the remainder of the Bunker Contract or any part thereof.

20.2    All rights and remedies of Seller hereunder are cumulative, and election of one remedy shall not exclude another.

20.3    This writing supersedes all previous general terms of sale of bunker fuel by the Seller and sets forth the final and exclusive expression of the parties' agreement unless it is modified in writing, which modification must be signed by the Seller. It supersedes all oral or implied agreements. Any disclaimer, notice or other writing by Buyer or the Vessel interests or their agents on the BDN or any other document, seeking unilaterally to alter or amend any part or this Bunker Contract shall be ineffective.

20.4    Barge rates provided to the Buyer for the Buyer's account are based upon normal barge availability. In the event that these facilities are fully committed, other barges, if available, will be engaged at such rates as are applicable.

20.5    Buyer may request modification of the terms of this Bunker Contract no later than when placing its initial order enquiry for Bunker Fuel and the Seller, at its discretion, may raise the prices offered in consideration of such modifications, including any increase in Seller's liabilities thereby.

## 21. NOTICE

21.1    Except where expressly stated otherwise, a notice, demand, request, statement, or other communication under this Bunker Contract shall only be effective if it is in writing.

21.2    Notices, demands, requests, statements or other communications under or in connection with this Bunker Contract shall be sent to a party at the addresses or numbers specified from time to time by the party to whom the notice is addressed.

21.3    Any notice given under or in connection with this Bunker Contract shall be effective only upon actual receipt at the address specified as per Clause 21.2.

21.4    Any notice given under or in connection with this Bunker Contract outside working hours in the place to which it is addressed shall be deemed not to have been given until the start of the next period of working hours in such place.

----------